# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

Orlando Division

Case No.: 6:19-cv-01908-WWB-EKJ

---

WYNDHAM VACATION OWNERSHIP, INC. a Delaware corporation; WYNDHAM VACATION RESORTS, INC., a Delaware corporation, WYNDHAM RESORT DEVELOPMENT CORPORATION; a Oregon Corporation; SHELL VACATIONS, LLC, an Arizona limited liability company; SVC-AMERICANA, LLC, an Arizona limited liability company; and SVC-HAWAII, LLC, a Hawaii limited liability company,

      Plaintiffs,

v.

SLATTERY, SOBEL & DECAMP, LLP, a California limited liability partnership; DEL MAR LAW GROUP, LLP, a California limited liability partnership; CARLSBAD LAW GROUP, LLP, a California limited liability partnership; JL 'SEAN' SLATTERY, an individual and resident of the State of California; PANDORA MARKETING, LLC f/k/a Timeshare Compliance, LLC d/b/a Timeshare Compliance and d/b/a timeshareexitcompanies.com and d/b/a timesharecancellationreviews.com, a Wyoming limited liability company; PANDORA SERVICING, LLC, a Wyoming limited liability company; INTERMARKETING MEDIA, LLC d/b/a Resort Advisory Group, a Wyoming limited liability company; POWER HAUS MARKETING INC., a California corporation; KENNETH EDDY a/k/a Ken Eddy, an individual and resident of the State of Oregon; RICH FOLK, an individual and resident of the State of California; WILLIAM WILSON a/k/a James Wilson a/k/a Bo Wilson, an individual and resident of the State of California; and ANDRIS PUKKE a/k/a Marc Romeo a/k/a Andy Storm, an individual and resident of the State of California,

      Defendants.

## AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts, Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); Shell Vacations, LLC ("SV"); SVC-Americana, LLC ("SVC-Americana"); and SVC-Hawaii, LLC ("SVC-Hawaii") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of Civil Procedure, hereby sue Defendants Slattery, Sobel & DeCamp, LLP ("SSD"), Del Mar Law Group, LLP ("Del Mar"), Carlsbad Law Group, LLP ("Carlsbad"), JL 'Sean' Slattery ("Slattery"), Pandora Marketing, LLC f/k/a Timeshare Compliance, LLC d/b/a Timeshare Compliance and d/b/a timeshareexitcompanies.com and d/b/a timesharecancellationreviews.com ("Pandora Marketing"), Pandora Servicing, LLC ("Pandora Servicing"), Intermarketing Media, LLC d/b/a Resort Advisory Group ("Resort Advisory Group"), Power Haus Marketing Inc. ("Power Haus"), Kenneth Eddy a/k/a Ken Eddy ("Eddy"), Rich Folk ("Folk"), William Wilson a/k/a James Wilson a/k/a Bo Wilson ("Wilson"), and Andris Pukke a/k/a Marc Romeo a/k/a Andy Storm ("Pukke"), and state as follows:

## I.      INTRODUCTION

1.      Defendant Pukke is a well-known perpetrator of false and misleading advertising schemes designed to defraud consumers.  The Federal Trade Commission ("FTC") has been pursuing, and obtaining injunctions against, Pukke for over a decade.  *See In re. Sanctuary Belize Litigation*, Case No. 1:18-cv-03309-PJM, currently pending in the United States District Court for the District of Maryland.

2.      Pukke caught the attention of the FTC for running a fraudulent "non-profit" "debt relief" company.  *See FTC v. AmeriDebt Inc.*, Case No. PJM 03-3317, formerly pending in the

United States District Court for the District of Maryland.  As a result of the *AmeriDebt* action, Pukke was permanently enjoined from engaging in a number of activities.

3.      Pukke immediately began violating the *AmeriDebt* injunction with the launch of his Sanctuary Belize scam.  The FTC discovered Pukke's Sanctuary Belize scam and obtained a temporary restraining order (the "TRO") and the appointment of a temporary receiver (the "Temporary Receiver").   Subsequently, the *Sanctuary Belize* court entered in preliminary injunction, including a freezing of assets, against Pukke and other defendants in the *Sanctuary Belize* litigation.

4.      Pursuant to the TRO, the Temporary Receiver entered the premises located at 3333 Michelson Drive, Suite 500, Irvine, California, the address where Pukke's Sanctuary Belize scam operated.

5.      However, upon entering the 3333 Michelson Drive location, the Temporary Receiver discovered there were additional entities operating at the premises, including "Pandora Marketing LLC dba Timeshare Compliance."

> The Temporary Receiver interviewed the principals[1] of Pandora Marketing LLC who assured the Temporary Receiver their operation had no business relationship with the Receivership Entities.  As discussed later in this report, the Temporary Receiver has determined this assertion is not true.

Temporary Receiver's Report of Activities for the Period from November 6, 2018 through February 21, 2019 (annexed as Exhibit 4 hereinbelow) at 15.

6.      During its yearlong review of the *Sanctuary Belize* defendants, the Temporary Receiver has found substantial cash flows (total hundreds of thousands of dollars) between Pandora Marketing and some of the *Sanctuary Belize* defendants, apparent comingling of funds,

---

[1] Later revealed to be defendants Folk and Wilson.

direct diversions of funds from Pandora to Pukke, and overlapping ownership and control between Pandora Marketing and some of the *Sanctuary Belize* defendants.  Pandora Marketing utilizes the same marketing companies under the same contracts as some of the *Sanctuary Belize* defendants.

7.     The recent Rule 26 disclosures provided by the original defendants in this civil action – SSD, Del Mar, Carlsbad, and Slattery (collectively, the "Lawyer Defendants") – indicate the Lawyer Defendants receive referrals from three sources: (1) "Timeshare Compliance" located at "3333 Michelson Drive, #500, Irvine, CA 92612", (2) Seaside Consultants Group, LLC, and (3) "Resort Advisory Group, LLC" at "26970 Aliso Viejo Parkway, Ste 150[,] Aliso Viejo, CA 92656".

8.     In other words, far from being simple lawyers, the Lawyer Defendants are accepting referrals (that violate the California Bar Rules) generated by companies (Pandora Marketing and Resort Advisory Group) that are intertwined with, comingle funds with, receive funding from, utilize the same marketing as, and have overlapping ownership and control with, a series of companies and individuals currently enjoined from operating by the United States District Court for the District of Maryland pursuant to an ongoing FTC lawsuit.  *See In re. Sanctuary Belize.*  Moreover, the ringleader of this scheme – Pukke – is a well-known operator of scams designed to defraud the consuming public, having previously been forced to forfeit $170,000,000 in assets to the FTC.  *See FTC v. AmeriDebt Inc.*

9.     A flow chart showing the relationship of the various defendants amongst themselves and with various defendants in the *Sanctuary Belize* litigation is annexed hereto as Exhibit 1.

10.    A copy of the *AmeriDebt* permanent injunction against Pukke is annexed hereto as Exhibit 2.

11.    A copy of the *Sanctuary Belize* temporary injunction against Pukke and others is annexed hereto as Exhibit 3.

12.    A copy of the Temporary Receiver's Report of Activities for the Period from November 6, 2018 through February 21, 2019 is annexed hereto as Exhibit 4.

13.    A copy of the Temporary Receiver's Second Court Report Dated July 2, 2019 is annexed hereto as Exhibit 5.

## II.    PARTIES, JURISDICTION, AND VENUE

### A.    <u>The Plaintiffs</u>

18.    Plaintiff Wyndham Vacation Ownership, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

19.    Plaintiff Wyndham Vacation Resorts, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

20.    Plaintiff Wyndham Resort Development Corporation is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

21.    Plaintiff Shell Vacations LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

22.     Plaintiff SVC-Americana, LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

23.     Plaintiff SVC-Hawaii, LLC is a limited liability company organized and existing under the laws of the state of Hawaii with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

**B.      The Defendants**

24.     Slattery, Sobel & Decamp, LLP is a limited liability partnership organized and existing under the laws of the State of California with a principal address at 12250 El Camino Real, Suite 120, San Diego, California 92130.

25.     Del Mar Law Group, LLP is a limited liability partnership organized and existing under the laws of the State of California with a principal address at 12250 El Camino Real, Suite 120, San Diego, California 92130, the same address as SSD.

26.     Carlsbad Law Group, LLP is a limited liability partnership organized and existing under the laws of the State of California with a principal address at 5050 Avenida Encinas, Suite 300, Carlsbad, California 92008.

27.     JL 'Sean' Slattery is an individual, citizen of the State of California and a member of the California Bar.  Slattery lists himself as the 'managing partner' of Carlsbad, the 'managing partner' of SSD, and the 'founding partner' or 'founding member' of Del Mar.

28.     Pandora Marketing, LLC f/k/a Timeshare Compliance, LLC, d/b/a Timeshare Compliance and d/b/a timeshareexitcompanies.com and d/b/a timesharecancellationreviews.com is a limited liability company organized and existing under the laws of the State of Wyoming.  Pandora Marketing previously had a principal address at 3333 Michelson Drive, #500, Irvine, California 92612.  However, Plaintiffs believe that, after the

Temporary Receiver entered the 3333 Michelson Drive address, Pandora Marketing moved its business operations to 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.

29.     Pandora Servicing, LLC is a limited liability company organized and existing under the laws of the State of Wyoming with a principal place of business at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.

30.     Intermarketing Media, LLC d/b/a Resort Advisory Group is a limited liability company organized and existing under the laws of the State of Wyoming.  Intermarketing Media, LLC previously had a principal place of business at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.  Intermarketing Media, LLC subsequently moved its principal address to 27201 Puerta Real, Suite 300, Mission Viejo, California 92691 at approximately the same time that Pandora Marketing moved from 3333 Michelson to 26970 Aliso Viejo Parkway. Despite moving its office, Intermarketing Media, LLC's agent for service of process – Robert Thompson – is located at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.

31.     Power Haus Marketing, Inc. is a corporation organized and existing under the laws of the State of California with a principal address at 3333 Michelson Drive, Suite 500, Irvine, California 92612.  Power Haus Marketing, Inc.'s registered agent for service of process is Cogency Global, Inc., 1325 J Street, Suite 1550, Sacramento, California 95814.  The individuals authorized to accept service by Cogency Global, Inc. are: Erin Upchurch, Mary McIntyre, Connie Mix, Phillip Morado, Amber Smyth, Mai Yang, Christen Vinnola, and Jean Bissell.

32.     Kenneth Eddy a/k/a Ken Eddy is an individual and resident of the State of Oregon with a residential address at 13606 NW 47th Avenue, Vancouver, Washington 98685.  Upon information and belief, Eddy leases an apartment at 50 Palatine, Apartment 108, Irvine, California 92614, an address across the street from the 3333 Michelson address.

33.     Rich Folk is an individual and resident of the State of California and may be found at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.

34.     William Wilson a/k/a James Wilson a/k/a Bo Wilson is an individual and resident of the State of California and may be found at 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California 92656.  Upon information and belief, Wilson may own an apartment at 1019 Costa Pacifica Way, Unit 1109, Oceanside, California 92054.

35.     Andris Pukke a/k/a Marc Romeo a/k/a Andy Storm is an individual and resident of the State of California and may be located at 19612 Sanderson Lane, Huntington Beach, California 92646.

### C.     Subject Matter Jurisdiction

36.     This Court has subject matter jurisdiction over the claims brought herein pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332 as there is complete diversity between the Plaintiffs and the Defendants and the amount in controversy exceeds Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

### D.     Personal Jurisdiction

37.     This Court has personal jurisdiction over the Defendants for the following reasons:

> a.     their actions, as more fully described herein below, are directed at consumers across the country, including consumers in the state of Florida. All Defendants operate websites that are freely accessible from Florida and target consumers in the State of Florida, which involves, *inter* alia, the repeated transmission of files over the Internet in, to, and out of the State of Florida;

b.     they cause false demand letters to be directed to Wyndham in the State of Florida and interfered with Wyndham's business in the State of Florida, all of which involves the repeated use of the wires and mails to transmit correspondence and other items into the State of Florida;

c.     at least some of the Timeshare Contracts and Timeshare Owners at issue in this civil action were entered into in Florida or are Florida residents; and

d.     Defendants committed acts and torts which caused injury to Plaintiffs in Florida.

**E.     Venue**

38.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida, because the Defendants ultimately harm the consuming public and Wyndham in Florida, and Defendants' conduct giving rise to the claims set forth herein occurred in this District.

**F.     Conditions Precedent**

39.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

**III.     SPECIFIC FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

**A.     The Wyndham Entities**

40.     Wyndham is a global leader in the hospitality and vacation ownership industry with properties and a network spanning the world.

41.     Wyndham Vacation Ownership, Inc. is the parent company or ultimate parent company of entities that conduct timeshare sales and development activities throughout the United States: Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, and SV, SVC-Americana and SVC-Hawaii.

42.     As part of its business, WVR, WRDC, SV, SVC-Americana, and SVC-Hawaii enter into timeshare contracts with consumers ("Wyndham Owners").  At the time Wyndham Owners purchase timeshares from WVR, WRDC, SV, SVC-Americana, and/or SVC-Hawaii the Wyndham Owners execute the Timeshare Contracts wherein the Wyndham Owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to Wyndham for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the now-Wyndham Owners agree to pay a pro-rated share of the property taxes to Wyndham which is then submitted by Wyndham to the appropriate local tax collectors.  Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement and become part of the Timeshare Contract.  These Timeshare Contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded.

**B.      Links Between the Various Defendants**

**1.      Relationship between the Lawyer Defendants and the Lawyer Defendants and the other Defendants.**

40.     Slattery lists himself on the Internet as the 'managing partner' and/or 'founding partner' of the three defendant law firms: SSD, Del Mar, and Carlsbad.

41.     Slattery controls SSD, Del Mar, and Carlsbad and their respective activities.

42.     SSD and Del Mar share the same address: 12250 El Camino Real, Suite 120, San Diego, California 92130.

43.     Slattery formed Del Mar with another attorney, non-party John Donboli, Esq. ("Donboli").  Slattery and Donboli know each other from when they were both associates at the law firm now known as Gordon Rees et al.

44.     Slattery and Donboli have had a "falling out" and are currently attempting to conclude the business of Del Mar and have sued each other over legal fees associated with Del Mar.  As a result, Slattery moved his timeshare exit work from Del Mar to the newer Carlsbad.

45.     Carlsbad has, at various points, briefly used two different domain names for hosting its website: <carlsbadlawgroup.com> and <carlsbadlg.com>.  Presently, <carlsbadlg.com> displays a mostly empty WordPress blog.

46.     SSD owns the <carlsbadlg.com> domain name.

47.     According to papers filed by Carlsbad attorneys in non-timeshare cases, the domain name their email utilizes is <carlsbadlg.com>.

48.     According to that same paper, "effective immediately Slattery, Sobel & DeCamp, LLP has changed its firm name to Carlsbad Law Group, LLP."  *See U.S. v. Zavala et al., Case No. 18-cr-03058-BAS, United States District Court for the Southern District of Florida, D.E. No. 82.*

49.     When the original complaint in the above-captioned civil action was filed, the domain <carlsbadlawgroup.com> was inactive, a fact set forth in the original Complaint.  Since the filing of the Complaint, Slattery and Carlsbad have caused a webpage to appear at <carlsbadlawgroup.com>.  This new webpage makes no mention of legal services related to timeshares.

50.     The Lawyer Defendants share a phone number: 858-793-6244.  This telephone number is listed on SSD's website and as the contact number on papers and pleadings signed by Del Mar and Carlsbad attorneys.

51.     The Lawyer Defendants have admitted in their Rule 26 disclosures that they receive referrals from Pandora Marketing and Resort Advisory Group.

>           **2.      Relationship between Pandora Marketing, the other Defendants, and the defendants in *In re Sanctuary Belize*.**

52.     Eddy, Folk, and Wilson are all former Wyndham employees.

53.     Eddy, Folk, and Wilson established Pandora Marketing and Pandora Servicing.

54.     Pandora Marketing and Pandora Servicing are shell companies of each other and, upon information and belief, are virtually indistinguishable from one another.   Pandora Marketing and Pandora Servicing share the same management and operate out of the same location.

55.     Pandora Marketing has five owners:

>    a.   Spectrum Holdings Irrevocable Trust owns 20%;

>    b.   "VCF, LLC" owns 40%;

>    c.   an individual named Michael Santos ("Santos") owns 20%; and

>    d.   Pukke owns 20%.

56.     Pukke is a well-known fraudster who has been pursued by the FTC for almost 17 years.

57.     Pukke is currently being sued by the FTC for perpetuating "the largest overseas real estate investment scam the FTC has ever targeted."

>           According to the FTC, the scam was established by Andris Pukke,
>           a recidivist scammer currently living in California, and he

- 12 -

perpetuated it even while serving a prison sentence for obstruction of justice.

The alleged scheme took in more than $100 million, marketing lots in what supposedly would become a luxury development in Central America known by several names, including Sanctuary Belize, Sanctuary Bay, and The Reserve. According to the FTC, the defendants duped consumers into buying Sanctuary Belize lots by falsely promising that the development would include luxury amenities and be completed soon, and that the value of the lots would rapidly appreciate.

FTC Press Release dated November 8, 2018, located at https://www.ftc.gov/news-events/press-releases/2018/11/ftcs-request-court-halts-massive-sanctuary-belize-real-estate (last accessed Jan. 9, 2020).

58.     Pukke was the 'ring leader' of the scam at issue in *In re Sanctuary Belize* and owned and/or controlled many of the companies listed as defendants in that litigation.

59.     As set forth hereinabove, Pukke owns 20% of Pandora Marketing.

60.     Pukke directly and personally received at least $22,400 in payments from Pandora Marketing.

61.     Three of the companies owned and/or controlled by Pukke that are defendants in *In re Sanctuary Belize*, Buy International, Inc. ("Buy International"), Global Property Alliance, Inc. ("GPA"), and Power Haus provide further links between the Defendants in this civil action and the defendants in *In re Sanctuary Belize*.

62.     With respect to Buy International, those links are as follows:

    a.   Pandora Marketing made a $100,000.00 payment to Buy International which was recorded in Buy International's books as a "management fee";

    b.   Buy International made payments totaling approximately $1,840,000.00 to Power Haus; and

  c. Buy International, Pandora Marketing, and, upon information and belief, Pandora Servicing were all co-located at 3333 Michelson.

63. With respect to GPA, the links are as follows:

  a. GPA's books list an account receivable from Pandora Marketing in the amount of $166,055.00 for an unknown purpose;

  b. GPA made a payment to Power Haus in the amount of $135,293.00 which was recorded as "due from Pandora Marketing"[2]; and

  c. GPA, Pandora Marketing, and, upon information and belief, Pandora Servicing were all co-located at 3333 Michelson.

64. With respect to Power Haus, those links are as follows:

  a. Power Haus received the $135,293.00 payment from GPA that was recorded as "due from Pandora Marketing";

  b. Power Haus listed Pandora Marketing and GPA as 'affiliates' of Power Haus that benefit from the marketing activities of Power Haus on an amendment to a media purchase agreement between Power Haus and a direct marketing company named Harvas Edge, LLC;

  c. Power Haus made payments totaling approximately $164,400.00 to Pandora Marketing; and

  d. Power Haus, Pandora Marketing, and, upon information and belief, Pandora Servicing were all co-located at 3333 Michelson.

65. Apparently pursuant to the agreement set forth in Paragraph 63(b), *supra*, Harvas Edge, LLC billed for $980,996.65 in advertising purchases for Pandora Marketing, more

---

[2] GPA made payments of at least $1,410,000.00 to Power Haus; it is presently unknown whether these amounts include the $135,293.00 set forth in Paragraph 61(b) and whether any portion of the $1,410,000.00 is attributable to, or for the benefit of, Pandora Marketing.

specifically $99,652.65 for radio advertisements and $881,344.00 for short form television advertisements.   Records show that Pandora Marketing paid only $816,643.50 for those advertising purchases.   Wyndham believes the $164,353.15 difference was paid for by one or more of the *In re Sanctuary Belize* defendants.

66.     Additionally, besides Pukke, there are a number of individuals who are defendants in *In re Sanctuary Belize* that link the Defendants with the defendants in *In re Sanctuary Belize*.

67.     First, Angela Chittenden ("Chittenden"), who is Pukke's domestic partner, links a number of the Defendants herein to the defendants in the *In re Sanctuary Belize* litigation.   In addition to her relationship with Pukke – an owner of Pandora Marketing who received direct payments therefrom – those links are as follows:

a.   Chittenden received approximately $1,200,000.00 in payments from Power Haus (which received payments from GPA that were recorded as "due from Pandora Marketing"), upon information and belief these funds were used to renovate and otherwise improve the Huntington Beach, California home Chittenden shares with Pukke; and

b.   Pandora Marketing made a payment of $125,000.00 to an entity named Online Wedding Solutions, Inc. to partially fund a purchase of a 21.829% ownership interest in Online Wedding Solutions, Inc. for Chittenden.

68.     Second, Santos links a number of the Defendants herein to the defendants in the *In re Sanctuary Belize* litigation, as follows:

a.   Santos is a defendant in the *In re Sanctuary Belize* litigation;

b.   Santos is the Registered Agent of Pandora Marketing;

c.  Santos owns 20% of Pandora Marketing;

d.  Santos is the Director of Business Development for GPA;

e.  Santos is the President of Alternative Investment Properties; and

f.  Santos maintained an email address with Buy International (michael@buyinternational.com).

69.  Third, an individual named Rod Kazazi ("Kazazi") links a number of the Defendants herein to the defendants in the *In re Sanctuary Belize* litigation, as follows:

a.  Kazazi is a defendant in the *In re Sanctuary Belize* litigation;

b.  Kazazi is the Treasurer of Pandora Marketing;

c.  Kazazi is or was the Chief Operating Officer of GPA; and

d.  Kazazi is or was an officer or owner of Buy International.

**3.  Relationship Between Resort Advisory Group and the Other Defendants.**

70.  Resort Advisory Group is either an alter-ego of Pandora Marketing and Pandora Servicing or is operated in conjunction and coordination with them.

71.  Resort Advisory Group previously operated out of 26970 Aliso Viejo Parkway, Suite 150, Aliso Viejo, California, the same address where Pandora Marketing, Pandora Servicing, Eddy, Folk, and Wilson currently operate.

72.  "Resort Advisory Group" is a trade name registered in the State of Wyoming to Intermarketing Media LLC.

73.  Intermarketing Media LLC is a company organized under the laws of the State of Wyoming and authorized to do business in the State of California.

74.     According to the public records of California, the manager or member of Intermarketing Media LLC is "Spectrum Holdings" located at 211 S. White Horse Pike, Audubon, New Jersey 92656.

75.     "Spectrum Holdings Irrevocable Trust", which owns 20% of Pandora Marketing, is also located at 211 S. White Horse Pike, Audubon, New Jersey 92656.

76.     211 S. White Horse Pike, Audubon, New Jersey is the address for the offices of Charlene Cathcart, Esq.

77.     Upon information and belief, Charlene Cathcart, Esq. previously resided at, or had an office at, 1800 Thibodo Road, Suite 100, Vista, California 92081.

78.     1800 Thibodo Road, Suite 100, Vista, California 92081 is the original address for Resort Advisory Group/Intermarketing Media, LLC.

79.     Thus, it appears that the same presently unknown entity "Spectrum Holdings" has an ownership interest in both Pandora Marketing and Resort Advisory Group.  The identity of and details regarding "Spectrum Holdings" is presently unknown due to Defendants' active efforts to conceal that information.

80.     Additionally, the websites for Pandora Marketing's Timeshare Compliance (timesharecompliance.com) and Intermarketing Media's Resort Advisory Group (resortag.com) contain substantial similarities and, in some respects, are direct copies of each other:

    a.  both websites contain similar, and in some instances identical, "stock art";

    b.  the substantive text of the Frequently Asked Questions sections of both websites (timesharecompliance.com/faqs/ and resortag.com/faqs/) are identical, including making the same mistaken duplications:



; and

    c.   the "sign up" boxes on both websites are substantially identical:





81.     Additionally, both Pandora Marketing and Resort Advisory Group claim, identically, to have brought the "Personal Credit" process of "United Doc Prep" "in-house":



United Doc Prep is a premier service provider assisting clients in the areas of Business Formations, Property Deeds, Residential Lease Agreements, Name Changes, Power of Attorney, Intellectual Property, Personal Credit, and other legal documentation or process needs. United Doc Prep has a proven track record in supporting everyday people in the processing requirements to assist in achieving their goals.

After working with many companies to upgrade our services and help in our commitment to advocacy and gaining freedom for our clients; Timeshare Compliance has decided to not only partner with United Doc Prep but to bring their Personal Credit process in-house.  We have found a synergistic advantage in being able to connect both sides for the betterment of our clients. With the changes in the industry and the world fiscally, it just makes sense in a world that doesn't always seem to make sense.

While Timeshare Compliance works in its process to resolve your contractual issues, the use of United Doc Preps' personal credit processes will make sure that your credit is not left in the dark. If qualified, ask your Analyst about United Doc Prep.

United Doc Prep is a premier service provider assisting clients in the areas of Business Formations, Property Deeds, Residential Lease Agreements, Name Changes, Power of Attorney, Intellectual Property, Personal Credit, and other legal documentation or process needs. United Doc Prep has a proven track record in supporting everyday people in the processing requirements to assist in achieving their goals.

After working with many companies to upgrade our services and help in our commitment to advocacy and gaining freedom for our clients; Resort Advisory Group has decided to not only partner with United Doc Prep but to bring their Personal Credit process in-house.  We have found a synergistic advantage in being able to connect both sides for the betterment of our clients. With the changes in the industry and the world fiscally, it just makes sense in a world that doesn't always seem to make sense.

While Resort Advisory Group works in its process to resolve your contractual issues, the use of United Doc Preps' personal credit processes will make sure that your credit is not left in the dark. If qualified, ask your Analyst about United Doc Prep.



82.     Because the relationships between the Defendants and other non-parties set forth in Paragraphs 40 through 81 is complex, a chart illustrating these links is annexed hereto as Exhibit 1.

83.     The Temporary Receiver's reports detailing the various financial transactions set forth in Paragraphs 40 through 81 are annexed hereto as Exhibits 4 and 5.

C.      **The Timeshare Exit Industry**

84.     The Defendants operate in conjunction as a timeshare exit company.

85.     Timeshare ownership is a contractual relationship.  Wyndham has valid and binding contracts (the "Timeshare Contracts") with identifiable Wyndham Owners.  The Timeshare Contracts control the benefits and obligations of timeshare ownership between the Wyndham Owners and Wyndham.

86.     Timeshare exit companies prey upon unsuspecting timeshare owners, including Wyndham Owners, inducing them into breaching their valid and binding Timeshare Contracts, causing harm to both the Wyndham Owners and Wyndham.  This scheme is not limited to just Wyndham Owners and has targeted the timeshare industry as a whole.

87.     Timeshare exit businesses typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with damaged or ruined credit.  To make matters worse, many consumers that may have an issue with their timeshare product could have the issue resolved by simply contacting the timeshare developer, such as Wyndham, directly or utilizing one of the many programs created by the timeshare industry for consumers, such as Wyndham Cares or the Wyndham Ovation® program.

88.     Timeshare exit scams are usually organized in one of a few different manners. One of the common organizational structures is two groups working together: the marketing group and the lawyer group.  The marketing group engages in advertising and promotional

- 20 -

activities, attempting to obtain new customers, including Wyndham Owners, and lure them into the scheme.  The lawyer group exists to lend a false air of legitimacy to the scheme and to effectively block communication between Wyndham and the Wyndham Owners, so the Wyndham Owners are prevented from learning the reality of what is happening to them.

89.     Most state bars have rules prohibiting certain kinds of attorney advertising, such as guaranteeing results and offering a "100% money back" guarantee.  In California the applicable rule is Rule 1-400 of the Rules of Professional Conduct.

90.     However, if the 'services' that are being offered were truthfully advertised – that is, that there is no guarantee of success and that a Wyndham Owner may have their timeshare interested foreclosed upon and that such a foreclosure would count as an 'exit' and not entitle the Wyndham Owner to the "100% money back" guarantee – no reasonable consumer would retain the 'services' being offered.  Thus, the lawyer group needs a marketing arm in order to attempt to circumvent legal restrictions on lawyer advertising.

91.     Likewise, the co-conspirators require a lawyer or group of lawyers to fully effectuate the scheme.  Amongst other roles, the lawyer group lends a false air of legitimacy to the overall scheme by allowing the marketing group to advertise that they work with attorneys, making the operation appear legitimate.  Often times, the lawyer group is advertised as part of a "team of professionals" utilized by the marketing group.  Additionally, the lawyer group is utilized to send 'demand letters' to Wyndham and claim that the Wyndham Owners are represented by counsel, thereby preventing Wyndham from having direct communication or contact with its owners and permitting the timeshare exit company to fully control the messaging provided to the Wyndham Owners.

92.     Unfortunately for the Wyndham Owners, the "services" such timeshare exit companies sell and/or provide typically result in an outcome very different than what is promised.

93.     Upon being retained, the timeshare exit company instructs, deceives, induces, or persuades Wyndham Owners to stop fulfilling their contractual obligations under the Timeshare Contracts, as a means of facilitating the "exit", "cancellation", or "transfer."  Even if they state otherwise in writing, the timeshare exit company instructs, deceives, induces, or persuades Wyndham Owners to stop making payments under the Timeshare Contracts.  There are three purposes to doing this:

a.  it helps justify the fees charged by claiming that the Wyndham Owner is saving money by not making payments to Wyndham as required by the Timeshare Contracts;

b.  it diverts the funds of the Timeshare Owners from Wyndham to the timeshare exit company, causing Wyndham damages; and

c.  it ensures a Wyndham Owner will go into default, and foreclosure, on their Timeshare Contract, allowing the timeshare exit company to claim success at "exiting" a Wyndham Owner from their Timeshare Contract, a false and misleading characterization which harms the Wyndham Owner.

94.     It is not disclosed to the Wyndham Owners the consequences of ceasing payments, or that their "cancellation" and "exit" will result in an unlawful breach of the Timeshare Contracts due to non-payment, leading to a non-judicial foreclosure of their timeshare interests.

95.     Nevertheless, after the Timeshare Contracts are foreclosed, the timeshare exit company then misrepresents to these former Wyndham Owners that they were successful in "cancelling" or "exiting" their Timeshare Contracts.

96.     Alternatively, a surrender or deed-in-lieu may be negotiated on behalf of Wyndham Owners, while failing to inform the Wyndham Owners that doing so also has substantial negative impacts on the credit and finances of Wyndham Owners.

97.     Cancellation or rescission of a contract is very different in nature than a breach and termination.  But Defendants advertise the former only to mislead Wyndham Owners into the latter.

98.     Under the Florida Statutes, the "cancellation" of a Timeshare Contract is a specific, non-waivable rescission right held by Wyndham Owners that can be exercised within a certain time period following the execution of a Timeshare Contract.  *See* Fla. Stat. § 721.10.  It is not a service that can be advertised, sold, or provided in commerce.

**D.     Slattery, SSD, Del Mar, and Carlsbad are the Law Group of a Timeshare Exit Company**

99.     As set forth above, SSD, Del Mar, and Carlsbad are all linked together and are all being run by Slattery.  It is unusual for one law firm to own the website for another law firm and share a telephone number with yet a third law firm.

100.    Prior to the filing of the original Complaint in the above-captioned civil action, none of SSD/Del Mar/Carlsbad had any substantial or clear advertising.  Indeed, Carlsbad lacked even a functional webpage at this time.

101.    Yet, despite the lack of any clear or obvious direct advertising (that is advertising conducted directly by SSD/Del Mar/Carlsbad and not advertising conducted on their behalf or by a third-party), SSD/Del Mar/Carlsbad has sent Wyndham approximately demand letters for at

least 199 Wyndham Owners who are residents of the following states: Arkansas, Arizona, California, Washington, D.C., Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, Mississippi, North Carolina, Nebraska, New Hampshire, New Jersey, New York, Nevada, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin.

102.    According to the Lawyer Defendants' Rule 26 disclosures, they have at least 270 files for Wyndham Owners.  Despite having 270 files for Wyndham Owners alone, the Lawyer Defendants disclosures list only three attorneys: Slattery, David Hall, and Trevor Bowen.

103.    Wyndham has been unable to locate a single attorney working for SSD/Del Mar/Carlsbad who is admitted to practice in the State of Florida, despite their sending hundreds of demand letters to Wyndham in Orlando regarding the Timeshare Contracts, many of which are either substantially or entirely controlled by Florida law.

104.    SSD/Del Mar/Carlsbad routinely send demand letters to Wyndham, including nonsensical and baseless allegations of violations of California law when none of Wyndham, the Wyndham Owner, or the Timeshare Contract at issue have any connection to the State of California, and then do little to nothing to follow-up on those demand letters.

105.    SSD/Del Mar/Carlsbad send demand letters to Wyndham and then do little to nothing to follow-up on those demand letters.

106.    Thus, SSD/Del Mar/Carlsbad show all the signs of being a lawyer group affiliated with a marketing group as part of a larger timeshare exit scam.

     E.     **That Timeshare Exit Company is Pandora and Resort Advisory Group.**

107.    In their Rule 26 disclosures, the Lawyer Defendants admit that they receive referrals from three different sources, two of which are Pandora Marketing and Resort Advisory Group.

108.    Thus, consumers, including Wyndham Owners, who are solicited by Pandora Marketing, Pandora Servicing, and Resort Advisory Group are funneled to, at least, the Lawyer Defendants.

109.    Annexed hereto as Exhibit 6 is a presentation showing the internal structure of Pandora Marketing. The presentation states that Pandora "[s]erves as the liaison between clients and attorneys", "[p]repares necessary documents for the Attorney", and "[p]rovides [p]eriodic updates of the [t]imeshare cancellation progress". Thus, there is no attorney-client relationship between the Lawyer Defendants and their Wyndham Owner "clients" because Pandora Marketing is an unnecessary, non-lawyer third-party participant in the communications between the Lawyer Defendants and their Wyndham Owner "clients".

## IV.    PANDORA MARKETING, PANDORA SERVICING, AND RESORT ADVISORY GROUP ENGAGE IN SUBSTANTIAL FALSE AND/OR MISLEADING ADVERTISING.

110.    Pandora Marketing, Pandora Servicing, and Resort Advisory Group engage in substantial false and/or misleading advertising on the internet, in television advertising, and through other means.

     A.     **Pandora Marketing and Pandora Servicing Run Fraudulent 'Rating' Websites.**

111.    Pandora Marketing and Pandora Servicing own and/or run two timeshare exit company 'rating' websites: www.timeshareexitcompanies.com and www.timesharecancellationreview.com (collectively, the "Ratings Websites").

112.    The Ratings Websites are designed to appear as if they are independent websites providing information and resources to the consuming public:



(https://www.timeshareexitcompanies.com/about-us/, last accessed Jan. 9, 2020)



(https://www.timesharecancellationreview.com/sample-page, last accessed Jan. 9, 2020).

113.    Neither    of    those    statements    are    true.    Pandora    Marketing, timeshareexitcompanies.com    and    timesharecancellationreview.com    are    actually    all    the    same company.

114.    In their "sign up" box on the timesharecompliance.com website, Pandora Marketing discloses that it is, in fact, timeshareexitcompanies.com:

* By providing my contact information I am giving Pandora Marketing LLC, DBA Timeshare Compliance (TimeshareCompliance.com and TimeshareExitCompanies.com) permission to contact

115.    While    Pandora    Marketing    never    discloses    that    it    is    also
timesharecancellationreview.com,              timesharecancellationreview.com              and
timexhareexitcompanies.com utilize the same toll-free telephone number: 1-844-485-1213.

116.    Additionally, timeshareexitcompanies.com states that its goal is "to help
timeshare owners find a reputable timeshare exit company to work with":

**OUR GOAL**

Our goal is to help timeshare owners find a reputable timeshare exit company to work with. We like to recommend timeshare exit companies that offer a no up front fee escrow payment option, so you are protected from scams. Contact us to receive a free timeshare exit consultation.

117.    This advertisement is false and/or misleading because the goal of the website is
not to "help timeshare owners find a reputable timeshare exit company to work with", the goal of
the website is to drive consumers, including Wyndham Owners, to other websites owned by the
same underlying company – Pandora Marketing.

118.    Both    timesharecancellationreview.com    and    timeshareexitcompanies.com    list
'Timeshare  Compliance' – which  is  actually  Pandora  Marketing – as  a  'recommended
company'.[3]

119.    Thus, Pandora Marketing has created a series of allegedly 'independent' websites
that  are  designed  to  recommend  itself.   The  Ratings  Websites  are  false  and/or  misleading
because they are designed to give the appearance of being somewhat independent when they are,
in fact, all the same company.

---

[3] These websites also list Seaside Consultants Group ("Seaside") as a 'recommended timeshare exit company'.
Seaside is the third exit company the Lawyer Defendants disclosed as a referral source.

120.     Additionally, the Ratings Websites are false and/or misleading through omission. Both of the Ratings Websites contain the same disclaimer:

**Disclosure:** We receive compensation if you choose to speak to one of the recommended timeshare exit companies mentioned here. The following information is for educational purposes and is not to be considered professional or legal advice.

121.     This "disclaimer" is false and/or misleading because, as it pertains to Pandora Marketing, the Ratings Websites are, in fact, Pandora Marketing – there is no difference between them.

122.     Similarly, timesharecancellationreview.com falsely and/or misleadingly advertises that Pandora Marketing is a "partner":

TimeshareCancellationReview.com partners with some timeshare cancellation companies mentioned on this website. We do our best to only recommend the the most trustworthy companies. We currently receive a referral commission for the companies below. We receive compensation if you choose to click a link on our website and visit their website. We also receive compensation if you speak with our phone center and we are able to refer you to one of the companies shown below.

**Pandora Marketing LLC, DBA Timeshare Compliance**

123.     This     advertisement     is     false     and/or     misleading     because timesharecancellationreview.com and Pandora Marketing are not "partners", they are one-and-the-same.

124.     Finally, the Ratings Websites are false and/or misleading by omission for failing to disclose that they are owned and operated by Pandora Marketing.  The Ratings Websites claim to review various timeshare exit companies but never disclose that they are, themselves, the timeshare exit company (Pandora Marketing) that they most highly recommend.  The omission of this critical information is material as disclosure of the fact that the Ratings Websites are simply "fronts" that Pandora Marketing is utilizing to recommend itself would destroy the appearance that the Ratings Websites are attempting to "help timeshare owners find a reputable

timeshare exit company to work with."  They are not.  They are, in fact, trying to drive traffic to Pandora Marketing.

125.    Overall, the Ratings Websites are false and/or misleading.

**B.    The Ratings Websites Contain Additional False and/or Misleading Advertisements.**

126.    While the Ratings Websites purport to review and rate various timeshare exit companies, they are, in fact, rigged to drive consumers, including Wyndham Owners, to Pandora Marketing's Timeshare Compliance.

127.    The Ratings Websites will only recommend – with one notable exemption, Wesley Financial – timeshare exit companies that offer a "no up-front fee escrow payment option".

128.    Pandora Marketing and Resort Advisory Group both offer "no up-front fee escrow payment options" and appear to have pioneered that 'concept'.

129.    Thus, the Ratings Websites are again false and/or misleading because they are 'rigged' to only recommend themselves.

130.    Moreover, the "no up-front fee escrow payment options" are illusory.  What is not disclosed to the consumer is that Pandora Marketing and Resort Advisory Group both charge substantial premiums to utilize the "escrow payment options".  These premiums are substantial in order to discourage consumers from actually utilizing the "escrow payment options".  Thus, Pandora Marketing utilizes the Ratings Websites to promote the "escrow payment options" which Pandora Marketing and Resort Advisory Group then make so expensive as to deter anyone from using those options.  This is not disclosed to consumers until late in the sales process, a tactic that is commonly referred to as a "bait-and-switch".

- 29 -

C. **The Ratings Websites Falsely and/or Misleadingly Advertise the Age of Pandora Marketing.**

131.    The Ratings Websites, as well as Pandora Marketing's other webpages and advertisements, advertise Pandora Marketing as having "been in business since 2012".  This is false and/or misleading because, while the limited liability company may have been formed in 2012, it was not "in business" until much later.

132.    Pandora Marketing, LLC is what is commonly known as a "shelf" company, a company that is formed and then "put on the shelf" to allow it to "age".  The purpose of this practice is to make companies appear older – and thus more capable and trustworthy – than they actually are:

> Wyoming Corporate Services will help clients create a company, and more: set up a bank account for it; add a lawyer as a corporate director to invoke attorney-client privilege; even appoint stand-in directors and officers as high as CEO. Among its offerings is a variety of shell known as a "shelf" company, which comes with years of regulatory filings behind it, lending a greater feeling of solidity.
>
> "A corporation is a legal person created by state statute that can be used as a fall guy, a servant, a good friend or a decoy," the company's website boasts. "A person you control... yet cannot be held accountable for its actions. Imagine the possibilities!"

*Special Report – A little house of secrets on the Great Plains: SHELL GAMES: A Reuters Investigation*, Reuters News Service, available at https://www.reuters.com/article/oukwd-uk-usa-shell-companies-idAFTRE75R22L20110628 (last accessed Jan. 9, 2020).

133.    Pandora Marketing was formed by Wyoming Corporate Services out of its infamous 2710 Thomas Avenue address.

134.    Pandora Marketing did not actually come into the control of any of the defendants until June of 2016 when Wilson was installed as the managing member.

135.    Thus, Pandora, through its various websites, including the Ratings Websites, falsely and/or misleadingly advertises the "age" of Pandora Marketing, making it appear to have been operating in business for nearly twice as long as it has actually operated.

**D.    Pandora Marketing Falsely and/or Misleadingly Advertises Through Its "Compliance" Webpage.**

136.    The Ratings Websites specifically reference the "compliance" page of Pandora Marketing's Timeshare Compliance webpage, stating that it "is unique and not something we've seen on any other timeshare company's website…[t]hey've even gone so far as to cite their sources with links to websites with more information about the laws they reference. **The company gets another +1 from us for this detailed analysis of the law.**" https://www.timeshareexitcompanies.com/timeshare-compliance-review/ (emphasis in original).

137.    The    "compliance"    webpage,    which    is    located    at https://timesharecompliance.com/timeshare-cancellation-attorneys/, is nothing but a series of false and/or misleading advertisements.

138.    The "compliance" webpage is broken into fifty separate links, one for each state. Clicking on a link creates a 'pop-out box' allegedly containing information on that state's timeshare laws and a statement about how Pandora Marketing will help the consumer.  None of the statements are accurate.

139.    For example, clicking on the first state (Alabama) reveals the following text:



If you want to cancel a timeshare that you purchased in Alabama, Timeshare Compliance can help. Our specialists, analysts, and attorneys have extensive experience with timeshare cancellation in every state. We're particularly well versed in Alabama, where specific laws protect timeshare purchasers.

140.    There is no law in Alabama that allows the cancellation of a timeshare under any and all circumstances, which is what Pandora Marketing advertises on its Timeshare Compliance website.   For example, a video on the Timeshare Compliance website states that Pandora Marketing can help if a consumer simply "feels they overpaid and just want out".  Nothing in the Alabama statute allows a timeshare owner to cancel their timeshare contract for "just want[ing] out".

141.    Advertisements regarding other states are even more egregious.  The Alaska link on the "compliance" page displays the following text:

> At Timeshare Compliance, we are exceptionally skilled at canceling timeshare contracts for clients who purchased in Alaska. Our attorneys are well versed in the code that pertains to timeshare contracts. In Alaska, laws governing timeshare cancellation are codified at Title 34, Chapter 08, Section 550. By understanding those laws of how to cancel timeshare contracts, our team at Timeshare Compliance serves clients who want to cancel their timeshares.

142.    Alaska Statute 34.08.550 states, in its entirety:

> If the declaration provides that ownership or occupancy of a unit is or may be in time shares, the public offering statement must disclose, in addition to the information required by AS 34.08.530 ,
>
> (1) the number and identity of units in which time shares may be created;
>
> (2) the total number of time shares that may be created;
>
> (3) the minimum duration of any time shares that may be created;
>
> (4) the extent to which the creation of time shares will or may affect the enforceability of the lien of the association for assessments under AS 34.08.470 ;
>
> (5) any restraint on the power of the purchaser of the time-share unit to transfer the interest in the time-share unit;

> (6) whether the time-share unit is included in an exchange program, the present cost and a good faith estimate of the future cost to the purchaser from the exchange program; and
>
> (7) whether the purchaser is required to become a member of the exchange program.

Nothing in this statute permits the cancellation of a timeshare interest.

143.    Another example is clicking on the link for Hawaii, which displays:



If want to cancel a timeshare contract in Hawaii, contact Timeshare Compliance. Our team is well versed in all laws that govern timeshare contracts in Hawaii. Those laws are codified in the Hawaii Revised Statutes. The relevant statures are in Title 28, which pertains to property. At Timeshare Compliance, we pay particular attention to those laws:

144.    The only reference to "timeshare" in Hawaii Statutes Title 28 is Section 503B, which creates the "Time Share Commissioners of Deeds".

145.    The "Compliance" webpage is nothing but one giant false and/or misleading advertisement containing 50 separate false and/or misleading advertisements, all designed to create the impression that Pandora Marketing (and the Lawyer Defendants, whom are referenced by implication as part of the "team") have some special skill, strategy, and/or legal basis to cancel timeshare contracts, including Wyndham Contracts, for any reason when they, in fact, do not.

**E.    The Language of the Pandora Marketing and Resort Advisory Group Websites is False and/or Misleading.**

146.    Because they are copies of each other, both the Pandora Marketing and Resort Advisory Group websites make the same false and/or misleading advertisements.

147.    Both websites make the following statement:

> **_ Will Timeshare Compliance completely remove my liability from the contract?**
>
> Yes. Our team at Timeshare Compliance has a proven track record of persuading developers to exit timeshare contracts. We will remove all liability from your timeshare contract. You will no longer be responsible for maintenance fees, assessment fees, or payments on debts. Your heirs will no longer be responsible for any liability. You will no longer have any liability for your timeshare contract.

148.    This advertisement is false and/or misleading because it states that Pandora Marketing and/or Resort Advisory Group will absolutely and unequivocally extinguish "any liability for your timeshare contract" and that they "will remove all liability from your timeshare contract" when, in fact, no such ability exists.

149.    The websites also state:

> **− What will be necessary for us to use your service?**
>
> Provide the information we need to accelerate our proven, proprietary strategy of resolving timeshare contracts. You may call us at 1-800-705-6856 and one of our specialists will call you to begin gathering the information our analysts and other professionals will need. They rely upon that information to begin the process of resolving your timeshare contract. Or you may enter your email information and we will send you a free book that explains our process. You can fill in the information requested and return the documentation we need to start.

150.    This advertisement is false and/or misleading because Pandora Marketing and Resort Advisory Group do not have any "proprietary strategy of resolving timeshare contracts".

151.    The websites also state:

> **− How can I remove liability for my heirs on my timeshare?**
>
> Timeshare Compliance will remove all liability from your timeshare contract. Upon the successful resolution of your contract, we will provide you with written documentation from the developer showing that the contract has been resolved and there is no further liability.

152.   Once again, this advertisement is false and/or misleading because there is no absolute way to "remove all liability from your timeshare contract".

153.   The advertisements set forth in Paragraphs 110 through 152 are hereinafter collectively referred to as the "False and/or Misleading Advertisements".

**COUNT I**
**False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against Pandora Marketing, Pandora Servicing,
Resort Advisory Group, Pukke, Eddy, Folk, and Wilson)

154.   Wyndham adopts and realleges paragraphs 1 through 153 above as if fully set forth herein.

155.   This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

156.   Pandora Marketing and Resort Advisory Group willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The False and/or Misleading Advertisements incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

157.   The False and/or Misleading Advertisements were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for Defendants' own financial gain, for the purpose of influencing consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

158.    Pandora Servicing is nothing but an alter-ego shell of Pandora Marketing and is under common control with Pandora Marketing.  Pandora Servicing participates in, and reaps the benefit of, the false and/or misleading advertisements described herein.  Pandora Servicing is therefore liable for the actions of Pandora Servicing.

159.    Pukke is personally and individually liable for the actions of Pandora Marketing and Resort Advisory Group as he is the architect of the overall scheme, directs the activities of the other Defendants, and has ownership in, and control over, Pandora Marketing.

160.    Eddy, Folk, and Wilson are each personally and individually liable for the actions of Pandora Marketing as they are the creators and managers of Pandora Marketing and each personally and individually direct and participate in the activities of Pandora Marketing.  Indeed, they are each, individually, and together, the driving force behind Pandora Marketing. Moreover, Eddy, Folk, and Wilson are repeatedly referenced in the False and/or Misleading Advertisements on Pandora Marketing's and Resort Advisory Group's websites, both of which refer to "[o]r leadership team has more than 50 years of combined experience of working in the timeshare industry."  Eddy, Folk, and Wilson are that leadership team, all three being former Wyndham employees.

161.    Pandora Marketing, Pandora Servicing, Resort Advisory Group, Pukke, Eddy, Folk, and Wilson may sometimes hereinafter be referred to as the "Direct False Advertising Defendants".

162.    The Direct False Advertising Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

163.    The Direct False Advertising Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain the Direct False Advertising Defendants'

services or to cease making payments to Wyndham or to utilize the Wyndham Cares and/or Ovation® programs, which are available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

164.   The Direct False Advertising Defendants' false and/or misleading advertising causes Wyndham Owners to believe that Wyndham will not help them exit their timeshares (when Wyndham does have its own trademarked exit program) and that the only solution is to use the Direct False Advertising Defendants' competing "exit" service, even though that service is false and illusory. *See Lexmark*, 572 U.S. at 133 ("[A] plaintiff can be directly injured by a misrepresentation even where a third party [such as a consumer], and not the plaintiff,  relied on it." (citation and internal quotation marks omitted)).

165.   Moreover the Direct False Advertising Defendants' false and/or misleading advertising materially misrepresents their services, what they can do for consumers, and the relationships amongst the Direct False Advertising Defendants', all of which is designed to trick Wyndham Owners into retaining the services of the Direct False Advertising Defendants, thereby diverting payments from Wyndham to the Direct False Advertising Defendants.

166.   The Direct False Advertising Defendants' advertised services affect interstate commerce.

167.   The Direct False Advertising Defendants are operating as competitors to Wyndham. Once a Wyndham Owner enters into an agreement with Pandora Marketing or Resort Advisory Group, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Direct False Advertising Defendants.

168.    Wyndham has been and continues to be injured as a result of Direct False Advertising Defendants' false and misleading statements.

169.    Wyndham has standing to bring this claim. A plaintiff has standing to sue when a defendants' misleading statements "seek[] to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product," thus "proximately caus[ing] the plaintiff's harm." *Lexmark*, 572 U.S. at 138 (noting that "although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)"). "[T]he causal chain linking" a plaintiff's "injuries to consumer confusion [need] not [be] direct," but may include an "intervening link of injury," consistent with "[t]raditional proximate-causation principles." *See id.* at 138–39 (finding that the plaintiff had adequately alleged proximate cause establishing standing even where the defendant's misleading statements were not directly diverting business from plaintiff to defendant).

170.    The Direct False Advertising Defendants' misleading advertising causes consumers to utilize the Direct False Advertising Defendants' false exit services, which directly results in the Wyndham Owners ceasing to pay on their contracts at the Direct False Advertising Defendants' instruction.

171.    Without the Direct False Advertising Defendants' false and/or misleading advertisements, the Wyndham Owners would have continued to make payments on their timeshares and continued to understand that their Timeshare Contracts are legitimate.

172.    Further, without Direct False Advertising Defendants' false and/or misleading advertising, the Wyndham Owners who wanted to leave their timeshares could have used Wyndham's legitimate trademarked exit services instead of the Direct False Advertising

Defendants' false exit services, without causing Wyndham to incur fees to foreclose on those timeshares and without causing damage to Wyndham's goodwill and reputation.

173.    Additionally, the Direct False Advertising Defendants' false and/or misleading advertising causes consumers to believe that Wyndham's business model is unlawful and that they were "scammed" into their timeshares, necessitating the Direct False Advertising Defendants' "help," when in reality, their contracts are legitimate and the Direct False Advertising Defendants are the ones perpetuating a scam. *See Lexmark*, 572 U.S. at 138 ("[The plaintiff] alleged that [the defendant] disparaged its business and products by asserting that [the plaintiff's] business was illegal. When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements.").

174.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover: (1) its actual damages sustained as a result of the false advertising; (2) Defendants' profits resulting from their false advertising to Wyndham Owners; and (3) the costs of this action.

175.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by the Direct False Advertising Defendants of 15 U.S.C. § 1125(a).

### COUNT II
### Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against the Lawyer Defendants)

176.    Wyndham adopts and realleges paragraphs 1 through 175 above as if fully set forth herein.

177.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

178.    The False Advertising Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

179.    Wyndham has been and continues to be injured as a result of the False Advertising Defendants' false and/or misleading statements.

180.    The Lawyer Defendants have contributed and continue to contribute to the False Advertising Defendants' false and/or misleading advertising by knowingly inducing or causing the conduct, or by materially participating in it.

181.    The Lawyer Defendants explicitly or implicitly encourage the false advertising because they knowingly accept legal representation of the consumers deceived by the false and/or misleading advertising. Without the Lawyer Defendants' willingness to accept those consumers as clients, the False Advertising Defendants could not advertise what they do.

182.    The False Advertising Defendants' false and/or misleading advertisements are public, serious, and widespread; therefore, the Lawyer Defendants have full knowledge of such advertising and condone it.

183.    More than that, the Lawyer Defendants each individually financially gain from the false advertisements in the form of client referrals and fee-splitting with the False Advertising Defendants.

184.    In other words, each of the Lawyer Defendants' businesses derive much, if not all, of their revenue from the consumers solicited through the False Advertising Defendants' false and/or misleading advertising.

185.     Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover: (1) its actual damages sustained as a result of the false and/or misleading advertising by the False Advertising Defendants; (2) the Law Firm Defendants' profits resulting from the False Advertising Defendants' false advertising to Wyndham Owners; and (3) the costs of the action.

186.     Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by the Lawyer Defendants of 15 U.S.C. § 1125(a).

**COUNT III**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against Power Haus)

187.     Wyndham adopts and realleges paragraphs 1 through 175 above as if fully set forth herein.

188.     This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

189.     The False Advertising Defendants willfully, deliberately, and egregiously made false and/or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

190.     Wyndham has been and continues to be injured as a result of the False Advertising Defendants' false and misleading statements.

191.     Power Haus contributes and continues to contribute to the False Advertising Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it.

192.    Power Haus explicitly or implicitly encourages the false advertising because it is the marketing company through which television and print advertisements are purchased and through which millions of dollars have been funneled for the betterment of Pukke.  Power Haus has been instrumental in the placing-into-commerce of the False and/or Misleading Advertisements (as well as other, as yet unknown advertisements).

193.    More than that, Power Haus financially gains from the false advertisements in the form of payments from the False Advertising Defendants.

194.    In other words, Power Haus derives much, if not all, of its revenue from TET's false and misleading advertising.  Additionally, it appears that much of Power Haus' financials are fraudulent.

195.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover: (1) its actual damages sustained as a result of the false and/or misleading advertising by the False Advertising Defendants; (2) Power Haus's profits resulting from the False Advertising Defendants' false and/or misleading advertising to Wyndham Owners; and (3) the costs of the action.

196.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by Power Haus of 15 U.S.C. § 1125(a).

## COUNT IV
## Tortious Interference with Contractual Relations
(against all Defendants)

197.    Wyndham adopts and realleges paragraphs 1 through 153 above as if fully set forth herein.

198.    This is a cause of action for tortious interference with contractual relations.

199.    Wyndham has contractual relationships with the Wyndham Owners.

200.    Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis upon which Defendants sought to establish a relationship with the Wyndham Owners. Indeed, if it were not for the existence of the contractual relationships between Wyndham and the Wyndham Owners, Defendants would have no reason to exist.

201.    Defendants have successfully solicited Wyndham Owners[4] and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and specifically with WVR, WRDC, and/or the SVC entities.

202.    In particular, Defendants have intentionally procured the breach of Wyndham's contractual relationships by soliciting Wyndham Owners and persuading them to hire Defendants to help "exit" (in reality, breach) their Timeshare Contracts.

203.    Defendants also procure breaches by directly instructing Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

204.    If Wyndham Owners knew the truth about Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to Defendants nor unlawfully terminate their timeshare interests (through breach resulting in foreclosure).

205.    Defendants have utilized improper, fraudulent, and/or illegal means to interfere with Plaintiffs' contractual relations.

---

[4] Due to the confidential and sensitive nature of the identities of Wyndham Owners who have been victims of Defendants' conduct, as well as the sheer volume of Wyndham Owners impacted, Wyndham has not included their identifying information herein. However, Wyndham can and will provide the Court with copies of the contracts with which Defendants have interfered at the appropriate time.

206.   Defendants' actions were done with improper motive and not in good faith, but rather were done with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

207.   As a direct and proximate result of Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate via Defendants, their contractual relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or the SVC entities, before the expiration of the terms of those contracts. These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

208.   Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as Defendants are strangers to the contractual relationships between Wyndham and its Wyndham Owners, and their interference with Plaintiffs' business is willful and malicious.

209.   The False Advertising Defendants are not law firms and have no attorney-client relationships with Wyndham Owners; therefore, they are not privileged to interfere under the attorney-client privilege.

210.   The False Advertising Defendants are not agents of the Wyndham Owners because the Wyndham Owners do not control their actions. Rather, the False Advertising Defendants control and guide the "exit" strategy as a so-called "service" that they provide to the Wyndham Owners.

211. Further, the False Advertising Defendants are motivated by personal gain and not by the interests of the Wyndham Owners.

212. Therefore, the False Advertising Defendants are not privileged to interfere as an agent of the Wyndham Owners.

213. Similarly, the Lawyer Defendants have failed to establish an attorney-client relationship with the Wyndham Owners who paid and retained the False Advertising Defendants' so-called services.

214. Accordingly, the Lawyer Defendants are not privileged to interfere with Wyndham's Timeshare Contracts.

215. Even if the Lawyer Defendants have established an attorney-client relationship with the Wyndham Owners, the Lawyer Defendants nevertheless profit greatly by accepting significant fees from Wyndham Owners (through the False Advertising Defendants') and then performing little or no actual legal work on their behalf to "exit" their timeshare contracts. Instead, Defendants convince Wyndham Owners to stop making payments on their Timeshare Contracts, which is not in the Wyndham Owners' best interests and which greatly damages the Wyndham Owners' finances and credit, in order to achieve the desired "exit."

216. The Lawyer Defendants are therefore not privileged to interfere with Wyndham's contractual relationships because Defendants act in their own interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received from the Wyndham Owner or even the best course of action to terminate the Timeshare Contract, considering the Wyndham Owner could lawfully terminate her contract for free, or at a much lower cost, by appealing directly to Wyndham.

217.   Furthermore, the Lawyer Defendants undermine any attorney-client relationship by rarely or never filing lawsuits on behalf of those Wyndham Owners related to their timeshares and by rarely or never representing Wyndham Owners in foreclosure proceedings on their timeshare interests. In other words, the lawyers only "represent" timeshare owners for the purpose of breaching contracts under the guise of legality.

218.   As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

219.   Plaintiffs are entitled to damages against all Defendants jointly and severally.

220.   Defendants' ongoing conduct has caused, and if not permanently enjoined, will continue to cause, irreparable harm to Wyndham due to the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law to fully remedy the harm caused by Defendants to Wyndham.

221.   Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

**COUNT V**
**Violation of Florida's Deceptive and Unfair Trade Practices Act**
(against all Defendants)

222.   Wyndham adopts and realleges paragraphs 1 through 153 above as if fully set forth herein.

223.   This is a cause of action for damages and permanent injunctive relief under Florida Statutes § 501.211.

224.   This cause of action is separate and apart from the causes of action premised upon Defendants' Lanham Act violations. *Cf. Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332–33 (11th Cir. 2008) ("Since Natural Answers is unable to bring an unfair competition claim under the Lanham Act under the theory of either *false advertising or*

*trademark infringement*, it follows that the common law claims *based on unfair competition and trademark infringement* must fail as well." (emphasis added)). It is based not only on Defendants' false and misleading advertisements, but also on Defendants' business practices as a whole, which are deceptive and unfair.

225.    Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

226.    Wyndham's owners and prospective owners are consumers for purposes of FDUTPA.

227.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

228.    Defendants are engaged in certain deceptive and unfair practices as set forth above, including but not limited to: (1) luring Wyndham Owners into procuring Defendants' illusory services with false advertising; and (2) using misrepresentations to convince Wyndham Owners to pay substantial fees to "exit" their Timeshare Contracts with Wyndham, when, in many instances, a lawful termination is only available to consumers directly from Wyndham, a party to the Timeshare Contracts, through the Ovation® Program. Further, Defendants are engaged in other deceptive and unfair practices, including but not limited to: (1) offering "guarantees" to Wyndham Owners about their "exits," even though Defendants know that any such exits rely on Wyndham's assent and are thus never guaranteed; (2) failing to disclose to and/or concealing from the Wyndham Owners that Defendants' "exit" "services" often includes a default and foreclosure, and subsequent negative credit impacts, and congratulating the Owners upon foreclosure by lying to the Owners that the "exit" "services" were successful; (3) unscrupulously telling the Wyndham Owners that they are represented by counsel, even

though the Owners do not speak to those counsel and those counsel are doing little or nothing to assist the Owners; and (4) concealing from Wyndham Owners that Wyndham has legitimate exit services that the Owners can use without resort to Defendants' expensive and illusory "exit" "services."

229.    Section 501.211(1) "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012).

230.    Under § 501.211(1), "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2). *Id.*; *see also Kinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990).

231.    Wyndham is a party aggrieved by Defendants' violation of FDUTPA. *See* Fla. Stat. § 501.204(1).

232.    As a result of Defendants' actions, Wyndham has suffered financial loss.

233.    Wyndham's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

234.    Wyndham is entitled to recover its attorney's fees and costs from Defendants under Florida Statutes §§ 501.2105 and 501.211.

## COUNT VI
## Civil Conspiracy to Commit Tortious Interference
(against all Defendants)

235.    Wyndham adopts and realleges paragraphs 1 through 153 above as if fully set forth herein.

236.     This is a cause of action for civil conspiracy to interfere with existing contractual relations.

237.     Defendants are parties to a civil conspiracy. Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

238.     Defendants conspired to do an unlawful act to cause Plaintiffs harm. Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' business relations with Wyndham Owners and/or causing Wyndham Owners to breach their Timeshare Contracts with Plaintiffs.

239.     Defendants committed or engaged in overt acts in furtherance of their unlawful conspiracy to interfere with Plaintiffs' business relations or to induce Plaintiffs' customers to breach their contractual agreements.

240.     Defendants conspired to interfere with Plaintiffs' contractual relationships with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Wyndham Owners.

241.     Defendants each performed and/or were directed by other Defendants to perform one or more overt actions in furtherance of their conspiracy as set forth above and below:

     a.   the False Advertising Defendants conspired with the Lawyer Defendants to effect the conspiracy.

     b.   For instance, the False Advertising Defendants engaged in false and/or misleading advertisements designed to lure the Wyndham Owners into obtaining their

services. They then instructed the Wyndham Owners not to pay on their Timeshare Contracts.

c.  The False Advertising Defendants relied on the Lawyer Defendants to use their cachet as attorneys to make the False Advertising Defendants' business appear to be legitimate, further inducing the Wyndham Owners to stop paying on their Timeshare Contracts. The Wyndham Owners then paid the False Advertising Defendants directly, which benefit in part was passed along to the Lawyer Defendants.

d.  As for their part in the scheme, the Lawyer Defendants sent formulaic demand letters to Wyndham, in concert with the False Advertising Defendants, stating non-legal bases upon which the Wyndham Owners could purported "cancel" or "terminate" their Timeshare Contracts, in furtherance of the conspiracy.

e.  The False Advertising Defendants could not have accomplished their part in the scheme without the Lawyer Defendants, and vice versa.

f.  All Defendants, benefited from the conspiracy.

242.  As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those contracts.

243.  Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts.

244.  Each of the Defendants have a personal stake in the conspiracy activities.

245.  The Individual Defendants (Pukke, Eddy, Folk, and Wilson) each have a personal stake in the conspiracy activities of Pandora Marketing, Pandora Servicing and Resort Advisory

Group; they each individually financially benefit from the conspiracy, separate and apart from the motives of Pandora Marketing, Pandora Servicing, and Resort Advisory Group. Specifically, because Pandora Marketing, Pandora Servicing, and Resort Advisory Group are closely held companies, the Individual Defendants have personal motives and stakes in conspiring with Pandora Marketing, Pandora Servicing, and Resort Advisory Group and the other Defendants to financially benefit from the concerted tortious interference. *See State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, No. 6:06-cv-1757-Orl-GJK, 2008 WL 11333443, at \*13 (M.D. Fla. Dec. 24, 2008) (in which the plaintiffs argued that the defendant company was closely held and thus that the individual defendant owners of the company personally benefited from the conspiracy, and the court held that the argument created a genuine issue of material fact as to whether the personal stake exception applied, allowing the claim to survive summary judgment).

246.    The Lawyer Defendants are not outside counsel to Pandora Marketing, Pandora Servicing, and/or Resort Advisory Group.  Thus, the Lawyer Defendants are not lawyer-agents of Pandora Marketing, Pandora Servicing, and/or Resort Advisory Group. The Lawyer Defendants are independent entities acting in conspiracy with Pandora Marketing, Pandora Servicing, and Resort Advisory Group.; they too have an independent financial benefit derived from participating in the conspiracy.

247.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

248.    Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and to cause Wyndham and its business millions of dollars in actual damages.

249.    Defendants acted willfully and with malice in taking these actions.

250.    Defendants are jointly and severally liable to Plaintiffs for Damages.

251.    Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

**<u>PRAYER FOR RELIEF</u>**

Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for:

a.      Damages;

b.      Corrective advertising;

c.      Disgorgement of Defendants' profits;

d.      Together with interest thereon;

e.      An award of court costs;

f.      A determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees under the Lanham Act;

g.      An award of attorney's fees under FDUTPA;

h.      Entry of permanent injunctive relief against Defendants, as well as their agents, representatives, employees, and affiliates, prohibiting Defendants from publishing or contributing to any false and misleading statements in advertising, including but not limited to on their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests; and

i.      For such other and further relief as the Court deems appropriate.

Respectfully Submitted,

*/s/ Alfred J. Bennington, Jr.*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**TODD F. KOBRIN, ESQ.**
Florida Bar No. 0946958
tkobrin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600

Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*

Dated:  January 24, 2020

ORLDOCS 17441975 2