UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WYNDHAM VACATION OWNERSHIP,
INC., WYNDHAM VACATION
RESORTS, INC., WYNDHAM RESORT
DEVELOPMENT CORPORATION,
SHELL VACATIONS, LLC, SVC-
AMERICANA, LLC and SVC-HAWAII,
LLC,

      Plaintiffs,

v.                                               Case No. 6:19-cv-1908-WWB-EJK

SLATTERY, SOBEL & DECAMP, LLP,
DEL MAR LAW GROUP, LLP,
CARLSBAD LAW GROUP, LLP, JL
"SEAN" SLATTERY, PANDORA
MARKETING, LLC, PANDORA
SERVICING, LLC, INTERMARKETING
MEDIA, LLC, KENNETH EDDY,
WILLIAM WILSON and RICH FOLK,

      Defendants.
_____/

## ORDER[1]

THIS CAUSE is before the Court on Lawyer Defendants' Motion for Summary Judgment on the Claims of Plaintiffs Wyndham Vacation Ownership, Inc. and Shell Vacations, LLC ("**First Motion for Summary Judgment**," Doc. 396), Plaintiffs' Response in Opposition (Doc. 458), Lawyer Defendants' Reply (Doc. 480), and Lawyer Defendants' Motion for Final Summary Judgment Against All Plaintiffs ("**Second Motion for Summary Judgment**," Doc. 511), Plaintiffs' Opposition (Doc. Nos. 543, 562), and Lawyer

---

[1] With the Court's permission, the parties have submitted a number of filings under seal. However, recognizing that proceedings in the United States District Court are public and court filings are matters of public record, this Order has been filed publicly.

Defendants' Reply (Doc. 569).  Also before the Court is Plaintiffs' Motion for Partial Summary Judgment as to Attorney Defendants ("**Motion for Partial Summary Judgment**," Doc. Nos. 512, 564), Lawyer Defendants' Response in Opposition (Doc. 542), and Plaintiffs' Reply (Doc. 567).  As set forth herein, Lawyer Defendants' First Motion for Summary Judgment will be denied and their Second Motion for Summary Judgment will be stricken.  Plaintiffs' Motion for Partial Summary Judgment will be granted in part and denied in part.

**I.     BACKGROUND**

Wyndham Vacation Ownership, Inc. ("**Wyndham Vacation Ownership**") is the parent company of Wyndham Vacation Resorts, Inc. ("**WVR**") and Wyndham Resort Development Corporation ("**WRDC**").  (Doc. 396-1 at 28:11–12; Doc. 458 at 5).  Shell Vacations, LLC ("**Shell Vacations**") is the parent company of SVC-Americana, LLC ("**SVC-Americana**") and SVC-Hawaii, LLC ("**SVC-Hawaii**").  (Doc. 396-1 at 31:22–25). WVR, WRDC, SVC-Americana, and SVC-Hawaii sell and manage timeshares through legally binding contracts.  (*Id.* at 26:18–19, 27:19–25; Doc. 564-1, ¶¶ 4–5).  Plaintiffs allege that Defendants Slattery, Sobel & Decamp, LLP ("**SS&D**"), Del Mar Law Group, LLP ("**Del Mar**"), Calsbad Law Group, LLP ("**Carlsbad**"), and JL "Sean" Slattery ("**Slattery**") (collectively "**Lawyer Defendants**") accept timeshare referrals from Pandora Marketing, LLC ("**Pandora Marketing**"), Pandora Servicing, LLC ("**Pandora Servicing**") (collectively, "**Pandora**"), and Intermarketing Media, LLC ("**Intermarketing**") (collectively with Pandora, "**Marketing Defendants**").  (Doc. 36, ¶¶ 7, 8)

Wyndham has identified 264 timeshare owners, holding 282 timeshare contracts, that were referred to Lawyer Defendants.  (Doc. 564-1, ¶¶ 14, 17).  Del Mar accepted

2

timeshare referrals from June 2017 through February 2019 and had a ninety-day Services Agreement (Doc. 564-8) with Pandora Marketing in June 2017.  (Doc. 577 at 2–3).  SS&D, for which Slattery was a partner, claims it was never involved in nor received any revenue from timeshare activities.  (*Id.* at 3, 7–8).  Carlsbad began receiving timeshare referrals in March 2019 and continues to receive such referrals.  (*Id.* at 3).  Slattery is a partner of each of the three law firms involved in this litigation.  (*Id.* at 2).

> Marketing Defendants made the following statement in their sales presentations:
>
>> Now, here's the most important part: Once the attorney sends out a letter to your developer, you're out of your Timeshare because nobody should be contacting you whatsoever.  That letter is going to tell Wyndham that they're only allowed to talk to our company and our attorney that is going to be representing this case.
>>
>> You're also going to call your credit card company and have them put a stop pay or do not honor on the card so they don't keep pulling money out of that every month, so you'll stop bleeding on that.
>>
>> So in a short period of time, you'll be done with the developer, you're not making any more payments, and your credit is preserved[.]

(Doc. 564-6 at 95:22–96:10, 166:4–19).  These statements were regularly made by multiple employees and were "the same on every client."  (*Id.* at 96:17–18, 96:21–23, 166:21–23).  The corporate representatives for the Marketing Defendants admitted that such statements are false.  (Doc. 512-17 at 241:14–17; Doc. 564-9 at 180:20–23).

Slattery and Marketing Defendants negotiated the cost Slattery would charge for legal services.  (Doc. 510-30 at 1–2).  From June 2017 to January 2018, Marketing Defendants paid the flat fee to Del Mar.  (Doc. 512-20 at 3).  After January 2018, for the most part, the owners paid the fee directly to Del Mar or Carlsbad as evidenced by Marketing Defendants' contracts with the owners.  (*Id.*; *see also* Doc. 512-18 at 3–4).  Pandora's contract with the owners provides:

3

> In addition to the Fee and the Processing Payment noted above, and if an attorney is necessary, Client agrees to pay the attorney an Attorney Payment in the amount of six-hundred dollars ($600.00) per developer and a thirty-three percent (33%) contingency fee in the event the attorney is successful in obtaining a refund of money from the Property Developer. The Client will not be responsible for any attorney's payments in excess of six-hundred dollars ($600.00). Any amounts billed by the attorney in excess of six-hundred dollars ($600.00) will be paid by [Pandora].

(Doc. 512-18 at 3). Intermarketing's contract contains a nearly identical provision, except that it requires the owner to pay $750.00 as compensation for the attorney to work on the case. (*Id*. at 11). After having contact with the Marketing Defendants, the timeshare owners stop making payments to Plaintiffs. (Doc. 564-1, ¶ 28). Once timeshare owners contract with Marketing Defendants to exit their timeshare contracts, the timeshare owners then sign a retainer agreement with one of the Lawyer Defendants. (*See generally* Doc. 512-3).

The owners were advised that they had to have a direct relationship with the attorney to "complete[] the loop of the attorney-client relationship." (Doc. 564-3 at 3; Doc. 564-5 at 122:18–123:16). Plaintiffs acknowledge that Marketing Defendants advised the timeshare owners to stop making payments to Wyndham and concede that the majority of the relevant contracts were delinquent before the owners retained Lawyer Defendants. (Doc. 564 at 4, 20). Once retained, Lawyer Defendants sent two letters to developers. (Doc. 512-2 at 75:13–76:12, 260:5–17; Doc. 512-3 at 1; Doc. 512-21 at 17–22). The letter to the developer advised the developer it could only communicate with Lawyer Defendants. (Doc. 564-6 at 95:22–96:3). Lawyer Defendants review the timeshare contracts in order to shape the dispute that is the foundation of the demand letter. (Doc. 512-2 at 273:22–274:3). Lawyer Defendants take no further action and have not initiated

litigation or arbitration for any relevant owner. (Doc. 512-3 at 1; Doc. 512-4 at 3; Doc. 512-5 at 4; Doc. 512-20 at 3; Doc. 512-23 at 1).

Lawyer Defendants claim they were not involved in the Marketing Defendants' advertising decisions, but Slattery was aware of Marketing Defendants' conduct and did not place any restrictions on their advertising. (Doc. 512-2 at 148:6–8, 211:11–212:15; Doc. 512-26, ¶¶ 11–12).

On these facts, Plaintiffs allege four counts against Lawyer Defendants: Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count II); Tortious Interference with Contractual Relations (Count IV); Violation of Florida's Deceptive and Unfair Trade Practices Act ("**FDUTPA**") (Count V); and Civil Conspiracy to Commit Tortious Interference (Count VI). (Doc. 36 at 39–52). Plaintiffs seek monetary damages, punitive damages, and a permanent injunction. (*Id.* at 52).

## II.   LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by

showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

### III.  DISCUSSION

#### A.  Lawyer Defendants' First Motion for Summary Judgment

Lawyer Defendants argue that Wyndham Vacation Ownership and Shell Vacations, (collectively the "**Parent Corporations**") have failed to assert an actual injury and are asserting injuries suffered by WVR, WRDC, SVC-Americana, and SVC-Hawaii (the "**Selling Entities**") and, therefore, this Court lacks jurisdiction over Plaintiffs' claims. Plaintiffs disagree.

"Article III of the United States Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' and 'the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III[.]'" *Hollywood Mobile Ests. Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1264–65 (11th Cir. 2011) (quoting U.S. Const. art. III, § 2; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "[T]he

'irreducible constitutional minimum' of standing under Article III consists of three elements: an actual or imminent injury, causation, and redressability." *Id.* at 1265 (quoting *Lujan*, 504 U.S. at 560–61); *see also Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010). There are "three factors which discourage judicial action despite a party's satisfaction of the constitutional elements: (1) assertion of a third party's rights rather than individual legal rights; (2) allegation of a generalized grievance rather than an injury peculiar to such litigant; or (3) assertion of an injury outside the statute's or constitutional provision's zone of interests." *Fed. Deposit Ins. Corp. v. Morley*, 867 F.2d 1381, 1386 (11th Cir. 1989).

A parent corporation does not have standing merely because it is a parent corporation of subsidiaries that entered into contracts that are at issue in a lawsuit. *Crowley Mar. Corp. v. Robertson Forwarding Co.*, No. 20-20151-Civ, 2020 WL 4366079, at *3 (S.D. Fla. July 30, 2020). "It is well established that 'where the business or property allegedly interfered with by forbidden practices is that being done and carried by a corporation, it is that corporation alone . . . who has a right of recovery, even though in an economic sense[ ] real harm may well be sustained [by other entities as a result] . . . of such acts." *Elandia Int'l, Inc. v. Koy*, No. 09-20588-Civ, 2010 WL 2179770, at *7 (S.D. Fla. Feb. 22, 2010) (quoting *Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir. 1957)), *adopted*, 2010 WL 2196040 (S.D. Fla. June 1, 2010).

In their response, Plaintiffs argue that in their Lanham Act claim, they allege harm to Plaintiffs' business and goodwill and their ability to conduct their business with their timeshare owners. As for the tortious interference and conspiracy claims, Plaintiffs emphasize that their allegations are that Lawyer Defendants interfered with their business

relations and their ability to interact with their timeshare owners. Similarly, Plaintiffs allege in their FDUTPA claim that Lawyer Defendants concealed from the owners that Plaintiffs have legitimate exit services that owners can utilize without Lawyer Defendants' services.

The Parent Corporations did not sell any of the contracts at issue in this case. (Doc. 396-1 at 26:15–19, 27:8–19, 32:10–17). Rather, the money owed under the timeshare contracts is owed directly to the Selling Entities. (*Id.* at 29:12–14, 32:2–9). In her deposition, Ramona Harrington, Wyndham's corporate representative, did not know "of any damages that Wyndham Vacation Ownership suffered other than the fact that its subsidiaries had losses[.]" (*Id.* at 29:16–24). Yet, in her declaration Harrington explained how the Parent Corporations and Selling Entities are interrelated. First, Wyndham Vacation Ownership employs personnel to conduct onsite sales presentations and market the timeshares. (Doc. 458-2 at 2–3). Wyndham Vacation Ownership then relies on WVR and WRDC to enter into contracts with the consumers who purchase timeshares. (*Id.* at 3). Thereafter, Wyndham Vacation Ownership assists with customer relations once the contract is executed. (*Id.*). Wyndham Vacation Ownership also oversees Shell Vacations, the second parent company, that sells timeshares through its subsidiaries. (*Id.* at 3–4). Shell Vacation likewise manages customer relations once the timeshare contracts are signed. (*Id.* at 4). In the Shell Vacations contracts, the timeshare owners contract to pay Shell Vacations for the Shell Vacations Club. (*Id.*).

Harrington explained that Lawyer Defendants damaged the goodwill that Wyndham Vacation Ownership and Shell Vacations developed and fostered through its customer relationships because they were no longer able to contact their timeshare owners once the owners received correspondence from the Lawyer Defendants. (*Id.* at

8

6; Doc. 480-2 at 245:14–246:24, 248:8–16). In addition, Wyndham Vacation Ownership had to handle the defaulted accounts and the inventory recovery from the defaulted owners, and Shell Vacations lost the revenue from the Shell Vacations Club fees and the loss of club members due to the rising club fees caused by the defaulting owners. (Doc. 458-2 at 6–7, 16, 31, 33–34, 57–58).

It is undisputed that the Parent Corporations are not parties to the timeshare contracts in this case. Although Plaintiffs have failed to demonstrate beyond speculation monetary damages the Parent Corporations incurred from the breached timeshare contracts, there is evidence that the Parent Corporations are not complete strangers to the contracts at issue in this case. The Parent Corporations have presented evidence they were injured by the misrepresentations made by Lawyer Defendants that can be redressed by an injunction proscribing further harm. *Cf. Crowley Mar. Corp.*, 2020 WL 4366079, at *3 (dismissing claims of parent corporation for lack of jurisdiction where the company's "purported authority to sue rests only on the conclusory allegation that [it] is 'the parent company' of parties to the contracts at issue"); *Elandia Int'l*, 2010 WL 2179770, at *8 (granting summary judgment as to one claim because the plaintiff did not own any interest in the subsidiary corporation that was a party to the transaction at issue in the case). Accordingly, Lawyer Defendants' first Motion for Summary Judgment will be denied.

### B. Lawyer Defendants' Second Motion for Summary Judgment

On August 3, 2021, Lawyer Defendants filed a second motion for summary judgment regarding all parties and the underlying claims. As set forth in the Case Management and Scheduling Order, a "motion for summary judgment and supporting

9

memorandum of law shall be presented in *a single document of not more than twenty-five pages*." (Doc. 30 at 6 (emphasis added)).  Lawyer Defendants did not seek leave to file a successive motion for summary judgment.  While Lawyer Defendants joined in a motion to exceed the twenty-five page limit for summary judgment briefing, such motion was filed after Lawyer Defendants filed its first motion for summary judgment and even noted that Lawyer Defendants agreed to only file one motion for summary judgment against the Plaintiffs.  (Doc. 505 at 2).  Accordingly, Lawyer Defendant's Second Motion for Summary Judgment will be stricken for failure to comply with the Court orders and the Court will not consider the merits of the arguments raised therein.

    **C.**    **Plaintiffs' Motion for Partial Summary Judgment**

        *1.*    *Lanham Act*

"To succeed on a false advertising claim under § [1125(a)(1)(B)], a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  In a contributory false-advertising claim, a plaintiff must show: (1) that the "third party in fact directly engaged in false advertising that injured the plaintiff" and (2) "that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015).

The evidence establishes that Marketing Defendants, in order to sell their timeshare-exit services, advised timeshare owners in their sales calls that once an attorney sent a letter to the owner's developer, the owner was out of their timeshare, which they admit is false.  "If an advertisement is literally false, there is no requirement to present evidence of consumer deception."  *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1105 (M.D. Fla. 2019).  Nevertheless, Plaintiffs must still present evidence of materiality even if the advertisement is false.  *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002).  "A plaintiff may establish this materiality requirement by proving that the defendants misrepresented an inherent quality or characteristic of the product."  *Id.* (quotation omitted).  Plaintiffs have established that Marketing Defendants misrepresented an inherent characteristic of their product, exit from a timeshare contract, by advising timeshare owners that they would be out of the contractual obligations for their timeshares once a letter was sent by an attorney.  Such misrepresentation is material as it likely influenced timeshare owners to pay for Marketing Defendants' services to exit their timeshare contracts.  Lawyer Defendants do not dispute whether the sales calls affected interstate commerce.  Thus, summary judgment will be granted as to the first four elements of the Lanham Act claim. The majority of Lawyer Defendants' arguments go to the issue of causation.  Inasmuch as Plaintiffs admit that they are not seeking summary judgment on causation (Doc. 567 at 2), the issue of causation and damages will be tried.

As for Lawyer Defendants' contribution to Marketing Defendants' misrepresentations, Plaintiffs argue that Lawyer Defendants, equipped with knowledge of Marketing Defendants intentions, implicitly ratified their false advertising by accepting the

11

time share owner referrals. Lawyer Defendants counter that they merely took referrals from Marketing Defendants and assisted the timeshare owners in resolving their disputes. There is evidence that Lawyer Defendants were crucial to Marketing Defendants' exit strategy because without their services, the exit strategy represented to the owners failed. Indeed, Marketing Defendants advertised in their sales pitch that the owners would be out of their time shares once Lawyer Defendants mailed their letters to the developers. Lawyer Defendants argue that accepting referrals did not make Marketing Defendants' false advertising possible because Marketing Defendants could just refer to another lawyer. However, that appears to be the point. If no lawyer agreed to accept referrals from Marketing Defendants, their false advertising fails. And Lawyer Defendants did in fact accept their referrals despite understanding Marketing Defendants' exit strategy. Nevertheless, there is a genuine issue of material fact as to whether Lawyer Defendants were aware that that the Marketing Defendants informed timeshare owners that they could stop making payments and were out of their timeshare contracts once Lawyer Defendants mailed a letter to the developer. Thus, summary judgment as to Lawyer Defendants' contribution to the false advertising will be denied.

2. *Tortious Interference*

Under Florida law, "[t]he elements of tortious interference with a business relationship are (1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (quotation omitted).

Plaintiffs assert that Lawyer Defendants caused the applicable timeshare owners to cease payment to Wyndham by the steps they took to shape Marketing Defendants' referral process. Specifically, Slattery preferred owners who had already stopped payment and required some credit protection. Thus, Marketing Defendants advised the owners to stop making payments based on Lawyer Defendants' preferences. Nevertheless, despite Lawyer Defendants' preferences, the evidence establishes that Marketing Defendants, not Lawyer Defendants, instructed the owners to stop making payments and Plaintiffs have not presented this Court with any evidence that Lawyer Defendants personally directed any relevant owner to stop paying. Accordingly, Plaintiffs' Motion for Partial Summary judgment will be denied as to Count VI. *See Wyndham Vacation Ownership, Inc. v. Sussman*, No. 6:18-cv-2171, 2021 WL 4949162, *3–4 (M.D. Fla. Sept. 27, 2021); *Club Exploria, LLC v. Austin*, No. 6:18-cv-576-Orl-28DCI, 2020 WL 6585802, at *6 (M.D. Fla. Nov. 10, 2020) (granting summary judgment where plaintiff failed to put forth evidence that defendant intentionally caused the owners to breach their contracts by instructing them to stop paying or causing them to believe they could stop paying).

### 3. Affirmative Defenses

Plaintiffs also argue that they are entitled to summary judgment as to Lawyer Defendants' affirmative defenses of attorney-client privilege, litigation privilege, *Noerr-Pennington Doctrine*, and unenforceable contracts.

#### a. Attorney-Client Privilege

Lawyers "are not liable to a nonclient for interference with contract . . . if the lawyer acts to advance the client's objectives without using wrongful means." *Westgate Resorts,*

13

*Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1351 (M.D. Fla. 2019) (quotation omitted). In other words, privilege is not afforded to an agent when the agent acts with ulterior motives and the advice is not in the principal's best interests or the agent utilizes improper methods. *Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, 367 F. Supp. 3d 1360, 1370 (M.D. Fla. 2019) (citations omitted). Thus, "[f]alse representations and fraudulent misrepresentations render an agent or attorney liable for tortious interference." *Sussman*, 387 F. Supp. at 1352. "A representation is fraudulent when, to the knowledge and belief of its utterer, it is false in the sense in which it's intended to be understood by the recipient." *Id.* (quotation omitted).

Here, there is evidence that Lawyer Defendants relied on Marketing Defendants to instruct the owners to stop payments, and then did nothing beyond sending a demand letter. However, there is evidence that the owners signed a retainer agreement with Lawyer Defendants and paid Lawyer Defendants directly. In addition, there is evidence that owners had more leverage to exit their timeshares if they stopped payment. (Doc. 575 at 15–17). Thus, summary judgment is not appropriate at this time on the attorney-client privilege defense. *See Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, No. 6:17-cv-1542-Orl-78DCI, 2019 WL 7423517, at *16 (M.D. Fla. Oct. 4, 2019).

       b.   *Litigation Privilege*

"Florida's litigation privilege affords absolute immunity for acts occurring during the course of judicial proceedings." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1274 (11th Cir. 2004). It has been extended to cover all acts related to and occurring within judicial proceedings, including tortious interference and conspiracy claims. *Id.* (citing *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639

So. 2d 606, 607–08 (Fla. 1994)). Although Lawyer Defendants never engaged in litigation, Slattery stated that Lawyer Defendants would have represented owners in litigation if it became necessary. *Cf. Sussman*, 387 F. Supp. 3d at 1354 (rejecting defendant's litigation privilege defense when the evidence established that the defendant never intended to litigate the clients' claims). However, pre-suit letters are only protected *if* they are necessarily preliminary to judicial proceedings because they are required by statute or contract as a condition precedent to suit, that is not the case here. *Reed Hein*, 367 F. Supp. 3d at 1372 (citing *Trent v. Mortg. Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356, 1360 (M.D. Fla. 2007)). Thus, summary judgment is appropriate as to Lawyer Defendants' litigation privilege defense.

### c.  Noerr-Pennington Defense

Plaintiffs argue that Lawyer Defendants' *Noerr-Pennington* immunity defense does not apply to an attorney who sends sham demand letters with no intent to commence litigation. "*Noerr-Pennington* immunity protects those who petition the government for official redress." *Sussman*, 387 F. Supp. 3d at 1355 (citing *TEC Cogeneration Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1571–72 (11th Cir. 1996)). "Although the *Noerr* doctrine initially arose in the antitrust context, courts have extended the *Noerr* doctrine to protect First Amendment petitioning of the government from claims brought under federal and state laws including . . . common-law tortious interference with contractual relations[.]" *Silverhorse Racing, LLC v. Ford Motor Co.*, 232 F. Supp. 3d 1206, 1211 (M.D. Fla. 2017) (citations and quotations omitted). The doctrine also extends to "acts reasonably attendant to litigation, such as demand letters." *Id.* "There is an exception to *Noerr* immunity, however, for 'sham' petitioning activities seemingly undertaken to induce

government action, but actually done for the purpose of interfering directly with the business of another." *Reed Hein*, 367 F. Supp. 3d at 1371 (citations omitted). Plaintiffs have the burden to prove the sham exception. *Silverhorse Racing*, 232 F. Supp. 3d at 1211.

Here, the evidence is disputed as to whether Lawyer Defendants would have represented owners in litigation if necessary. Further, the demand letters indicated that the timeshare contracts were voidable under California law and Plaintiffs have not demonstrated that California law was inapplicable to every timeshare contract at issue. (Doc. 575 at 93–99). This distinguishes the instant case from *Sussman* and *Orange Lake* because the attorneys in those cases made it clear they would never engage in litigation and the letters they sent did not demand that the plaintiffs stop committing an illegal act. Thus, Plaintiffs have not met their burden to prove that summary judgment is appropriate at this juncture as to the *Noerr-Pennington* defense.

       d.  *Unenforceable Contract Defense*

Finally, Plaintiffs argue that Lawyer Defendants' Fourth Affirmative Defense fails because an unenforceable contract may still support a tortious interference claim. "[A] claim for tortious interference can lie even if the contract forming the basis of the relationship is void and unenforceable." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1344 (M.D. Fla. 2006) (citing *United Yacht Brokers, Inc. v. Gillespie*, 377 So. 2d 668, 672 (Fla. 1979)). Thus, Lawyer Defendants' claim that the timeshare contracts are either void or voidable does not bar Plaintiffs' claim. Accordingly, summary judgment will be granted to the extent that Lawyer Defendants' claim that no tortious interference can lie where the timeshare contract is void or voidable.

16

IV.  **CONCLUSION**

Based on the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Lawyer Defendants' First Motion for Summary Judgment (Doc. 396) is **DENIED**.

2. Lawyer Defendants' Second Motion for Summary Judgment (Doc. 511) is **STRICKEN**.

3. Plaintiffs' Partial Motion for Summary Judgment (Doc. Nos. 512, 564) is **GRANTED in part** as set forth herein and **DENIED** in all other respects.

**DONE AND ORDERED** in Orlando, Florida on March 22, 2022.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

17