# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

WYNDHAM VACATION OWNERSHIP, INC., et al.,

      Plaintiffs,

v.

SLATTERY, SOBEL & DECAMP, LLP, et al.,

      Defendants.

_____/

Case No. 6:19-cv-1908-Orl-78EJK

**PLAINTIFFS' CORRECTED[1] MOTION FOR DEFAULT JUDGMENT AGAINST TELEMARKETING DEFENDANTS AND MEMORANDUM OF LAW**

Plaintiffs ("Wyndham") move, pursuant to Fed. R. Civ. P. 37(b), (e), and the Court's prior sanctions order [DE 689], for entry of a default judgment against Pandora Marketing, LLC; Pandora Servicing, LLC; William Wilson; Rich Folk; and Intermarketing Media, LLC (collectively, "Telemarketers"). Prior entry of default and determination that the Telemarketers failed to comply with Court orders warrant (1) the entry of default judgment against the Telemarketers on Wyndham's claims, as stated in the *Amended Complaint for Damages and Injunctive Relief* [DE 36] ("Am. Compl."), and (2) an award of $▮▮▮▮▮▮▮ in damages in favor of Wyndham.[2]

The instant motion is ripe for adjudication as the Court has now rejected the latest of the Telemarketers' ill-conceived legal theories in their "aggressive, yet ultimately unpersuasive, effort to extricate themselves from their bind." *See* DE 841, p. 4. Since the Court defaulted the Telemarketers, the Telemarketers unsuccessfully sought to (a)

---

[1] The instant filing corrects an inadvertent error contained in the original filing.

[2] Contemporaneous to the filing of this Motion, Wyndham is filing a motion seeking the entry of a permanent injunction against the Telemarketers. Further, Wyndham reserves the right to seek costs, as permitted under the Lanham Act, within 14 days after entry of the requested judgment. *See* M.D. Fla. Local Rule 7.01. Accordingly, Wyndham further requests that, to the extent necessary, the Court retain jurisdiction over the Telemarketers to award such further relief.

participate at trial; (b) challenge the Court's jurisdiction; and (c) vacate the underlying default. DE Nos. 714, 716, 799, 802. The Court has rejected each of these arguments. DE Nos. 725, 841, 844, 869. Accordingly, entry of default judgment against the Telemarketers is now ripe. As described below, and as supported by precedent, the Court should enter such judgment **now**, irrespective of any future trial as to non-defaulted Defendants.

## BACKGROUND

Telemarketers operate a California-based telemarketing scheme, targeting Wyndham customers and other consumers for illusory legal services. *See* Am. Compl. Telemarketers charge thousands of dollars, while failing to disclose that only $750 is ever paid to the affiliated law firms supposedly performing the advertised legal services. *See e.g. id.* at ¶ 228. Since the Telemarketers do not actually perform any work, the money they charge is pure profit. *See id.* Instead of performing legitimate services, Telemarketers simply induce consumers to breach contractual obligations, later claiming that the resulting default/foreclosure constitutes success. *See id.* at ¶¶ 95, 197-221.

Wyndham brought this lawsuit to enjoin such improper conduct and recover the damages suffered thereby. Am. Compl. Wyndham alleges that the Telemarketers (a) engaged in false advertising in violation of the Lanham Act 15 U.S.C. § 1125(a)(1)(B) (Count I); (b) tortiously interfered with Wyndham's contracts (Count IV), (c) violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count V), and (d) engaged in a civil conspiracy (Count VI). The Court defaulted the Telemarketers as a case-ending sanction for their obstruction of the discovery process and spoliation of key documents evidencing their liability. DE Nos. 599, 689, 691-95. The Court entered a *Report and Recommendation* [DE 599] ("R&R") recommending a default as to each of

the Telemarketers. Thereafter, the Court fully adopted the R&R [DE 689] ("Sanctions Order"), ordering the Clerk to (1) strike the Telemarketers' answers and defenses, and (2) enter a default against the Telemarketers.  DE 689 at p. 11.  The Sanctions Order found all facts necessary for the entry of a default judgment. *See, infra* § II.  The Clerk entered a default as to each of the Telemarketers.  DE Nos. 691-95 ("Defaults").  The impact of the default renders all of the factual allegations in the Complaint as to the Telemarketers true.  Default judgment against the Telemarketers is ripe and warranted.

By way of further background, Telemarketers "engage in substantial false and/or misleading advertising…," Am. Compl, ¶ 110; including "sales calls," which state that "once an attorney sent a letter to the owner's developer, the owner was out of their timeshare." DE 734, p. 11.  Telemarketers "admit" such statements to be false. *Id.*  The Court noted that "Plaintiffs have established that [Telemarketers] misrepresented an inherent characteristic of their product…" *Id.*  Through their false advertising, Telemarketers cause timeshare owners to cease payment to Wyndham.  Am. Compl, ¶¶ 163, 170.  Telemarketers "also procure breaches by directly instructing Wyndham Owners to stop paying their timeshare loans…" *Id.* at ¶ 203.  Telemarketers admit that they refer timeshare owners to the co-Defendant attorneys ("Lawyer Defendants") and that such referral violates state bar rules. *Id.* at ¶¶ 7-8.  Telemarketers also admit that such referrals are a necessary part of their scheme as they "relied on the Lawyer Defendants to use their cachet as attorneys to make the [Telemarketers] business appear to be legitimate, further inducing the Wyndham Owners to stop paying on their Timeshare Contracts." *Id.* at ¶ 241(c).  Telemarketers could not have accomplished their scheme without referral to the Lawyer Defendants.  *Id.* at ¶ 241(e).  As a result of the scheme, Wyndham was

substantially harmed.  *Id.* at ¶¶ 168, 207, 218, 220, 232, 233, 247.

## LEGAL STANDARDS

"Under Rule 37(b)(2)(A)(vi), the district court may enter a default judgment against a disobedient party if it makes a finding of willfulness or bad faith failure to comply with a discovery order."  DE 689, p. 4; *see also Johnson v. New Destiny Christian Ctr. Church, Inc.*, No. 615CV1698ORL37GJK, 2017 WL 8948394, at *3 (M.D. Fla. Aug. 28, 2017), *report and recommendation adopted*, 324 F.R.D. 404 (M.D. Fla. 2018) (Such a sanction "requires a willful or bad faith failure to obey a discovery order.").  The following must be established: (1) willful or bad faith failure to obey a discovery order; (2) finding that default is a "just" sanction, complying with due process; and (3) less drastic sanctions would not ensure compliance with court orders.  *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993).  "Entry of default judgment is . . . only warranted when there is a sufficient basis in the pleadings for the judgment entered."  *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (quotation omitted).

"The effect of the entry of a default is that all of the factual allegations in the Complaint are taken as true, save for the amount of unspecified damages. Thus, if liability is well-pled in the complaint, it is established by the entry of a default."  *A.A. Metals, Inc. v. Sols. In Stainless, Inc.*, No. 613CV330ORL31DAB, 2013 WL 12207503, at *1 (M.D. Fla. May 6, 2013), *report and recommendation adopted*, No. 613CV330ORL31DAB, 2013 WL 12205841 (M.D. Fla. May 23, 2013).  "Attempts by a defendant to escape the effects of his default should be strictly circumscribed; he should not be given the opportunity to litigate what has already been considered admitted in law…The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established."

4

*Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).[3]

## ARGUMENT

**I.      The Matter is Ripe for Immediate Entry of Default Judgment**

The Court should enter default judgment now as there is no just reason for delay. Delay would only reward Telemarketers for the very concealment that led to their sanction in the first instance and provide a blueprint for others to ignore this Court's authority.

First, immediate judgment is proper as the Court defaulted the Telemarketers as a case-ending sanction for discovery abuses. In *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 218CV01479KOBHNJ, 2021 WL 289596, at *3 (N.D. Ala. Jan. 28, 2021),[4] the Court entered a judgment against a sanctioned party notwithstanding remaining claims against similarly situated parties.  The Court acknowledged that in typical circumstances (default for failure to plead or defend), courts delay a judgment until resolution as to other parties.[5] *Id.* ("Courts are reluctant to enter default judgment because doing so can risk inconsistent and incongruous results in the litigation.") (citation omitted). However, there—as here—default was "a *case-ending sanction* for the Defaulted Defendants' defrauding the court."  *Id.* (emphasis original).

In *Roche*, the Court held that Fed. R. Civ. P. 54(b) permits entry of a final judgment as to one or more, but fewer than all, claims or parties "if the court expressly determines

---

[3] Decisions of the former Fifth Circuit prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[4] Pandora Defendants themselves previously cited to this decision.  DE 771, p. 2.

[5] The defaulting party benefits from the non-defaulting party's defense.  S*ee Wyndham Vacation Ownership, Inc. v. Clapp Bus. L., LLC*, No. 619CV756ORL41GJK, 2020 WL 1171961, at *1 (M.D. Fla. Feb. 19, 2020), *report and recommendation adopted*, No. 619CV756ORL41GJK, 2020 WL 1170848 (M.D. Fla. Mar. 11, 2020) ("[I]f the non-defaulting parties prevail then in most cases that judgment will accrue to the benefit of the defaulting defendants, unless the defense is personal to that defendant.").

that there is no just reason for delay." *Id.,* quoting Fed.R.Civ.P. 54(b).  In *Roche,* the defaulted defendant argued that determining damages against the defaulted defendant "would be premature and could lead to inconsistent results." *Id.*  The defaulted defendant argued that there were claims where defaulted and non-defaulted defendants were alleged to be jointly and severally liable, resulting in the defaulted defendants paying damages on claims for which non-defaulted defendants might be later absolved of liability or subject to fewer damages. *Id.*  The Court in *Roche* rejected such arguments, explaining that the case-ending default resulted in the defaulted defendants' liability being "beyond dispute regardless of the factual record" underlying plaintiff's claims.  *Id.* ("The Defaulted Defendants will not escape liability even if other defendants in this case are found not to be liable.").  The Court in *Roche* went on to explain that if liability were later imposed on the non-defaulted defendants, any amount paid by the defaulted defendants "would offset what the other defendants owe." *Id.*

The Court should reach the same conclusion here. This Court did not default Telemarketers for a failure to defend. *See* DE Nos. 599, 689.  Rather, the Court defaulted Telemarketers as a sanction for willful obstruction of the discovery process and spoliation of key documents evidencing their liability.   *See id.*  Thus, there is "no just reason for delay in determining damages…and entering final judgment" as to the Telemarketers. *See Roche*, 2021 WL 289596, at *3.

Second, immediate entry of default judgment will prevent the Telemarketers from profiting from their misconduct. Telemarketers stated that they intend to take advantage of any "inconsistent judgment" resulting from any future trial.  *See* Tr. of Telephonic Status Conference, Jan. 19, 2022, 6:19-20 ("[W]hen that trial goes forward, there's a significant

risk of inconsistent judgments…") (**Exhibit K**).  To the extent; however, that the outcome of trial could somehow benefit the Telemarketers, such an unintended windfall will only come to fruition because Telemarketers' misconduct prejudiced Wyndham's ability to present its case against the *Lawyer* Defendants.[6]  Permitting the Telemarketers to take advantage of any trial determinations would serve no purpose other than to allow them to benefit from their withholding of key materials from Wyndham and the Court.

Moreover, such a result would provide a blueprint for defendants in any multi-defendant litigation to escape liability by neutralizing Court authority and would render the discovery process meaningless. Specifically, in future multi-defendant cases, defendants with key evidence (like Telemarketers) could ignore court orders for production of such records even to the point of default while co-defendants without such records could (like Lawyer Defendants) technically comply with all obligations and proceed to trial. In that scenario (as here), the delinquent party's obstruction would thwart the plaintiff's ability to establish liability against the non-defaulting parties.  And that is the inequitable result a defaulting party (like the Telemarketers) would then take advantage of:  if plaintiff cannot prove the non-defaulting parties' liability, the defaulting party will use that judgment to try to shield its own liability so that, in the end, the defaulted party walks away unscathed precisely *because* it made the strategic decision to disregard court authority.

Third, the monetary damages sought herein would not be inconsistent with a judgment as to the Lawyer Defendants, regardless of the result of the trial, nor would the default judgment affect any judgment against the Lawyer Defendants. While the damages

---

[6] As example, Wyndham previously noted that such misconduct precluded expert analysis and expressly tied the lack of such analysis to its case against the Lawyer Defendants.  DE 547, pp. 12-13.

sought here are based on multiple claims, all of the requested damages are also encompassed solely within the direct false advertising claim under the Lanham Act. *See, infra.* No such claim is brought against the Lawyer Defendants. Am. Compl. Moreover, Wyndham is not seeking actual damages in its trial against the Lawyer Defendants, only equitable remedies in a bench trial. *See* DE 866. Accordingly, under these specific circumstances, the Court may enter the requested monetary award without concern of an inconsistent judgment as to the Lawyer Defendants.

Finally, entry of a default judgment against the Telemarketers prior to the upcoming trial promotes judicial efficiency as the Lawyer Defendants will be disabused of the notion that their defense somehow benefits the Telemarketers, with whom they are presently aligned. Entry of default judgment prior to trial would further narrow the focus of the trial, as well as further promote the potential resolution of the remaining claims before trial.

## II.     <u>The Court's Prior Ruling Justifies Default Judgment Pursuant to Rule 37</u>

The Court's prior Sanctions Order under Rule 37 justifies the entry of a default judgment against the Telemarketers. *See* DE 689. The Court has already made sufficient factual findings such that entry of default judgment is appropriate. *See id.*

First, the Court determined that the Telemarketers willfully disobeyed Court orders. The Court stated that "[i]t is apparent that Pandora Marketing willfully disregarded the Court's orders to compel discovery, and that the remaining Telemarketers willfully relied on Pandora Marketing to produce responsive discovery on their behalf despite being well aware of Pandora Marketing's willful noncompliance." *Id.* at p. 5.

Second, the Court determined that a default judgment would be just as Telemarketers had sufficient notice of a potential default judgment sanction and opportunity to contest its entry. The Court stated that "[i]n this case, Magistrate Judge

Kidd issued multiple orders compelling discovery directed to all the Telemarketers regarding call scripts and the audio recordings. Further, Plaintiffs filed an amended motion for sanctions against the Telemarketers seeking an entry of default, and Magistrate Judge Kidd set an evidentiary hearing to address it. Thus, the Telemarketers were well aware of the sanctions sought and were afforded an opportunity to respond." *Id.* at p. 4.

Third, the Court determined that lesser sanctions would be insufficient. The Court stated that it "is not satisfied that lesser sanctions would guarantee the Telemarketers' compliance or cure Plaintiffs' prejudice." *Id.* at p. 9.

Finally, the Court determined that Wyndham stated valid claims. *Id.* at pp. 9-10. The Court expressly stated that "[t]his Court has already found that Plaintiffs stated valid claims against the [Telemarketers]." *Id.* at p. 10, *citing* DE 488 at p. 17-26.  Moreover, the Court ruled in summary judgment that there was no dispute as to a number of elements of Wyndham's Lanham Act claim. DE 734, pp. 10-12.

Accordingly, the entry of **default judgment** on liability is proper.  *See Malautea*, 987 F.2d at 1544.  Indeed, the Court's prior Sanctions Order includes references to the standard for default judgment and determines that the facts meet those circumstances here.  *See e.g.* DE 689, p. 3 ("In the Eleventh Circuit, entry of a default **judgment** can only be imposed for discovery violations under Rule 37 if…") (emphasis added).  Thus, the Court should now enter default judgment against the Telemarketers.

III.   **The Court Should Award $ ███████████ in Monetary Damages[7]**

The Court should award $ ███████ in monetary damages against the Telemarketers, composed of $33,545,917.78 in actual damages and $ ███████ in

---

[7] The Court has already determined that no trial is necessary for such relief.  DE 725.

9

disgorgement of profits.[8]

### A. The Court Should Award Wyndham its Identifiable Actual Damages

Wyndham's actual damages can be measured by the cumulative outstanding principal loan balances of contracts that were breached because of the Telemarketers' false advertising and tortious interference. The total cumulative unpaid principal loan balance for the relevant contracts is $33,545,917.78. *Dec. of Ramona Mae Harrington*, ¶ 13 (**Exhibit A**) ("Wyndham Declaration").

#### 1. Admitted Pleadings Establish Right to Loan Balances

Telemarketers admit they induced non-payment of outstanding loan balances owed pursuant to "Timeshare Contracts" held by "Wyndham Owners" as those terms are understood for purposes of the Am. Compl. Specifically, they admit the following:

- "[W]ithout" their advertising, "the Wyndham Owners would have continued to make payments on their timeshares and continued to understand that their Timeshare Contracts are legitimate." Am. Compl., ¶ 171;

- Telemarketers "intentionally procured the breach of Wyndham's contractual relationships by soliciting Wyndham Owners and persuading them to hire Defendants to help 'exit' (in reality, breach) their Timeshare Contracts." *Id.* at ¶ 202;

- Telemarketers "directly instruct[] Wyndham Owners to stop paying their

---

[8] The Telemarketers admitted joint and several liability.   *See* DE 36, § 250, p. 52. Adjudication of the indemnification crossclaim [DE 546] may proceed subsequent to an order on this motion.  *See e.g. Woodhaven Homes & Realty, Inc. v. Hotz*, 396 F.3d 822, 824 (7th Cir. 2005) (Court resolved primary claim at summary judgment and four months later resolved indemnification cross-claim); *McLeod v. Llano*, No. 17CV6062ARRSMG, 2019 WL 1129429, at *7 (E.D.N.Y. Mar. 12, 2019) ("[I]indemnification claim does not ripen until judgment…"); *B & B Inv. Club v. Kleinert's, Inc.*, 472 F. Supp. 787, 789 (E.D. Pa. 1979) (Crossclaims "would be tried…after the resolution of…main claims.").

timeshare loans…"  *Id.* at ¶ 203;

- "As a direct and proximate result of Defendants' intentional misconduct," Telemarketers admit that "Wyndham Owners have terminated…their contractual relationships with Plaintiffs…before the expiration of the terms of those contracts."  *Id.* at ¶ 207; and

- "Defendants acted in concert…to bring about a desired result and/or accomplish a preconceived plan…of interfering with Plaintiffs' business relations with Wyndham Owners and/or causing Wyndham Owners to breach their Timeshare Contracts with Plaintiffs."  *Id.* at ¶ 238.

The Am. Compl.'s definitions of "Wyndham Owners" and "Timeshare Contracts" extend Wyndham's claims to reach contracts between consumers and one of the plaintiff entities.  *Id.* at ¶¶ 42, 85.  The Court should award Wyndham, as actual damages, the outstanding principal loan balances of contracts that fit within the scope[9] of such admitted

---

[9] Recent motions for an advisory opinion by certain of the Telemarketers indicate that the Telemarketers may assert that the referenced contracts are outside the scope of admitted pleadings.  DE 861.  Such argument is likely to be just a restatement of their misguided (and rejected) standing argument.  Specifically, it is claimed that Wyndham "presented new allegations via declarations…claiming that the loans were reassigned to Plaintiffs along with the causes of actions presently asserted" and that "Plaintiffs' new allegations appear nowhere in their Complaint, nor in their Amended Complaint."  DE 861, p. 4. Accordingly, it appears likely that Telemarketers may argue that the operative pleadings to which they admit, do not cover the referenced Relevant Contracts if such Relevant Contracts were recovered by assignment.  *See id.*  This argument would misread the Amended Complaint and has already been rejected. Specifically, the Magistrate Judge stated that "the Pandora Defendants state that if Plaintiffs 'did not own the loan contracts at the time [sic] alleged wrongful conduct, Plaintiffs were not and could not have been injured, therefore have no standing, and all causes of action fail.'…Following the logic of this argument, if Plaintiffs were to allege that they owned the relevant loan contracts at the time of the filing of the operative complaint, by their own formulation, the Pandora Defendants' standing objections should be denied. And this is precisely what Plaintiffs allege."  DE 844, p. 10.  Thus, to the extent that Telemarketers argue the pleadings fail

allegations; i.e., contracts between consumers and one of the plaintiff entities.  *See id.*

## 2.  934 Contracts Are Within the Scope of Admitted Pleadings

Nine hundred and thirty-four (934) delinquent contracts fall within the scope of the admitted pleadings.  Wyndham Declaration, ¶ 6.  As to each contract, the Wyndham Declaration shows (a) the delinquency date, (b) the outstanding principal balance, and (c) the first known date such owners had contact with defendants.  *Id.* at ¶¶ 11, 12, 15.  Thus, the Wyndham Declaration establishes that the referenced delinquencies occurred after defendant interaction.  *See id.*  The Wyndham Declaration also identifies a cumulative unpaid principal loan balance of $33,545,917.78 for such relevant[10] contracts.  *Id.* at ¶ 13.

Such proof has been accepted in a similar matter.  *Diamond Resort Holdings, LLC v. Diamond View Social House, LLC, et al.*, Case No. 17-03208-CV-S-BP (W.D.Mo.), DE

---

to support damages related to the Relevant Contracts, such argument has already been rejected.  *See id.*

[10] To the extent that Telemarketers assert that some of these contracts should be excluded from Wyndham's damages because causes of action associated with the underlying debt were only transferred to Wyndham after filing the Am. Compl., that ignores the fact that harm related to any such later recovered interests springs from a continuation of Telemarketers' long-running practices.  See DE 36. "Damages accruing since the action began were allowed, but only such as were the consequence of acts done before and constituting part of the cause of action declared on."  *Lawlor v. Loewe*, 235 U.S. 522, 536, 35 S. Ct. 170, 172, 59 L. Ed. 341 (1915); *see also Dean Foods Co. v. Albrecht Dairy Co.*, 396 F.2d 652, 661 (8th Cir. 1968) ("Damages are limited to the date of filing of the complaint and may be recovered beyond that date only where it is shown that they have resulted from the original illegal acts which were the subject of the complaint."); *Elyria-Lorain Broad. Co. v. Lorain J. Co.*, 358 F.2d 790, 794 (6th Cir. 1966) ("Damages may be recovered beyond the date of the filing of the complaint only when it is shown that they resulted from the original illegal acts which were the subject of the complaint.").  Here, the causes of action relate to ongoing advertising that caused the same harm before and after the filing of the operative pleading. Thus, the damages associated with any later-recovered interests "resulted from the original illegal acts which were the subject of the complaint" and that preceded filing of such complaint.  *See Lorain*, 358 F.2d at 794.

187 (**Exhibit B**).  In that case, the Court awarded damages for tortious inference and Lanham Act claims based on plaintiff's affidavit of outstanding loan balances.  *See Declaration,* § II.A; Case No. 17-03208-CV-S-BP, DE 180-1 (Feb. 11, 2019) (**Exhibit C**). Thus, the Court should accept the Wyndham Declaration to identify those contracts and outstanding balances that are subject to the admitted pleadings.  *See* **Exhibits B, C**.

3.   *No Reduction of Damages is Justified*

Telemarketers cannot escape a monetary award by arguing that (a) Wyndham failed to mitigate harm by not reacquiring relevant timeshare interests (points), or (b) Wyndham suffered no damages because it did actually reacquire such interests. Here, the relevant contracts are non-exclusive contracts, rendering recovery of any of the underlying timeshare interests irrelevant and defeating any argument that Wyndham had an obligation to, or even could, mitigate its damages. Moreover, to the extent Telemarketers argue for a set-off based on the recovery of timeshare interests, they are precluded from making such argument as a consequence of the Court striking their pleadings.

a.   Relevant Contracts are Non-Exclusive Contracts

The relevant contracts are non-exclusive contracts. A non-exclusive contract exists where "the relation between the parties is such that the wronged party [is] legally free to enter into similar contracts with others…" *Graphic Assocs., Inc. v. Riviana Rest. Corp.*, 461 So.2d 1011, 1014 (Fla. Dist. Ct. App. 1984); *see also Burger King Corp. v. Barnes*, 1 F.Supp.2d 1367, 1372 (S.D.Fla. 1998) (same); *cf. Lady of America Franchise Corp. v. Arcese*, No. 05-61306-CIV, 2006 WL 8431025, at *7 (S.D. Fla. May 26, 2006) (Contract was *exclusive* "insofar as [plaintiff] could not legally enter into a similar contract for a similar geographic location with another franchisee."). As an example, "a new car

dealership theoretically has an unlimited number of cars to sell.  A purchaser who breaches his contract to buy an automobile is not entitled to credit against claimed damages for other sales of automobiles made by the dealer." *Graphic Assocs.*, 461 So.2d at 1014.  Conversely, a franchise agreement that "precluded [plaintiff] from authorizing another franchise to open a fitness center anywhere within a five mile radius of [Defendant's] location" was found to be an exclusive contract as Plaintiff was precluded from entering into a similar contract.  *Arcese*, 2006 WL 8431025, at *7.

Here, the applicable contracts are non-exclusive contracts as Wyndham's sale of timeshare points to one owner does not preclude it from selling the exact same number of points to another owner bestowing the same rights to both owners.  Wyndham Declaration, ¶¶ 17-21.  Wyndham was "legally free to enter into similar contracts with others…" *See Graphic Assocs.*, 461 So.2d at 1014.  Wyndham has substantial levels of inventory to sell, operates its sales centers and conducts sales tours on a daily basis, and has never encountered a situation where it has sold all inventory in its timeshare plans. *See* Wyndham Declaration, ¶¶ 17-21.  Indeed, Wyndham continues to market and sell timeshare interests during the pendency of this litigation. Accordingly, the relevant contracts are non-exclusive and Wyndham's damages should not be reduced based on theories reserved for exclusive contracts.  *See Graphic Assocs.*, 461 So.2d at 1014; *Arcese*, 2006 WL 8431025, at *7.

b.   Wyndham Has No Duty to Mitigate

Wyndham has no duty to mitigate breach of the at-issue contracts. Such obligation applies only in the context of an *exclusive* contract.  *See e.g.*, *Arcese*, 2006 WL 8431025, at *7; *Graphic Assocs.*, 461 So.2d at 1014.  "If the relation between the parties is such that the wronged party was legally free to enter into similar contracts with others, the fact

that subsequent to the breach the wronged party could have or actually has made similar contracts in no way reduces the damages to which he is entitled." *Graphic Assocs.*, 461 So.2d at 1014 (internal citation omitted); *see also Burger King*, 1 F.Supp.2d at 1372 ("When a non-exclusive contract is involved…there is no duty to mitigate or minimize losses."); *Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. and Assocs., P.A.*, 501 So.2d 107, 109, n. 2 (Fla. Dist. Ct. App. 1987) (No duty to mitigate where non-breaching party "could have performed the [contract] for its remaining term in addition to all others it did or could have acquired…"); *In re Standard Jury Instructions--Cont. & Bus. Cases*, 116 So. 3d 284, 339 (Fla. 2013) (mitigation instruction "intended primarily for use in exclusive contract cases when the defense of mitigation of damages has been asserted, as non-exclusive contracts are generally considered an exception to the doctrine of avoidable consequences."). Accordingly, given that this matter deals only with non-exclusive contracts; *see supra*; the Court should ignore Telemarketers likely argument, *see e.g.* DE 539, p. 7, that Wyndham's actual damages should be reduced on mitigation grounds.[11]  *See Graphic Assocs.*, 461 So.2d at 1014; *Burger King Corp.*, 1 F.Supp.2d at 1372; *Physicians Reference Lab*, 501 So.2d at 109, n. 2; *In re Standard Jury Instructions--Cont. & Bus. Cases*, 116 So. 3d at 339.

c.    Reduction for Any Supposed "Recovery" is Improper

Similarly, the Court should reject any contention that the damages should be reduced where Wyndham recovered timeshare interests. As non-exclusive contracts, actual recovery of any underlying interests is irrelevant.  In *Gary Massey Chevrolet, Inc.*

---

[11] Moreover, even if there was a duty to mitigate, Wyndham's continuous marketing and sale of interests in the timeshare plan defeats any assertion that Wyndham is not mitigating its damages. *See* Wyndham Declaration, ¶ 20.

*v. Ritch*, the appellate court found that evidence of the "**occurrence**...of mitigation of damages" is irrelevant.  507 So. 2d 713, 715 (Fla. Dist. Ct. App. 1987) (emphasis added).  There, the trial court excluded evidence of "earnings and profits" that the non-breaching party "was actually able" to earn in lieu of the benefit of the breached contract.  *Id.* at 714.  The appellate court affirmed that decision as the applicable contract was "clearly a nonexclusive contract which would have allowed appellee, had he chosen to do so, to have entered into other similar contracts. Thus, appellee was under no duty to minimize his losses."  *Id.* at 715.  Similarly, in *Graphic Assocs.*, the Court made clear that even if the non-breaching party "actually has made similar contracts" following breach, such contracts "in no way reduce[] the damages to which he is entitled."  *Graphic Assocs.*, 461 So.2d at 1014 (internal citation omitted).  Accordingly, in the context of a non-exclusive contract, even where the non-breaching party recovers assets that would typically be considered as mitigation to reduce a damages award, no diminution in award is proper.  *See Graphic Assocs.*, 461 So.2d at 1014; *Gary Massey Chevrolet*, 507 So. 2d at 715.

Telemarketers point to the existence of completed copies of Internal Revenue Service Form 1099-A to argue that Wyndham's damages should be reduced by the value of inventory recovered from delinquent timeshare owners.  *See e.g.* DE 774, p. 2 ("1099As show that Plaintiffs never suffered an economic loss related to any defaulted contract at issue in this case.").  This argument ignores case law that holds an award should not be reduced for breach of a non-exclusive contract even where the non-breaching party obtains a supposed replacement asset.  *See Graphic Assocs.*, 461 So.2d at 1014; *Gary Massey Chevrolet*, 507 So. 2d at 715.  Even if the 1099-As show Wyndham obtained a replacement asset (which they do not, see below), it is not proper to reduce Wyndham's

16

damages award given that the relevant contracts are non-exclusive. *See id.*

Moreover, the breach caused by the Telemarketers still denies Wyndham of the benefit of a second sale. *See Restatement (Second) of Contracts* § 347, comment f (1981) ("If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract."). In such case, "[t]he injured party's damages are then based on the net profit that he has lost as a result of the broken contract." *Id.* Thus, any evidence (including 1099-A) offered to show that Wyndham recovered some of the interests does not diminish Wyndham's suffered harm. *See Dep. of Ramona Harrington*, Mar. 24, 2021, 53:8-19 (**Exhibit D**) ("Q. Would you agree that…had Wyndham simply taken back his points and resold them, Wyndham would not have had a $20,000 loss?...THE WITNESS: No, I do not agree…Q. And why not? A. Because we still had a loss of the $23,965.61. We sold that -- we already sold it once. If we take it back, we have to sell it again when we could have been selling other inventory on hand. So it's still a loss to Wyndham.").

### d.    Telemarketers Waived Any Set-Off Argument

Finally, Telemarketers may not now assert a defense based on the set-off of the recovery of any asset because the Court struck their pleadings. Set-off is deemed waived if not raised in a responsive pleading. *See Saphos v. Grosse Pointe Dev. Co., Inc.*, No. 6:06-CV-257-ORL-19DA, 2008 WL 976839, at *5 (M.D. Fla. Apr. 9, 2008) (Defendant "neither asserted a counterclaim against [plaintiff] nor plead 'set-off' as an affirmative defense. As a result, [Defendant] is barred from now raising 'set-off' as a defense."). Here, based on the Telemarketers' repeated violations of this Court's orders and spoliation of evidence, the Court struck all defenses. DE 689, p. 11, ¶ 4. Accordingly,

there is no operative set-off defense to permit the Telemarketers to argue that any award should be reduced by the amounts reflected in any IRS Form 1099-A.

For the foregoing reasons, the Court should award Wyndham **$33,545,917.78** in actual damages.

      **B.**    **The Court Should Award $▌▌▌▌▌▌▌ in Disgorgement of Profits**

Wyndham is entitled to disgorgement of profits pursuant to its Lanham Act claim. Upon establishing a violation of the Lanham Act, a "plaintiff shall be entitled…to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, **and** (3) the costs of the action." 15 U.S.C. § 1117(a) (emphasis added). Importantly, "for violations of the Lanham Act based on false advertising, a plaintiff's recovery may include both actual damages **and** the defendant's profits." *Wildlife Rsch. Ctr., Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131, 1135 (D. Minn. 2005) (emphasis added); *see also Ameritox, Ltd. v. Millennium Lab's, Inc.*, No. 8:11-CV-775-T-24-TBM, 2014 WL 1456347, at *8 (M.D. Fla. Apr. 14, 2014) (same). Disgorgement of $▌▌▌▌▌▌ of profits is appropriate.

        *1.*    *Wyndham Can Identify $▌▌▌▌▌▌ in Telemarketers' Revenue from Improper Advertising*

Wyndham can piece together a *partial* picture of the Telemarketers' revenue attributable to the improper advertising. Pandora Marketing disclosed $▌▌▌▌▌▌ in income from Wyndham owners. PANDORA-402965 (**Exhibit E)**. Intermarketing produced records to show $▌▌▌▌▌ in income from Wyndham timeshare owners. Intermarketing-Wyndham-054888 (**Exhibit F)**. Such documentation fails to indicate ▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

.[12]

Wyndham need only show revenue. "[P]laintiff must establish only the defendant's sales of the product at issue; the defendant bears the burden of showing all costs and deductions, including any portion of sales that was not due to the allegedly false advertising." *Ameritox*, 2014 WL 1456347, at *9 (M.D. Fla. Apr. 14, 2014) *quoting Rexall Sundown, Inc. v. Perrigo Co.*, 707 F.Supp.2d 357 (E.D.N.Y.2010).   Plaintiff above provides as clear an understanding of Telemarketer sales as possible in light of Telemarketers' partial disclosure. For the reasons discussed below, Telemarketers cannot sustain their burden to diminish such figure. Disgorgement of the entirety of the referenced sales is proper.

### 2. *Telemarketers Cannot Justify Reduction of Sales*

Telemarketers are unable to justify reduction of the above-referenced sales for purposes of calculating a disgorgement award.

First, Telemarketers already conceded certain sales to be profit. ███████ ███████████████████████████████████████. *Co-Defendants, Pandora Marketing, LLC's Supplemental Answers to Plaintiffs' Second Interrogatories*, May 17, 2021, No, 22 (**Exhibit G**).  Intermarketing has conceded that, at least, 19% of income is profit. *Intermarketing Media LLC's Resp. to Pls.' Second Set of Interrogs.*, April 12, 2021, No. 23 (**Exhibit H**).  Thus, at best, any reduction based on costs would only reduce disgorgement of Pandora Marketing sales to $███████ and Intermarketing sales to $███████. *See* **Exhibits, E-H**.

Second, Telemarketers failed to disclose sufficient information to justify reduction

---

[12] Placeholder exhibits and redacted text filed pursuant to M.D. Fla. Local Rule 1.11(d).

of sales based on costs. Pandora Marketing 

. **Exhibit G**, No. 22.

. *See id.* Intermarketing provides even less, offering only an "estimate" of its expenses without any justification for that guess. **Exhibit H**, No. 23.

Finally, Telemarketers cannot demonstrate that any portion of the requested sales are "not due to the allegedly false advertising." *Rexall*, 707 F.Supp.2d at 359. In the Lanham Act context, it is the defendant's burden to "establish any deductions, including costs and any apportionment for sales that were not due to the allegedly false or misleading statements." *Id.* at 363. Here, pursuant to the Defaults, Telemarketers admit that the sales they made to Wyndham Owners were the result of advertising that violates the Lanham Act. DE 36, ¶ 170 ("The Direct False Advertising Defendants' misleading advertising causes consumers to utilize the Direct False Advertising Defendants' false exit services…"). Not only are Telemarketers foreclosed from disputing such admission, they produced no records in discovery that would permit a determination that some portion of the requested sales resulted from acceptable advertising. Thus, they cannot now claim such deduction.

Accordingly, there is no basis to reduce any disgorgement award.

### 3.   *Disgorgement is Proper in Addition to Actual Damages*

The award of profits in addition to actual damages comports with equitable principles. *Ameritox*, 2014 WL 1456347, at *8; *Wildlife Rsch. Ctr.*, 409 F. Supp. 2d at 1135. Here, the Telemarketers' flawed discovery responses reveal only partial understandings of both Wyndham's actual damages and the defendants' profits.

Wyndham's measure of actual damages referenced herein is necessarily incomplete. And that is because, as the Court found, the Telemarketers willfully spoliated and hid evidence. DE Nos. 599; 689. Moreover, despite the fact that the Telemarketers have an ongoing business, *Dep. of William Wilson*, August 27, 2020 ("Wilson Dep."), 229:24-230:1 (**Exhibit I**) ("Q. Is Mr. Slattery actively taking new clients from Timeshare Compliance? A. Yes. Q. Is he actively taking new clients from the Resort Advisory Group? A. Yes, I believe so."), the last known collection of documents from Telemarketers occurred in July 2021. *Tr. of Evidentiary Hr'g.*, Vol. II, Aug. 12, 2021, 11:25-12:6 (**Exhibit J**) ("I believe the 1.9 million were finished uploading into the system, into Everlaw sometime…in the month of July."). Wyndham will never know the full scope of contracts that became delinquent because of the conduct at issue. Thus, the actual damages sought herein are insufficient to provide a full remedy for the improper advertising. Indeed, the very purpose of awarding profits is because calculating actual damages in Lanham Act cases is typically difficult to perform with precision. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1354 (11th Cir. 2019) ("The Lanham Act permits recovery of profits because actual damages are often difficult to prove.").

Moreover, the award of profits and actual damages serves the interests of justice where there is a "showing of the deliberate falsity of [defendant's] advertising" and widespread damage to plaintiffs. *Wildlife Rsch. Ctr.*, 409 F. Supp. 2d at 1135. Here, admitted facts establish that Telemarketers "engage in substantial false and/or misleading advertising on the internet, in television advertising, and through other means". Am. Comp., ¶ 110. The Am. Compl. states Pandora Marketing and Pandora Servicing "willfully, deliberately, and egregiously" made "False and/or Misleading Advertisements"

and "intended to mislead customers." *Id.* at ¶ 156. Indeed, the Court has already determined the Telemarketers' advertising to be false. DE 734. Finally, Wyndham can identify at least $33 million in harm demonstrating significant injury caused by the Telemarketers. *See supra,* § II.A.1.

Thus, the Court may properly award both actual damages and disgorgement of profits against the Telemarketers and in Wyndham's favor.

WHEREFORE, the Court should (a) grant this Motion; (b) find that there is no just reason for delay in entry of the requested default judgment against the Telemarketers; (c) enter default judgment in Wyndham's favor against the Telemarketers for Counts I, IV, V, and VI of the Am. Compl.; (d) award Wyndham $███████ in monetary damages from the Telemarketers; (e) retain jurisdiction over the Telemarketers so as to further award costs as permitted under the Lanham Act and/or permanent injunctive relief pursuant to Wyndham's separate motion; and (f) grant any such additional relief that the Court deems just and proper.

## **LOCAL RULE 3.01(g) CERTIFICATION**

On September 8, 2022, counsel for Wyndham conferred with counsel for Pandora Marketing, LLC; Pandora Servicing, LLC; William Wilson; and Rich Folk by telephone who opposes the relief sought in this motion. Counsel for Wyndham attempted to confer with counsel for Intermarketing Media, LLC by email on September 12, 2022 who promised a response by September 13, 2022, and again by email on September 19, 2022, to no avail. No response from Intermarketing's counsel has been received as of the date of the filing of this Motion. Wyndham will update this conferral certification as to Intermarketing, once, and if, they advise as to their position attendant to the relief requested herein.

Dated: September 19, 2022                    Respectfully submitted,

*/s/ Michael J. Quinn*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**MICHAEL J. QUINN, ESQ.**
Florida Bar No. 84587
mquinn@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No. 1010706
belliott@shutts.com

**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

*Counsel for Wyndham*

ORLDOCS 19493155 24