# Wyndham - Carlsbad

 **Miller, Suzanne (Vol. 01) - 03/19/2021**    1 CLIP  (RUNNING 00:23:09.473)

 UPDATED

SM-0319-0000713        29 SEGMENTS  (RUNNING 00:23:09.473)    

### 1. PAGE 7:13 TO 7:15  (RUNNING 00:00:11.946)

```
        13      Q.      Ma'am, can you please state your
        14  full name for the record?
        15      A.      Suzanne Justine Miller.
```

### 2. PAGE 13:09 TO 13:15  (RUNNING 00:00:29.190)

```
        09      Q.      Okay.  Gotcha.  Do you know
        10  anything about Carlsbad Law Group?
        11      A.      No, nothing more than the
        12  timeshare exit company having me -- what do you
        13  call it, communicate with them to send a letter,
        14  I guess, to Wyndham that I was looking to get
        15  out of my timeshare.
```

### 3. PAGE 14:14 TO 15:01  (RUNNING 00:00:22.050)

```
        14      Q.      Did you sign a retainer agreement
        15  with Carlsbad Law Group?
        16      A.      Yes.
        17      Q.      So your communication with the
        18  secretary at Carlsbad Law Group was related to
        19  signing that retainer?
        20      A.      Yes.
        21      Q.      Have you ever met with any
        22  attorney at Carlsbad Law Group?
        23      A.      No.
        24      Q.      Have you ever spoken with any
        25  attorney at Carlsbad Law Group?
00015:01        A.      No.
```

### 4. PAGE 17:01 TO 18:13  (RUNNING 00:01:54.510)

```
00017:01        Q.      Did you make any requests of
     02  Wyndham to go through their Ovation program?
     03      A.      I did.
     04      Q.      All right.  How many contracts did
     05  you have with Wyndham, do you remember?
     06      A.      I believe five.
     07      Q.      And were any of those paid off
     08  meaning that there was no mortgage balance on
     09  them?
     10      A.      Three of them.
     11      Q.      So three of the five contracts
     12  that you had were paid in full?
     13      A.      Yes.
     14      Q.      And did you reach out to Wyndham
     15  to see about getting rid of those contracts?
     16      A.      Yes.
     17      Q.      All right.  As we sit here today
     18  in March of 2021, what's the status of those
     19  three contracts that were paid in full?
     20      A.      I rescinded them to Wyndham.
     21      Q.      So were you able to use the
     22  Ovation program to hand those timeshare
     23  interests back to Wyndham?
     24      A.      If that's how it happens through
```

## Wyndham - Carlsbad

```
           25   Ovation, yeah.  I don't remember if I called
   00018:01   Wyndham first and they sent me an email.  And I
           02   think this also was in talking to the timeshare
           03   exit company, they had recommended anything that
           04   I had paid off to speak to the company itself,
           05   be it Wyndham, because that way I wouldn't have
           06   to pay to try to get out of them because they
           07   would usually take them back.
           08        Q.     Were you able to successfully use
           09   the Ovation program that Wyndham offered --
           10        A.     Yes.
           11        Q.     -- to transfer back those three
           12   timeshare interests?
           13        A.     The paid timeshares, yeah.
```

### 5. PAGE 23:01 TO 23:16  (RUNNING 00:00:40.230)

```
   00023:01        Q.     Did you ever calculate what
           02   percentage of your remaining debt that you were
           03   paying to Timeshare Compliance?
           04        A.     Define.
           05        Q.     Well, you said you owed just under
           06   30,000?
           07        A.     Yup.
           08        Q.     And you said you paid about $9,500
           09   to Timeshare Compliance?
           10        A.     Yes.
           11        Q.     When you were signing up and
           12   making the decision to sign up with Timeshare
           13   Compliance, did you ever sort of compare to see
           14   you owed just under 30,000 and how much you had
           15   to pay to Timeshare Compliance?
           16        A.     I thought I was saving $20,000.
```

### 6. PAGE 28:04 TO 28:19  (RUNNING 00:00:44.980)

```
           04        Q.     Yeah.  So you mentioned earlier
           05   that you were sent to Carlsbad Law Group,
           06   right?
           07        A.     That's who Timeshare Compliance
           08   said would be reaching out to me for sending the
           09   letter or whatever to Wyndham.
           10        Q.     Other than to send you to the
           11   lawyer, are you aware of anything else that
           12   Timeshare Compliance itself is supposed to be
           13   doing for you moving forward?
           14        A.     Working with -- oh, god.  I don't
           15   remember exactly.  I thought that they were
           16   doing the legwork to make sure that this was
           17   getting taken care of.
           18        Q.     That Timeshare Compliance was?
           19        A.     Yes.
```

### 7. PAGE 31:12 TO 31:24  (RUNNING 00:00:35.364)

```
           12        Q.     Now, you paid Timeshare Compliance
           13   over $9,000; right?
           14        A.     Yes.
           15        Q.     If all of the Timeshare Compliance
           16   and the attorneys were intending to do was to
           17   send one or two letters to Wyndham and nothing
           18   else, do you think that that is worth the $9,000
           19   you paid?
           20        A.     No.  I'm sure that I anticipated
           21   that they would do more than that, that they
           22   would fight for me to get out of my timeshares,
           23   that it would be more than just one or two
           24   letters.
```

**8. PAGE 48:21 TO 48:24  (RUNNING 00:00:08.760)**

```
21        Q.    Were you concerned that by not
22   making your payments to Wyndham that that might
23   affect your ability to obtain a mortgage?
24        A.    Yes.
```

**9. PAGE 53:04 TO 53:08  (RUNNING 00:00:09.760)**

```
04        Q.    And you would have relied upon any
05   of the statements that Taylor Otto made to you
06   in the call with you in signing up for the
07   service, right?
08        A.    Yes.
```

**10. PAGE 54:24 TO 55:04  (RUNNING 00:00:28.060)**

```
           24        Q.    So several months later when
           25   Carlsbad Law Group contacts you and states, "We
   00055:01   cannot guarantee any outcome," by that point had
           02   you already paid Timeshare Compliance the
           03   $9,000?
           04        A.    Yes.
```

**11. PAGE 63:20 TO 63:23  (RUNNING 00:00:06.370)**

```
20        Q.    Is this a copy of the retainer
21   agreement that you would have signed with
22   Carlsbad Law Group?
23        A.    I would have to say so, yes.
```

**12. PAGE 64:08 TO 64:13  (RUNNING 00:00:31.860)**

```
08        Q.    Did you sign this agreement after
09   you had paid Timeshare Compliance the $9,000?
10        A.    Yes.
11        Q.    And had you signed this agreement
12   after you had spoken with Taylor Otto?
13        A.    Yes.
```

**13. PAGE 79:10 TO 79:13  (RUNNING 00:00:10.540)**

```
10        Q.    Do you recall having an email
11   conversation with Taylor Otto in March 2020?
12        A.    Do I recall, no.  Obviously, I did
13   but I don't recall it.  I'm sure it happened.
```

**14. PAGE 81:09 TO 82:11  (RUNNING 00:01:16.240)**

```
           09        Q.    Yeah.  No problem.  So what you
           10   had just read through was on March 27th, six
           11   days after Taylor Otto answered yes when you
           12   asked whether you should stop being on auto pay.
           13   Six days later you asked another similar
           14   question which was, "Hello again, Taylor.  Did
           15   you also tell me to stop the mortgage payments
           16   on the two Wyndham contracts?"  And Taylor
           17   Otto's response was, "Hi, Suzanne.  We find it
           18   easier and we get you out faster when you are
           19   not making payments to your timeshare."
           20   Remember that?
           21        A.    Yes, I see that.
           22        Q.    As a result of Taylor Otto
           23   indicating to you that it was faster, you would
           24   be more likely to get out faster if you did not
           25   make your payments, did you make that decision
   00082:01   to not make your payments?
           02        A.    Yes.
           03        Q.    And above that, you then indicated
           04   on March 27th at 12:18 p.m., "Thank you for the
```

## Wyndham - Carlsbad

```
            05  clarification.  I wish I had thought to verify
            06  that before this past week.  Another payment out
            07  of my credit card.  Oh well, my bad.  I will
            08  hope the attorney will be able to get some back.
            09  Thank you, Suzanne."  Do you remember writing
            10  that?
            11       A.    I'm sure I did.
```

**15. PAGE 85:15 TO 86:01  (RUNNING 00:00:37.200)**

```
            15       Q.    (By Mr. Quinn) Ms. Miller, I
            16  appreciate your patience in going through all
            17  this.  I have a few more questions for you, and
            18  what I wanted to cover now was the sales
            19  presentation that you listened in on with a man
            20  by the name of Taylor Otto.  Do you remember
            21  that person's name?
            22       A.    Yes.
            23       Q.    And was Taylor Otto the person at
            24  Timeshare Compliance who you spoke with when you
            25  made the decision to sign up with that company?
   00086:01       A.    Yes.
```

**16. PAGE 94:07 TO 95:12  (RUNNING 00:01:03.530)**

```
            07       Q.    All right.  So what I'd like to
            08  play for you now is what we're going to mark as
            09  Exhibit 2 to the deposition.  It's an audio
            10  file, it's an MP3 file which appears to be an
            11  audio recording of the telephone that call you
            12  had with Taylor Otto prior to you signing up and
            13  paying Timeshare Compliance.  All right?
            14       A.    Yes.
            15       Q.    All right.
            16
            17             (recording playing)
            18
            19             Hello.
            20             Yes, hello.  Is this Suzanne?
            21             This is.
            22             Hi, this is Taylor Otto calling
            23  with Timeshare Compliance.  How is your day
            24  going?
            25             Hi, Taylor.  How are you?
   00095:01             Very good to hear.  I know that we
            02  scheduled a call today to talk about your
            03  Wyndham timeshare nightmare; is that correct?
            04             Yes.
            05             Okay.  Is this still a good time
            06  for you?
            07             Yes.
            08             All right.  Very good.  So as you
            09  know, my name is Taylor Otto.  I'm a senior
            10  analyst with Timeshare Compliance, and what I'd
            11  like to have you do, please, is grab a piece of
            12  paper, a pen and a calculator.
```

**17. PAGE 100:18 TO 101:24  (RUNNING 00:01:09.008)**

```
            18             All right.  So this new loan on
            19  this most recent upgrade, the first payment due
            20  date was January 6th; is that right?
            21             Yes.
            22             Okay.  And you have paid January,
            23  February and March?
            24             Yes.
            25             So that's three payments out of
   00101:01  your 120 payments?
```

```
        02              Yeah.  Ten years, right.
        03              Ten year loan, 12 months, yeah,
        04 120.  Okay.  So is it my understanding that you
        05 have 117 payments left?
        06              I would guess.
        07              Yeah, 120 minus three, right?
        08              Automatic out of my, yeah, out of
        09 my credit card so.
        10              Correct.
        11
        12              (recording stopped)
        13
        14      Q.      (By Mr. Quinn) Do you recall
        15 Taylor Otto talking to you about the loan that
        16 you had with Wyndham?
        17      A.      You asked me if I recall.  I can't
        18 say that I recall, but I can tell just by those
        19 responses are the same kind of responses I'm
        20 giving you.  That's me.  So to say that --  I
        21 think you understand what I'm saying.
        22      Q.      I do.
        23      A.      It's a year later.
        24      Q.      Understood.  Another clip.
```

**18. PAGE 111:01 TO 111:20  (RUNNING 00:00:36.301)**

```
  00111:01      Q.      One moment.  I'm going to play the
        02 next clip for you.
        03
        04              (recording playing)
        05
        06              So I know that you -- I can hear
        07 it that you're ready to get out of this thing.
        08 You can keep calling around to different
        09 companies, you can do whatever you'd like.  But
        10 I can tell you that if we take this case, we
        11 will get you legally and permanently out.
        12
        13              (recording stopped)
        14
        15      Q.      (By Mr. Quinn) When Taylor Otto
        16 told you that if we take this case, we will get
        17 you legally and permanently out, did you
        18 understand that to mean that it was guaranteed
        19 that you would get out?
        20      A.      That's what I felt.
```

**19. PAGE 111:23 TO 112:08  (RUNNING 00:00:33.134)**

```
        23      Q.      (By Mr. Quinn) When Taylor otto
        24 told you that if we take the case, we will get
        25 you out legally and permanently; what was your
  00112:01 impression of what that meant?
        02      A.      Well, every time he said if he'll
        03 take the case, I always a felt like okay so I
        04 didn't know what their prerequisites were for
        05 taking the case.  But obviously they didn't take
        06 everyone, and I guess if they take my case then
        07 there's a good chance that I'll -- that they
        08 would get me out of the timeshares.
```

**20. PAGE 116:02 TO 116:16  (RUNNING 00:00:39.460)**

```
        02      Q.      Let me play you one more clip.
        03
        04              (recording playing)
        05
        06              Okay.  So let me explain to you
```

## Wyndham - Carlsbad

```
07  what we do.  Okay?  We do not buy or sell
08  timeshares.  We do not transfer timeshares.  We
09  only take cases with misrepresentation, cases
10  like yours; and we legally and permanently get
11  you out with our team of attorneys that deal
12  directly with Wyndham.  We are very familiar
13  with Wyndham and Wyndham unfortunately is very
14  familiar with us.  Lone Star does not use
15  attorneys.  I'm reading their review right now.
16  There is not the word attorney used once.
```

**21. PAGE 117:02 TO 117:25  (RUNNING 00:00:47.660)**

```
02              All right.  Do you have any kids?
03              Grown, yes.
04              Okay.  Are you aware that if you
05  don't get out of the timeshare, it automatically
06  goes to them when you're gone?
07              I didn't realize it automatically
08  went to them, no.
09              It's automatically transferred
10  through the estate to your kids and then they're
11  on the hook for the maintenance fees forever.
12              Wow.  It was never put to me like
13  that.
14              If you marry your boyfriend and if
15  something happens to you, now the timeshare is
16  on him because it's common property it goes to
17  him.
18              Wow.
19              Uh-huh.
20              I thought it just stopped if you
21  didn't will it to your kids.
22              No, absolutely not.
23              I thought you had to will it to
24  your kids.  Wow.
25              No, it automatically goes to them.
```

**22. PAGE 119:08 TO 120:16  (RUNNING 00:01:19.894)**

```
08       Q.   (By Mr. Quinn) All right.  So here
09  in this clip you can see that now Taylor Otto
10  has repeated that same claim, that if he takes
11  your case they'll get you out legally and
12  permanently forever.  You hear that?
13       A.   Yeah, I thought you replayed the
14  same one.
15       Q.   Right.  Right.  It's a very
16  similar statement.  Were you aware that he was
17  reading off of a script?
18       A.   No.
19       Q.   Let me play for you another clip.
20
21              (recording playing)
22
23              We don't take every case.  There's
24  lots of cases that we decline.  But of the cases
25  we take, we have never lost a single case.  And
00120:01  you can quote me on that.  These calls are
02  recorded.
03
04              (recording stopped)
05
06       Q.   (By Mr. Quinn) When he told you,
07  "We've never lost a case and you can quote me on
08  that because this call is recorded," what was
09  your impression regarding the likelihood of
```

## Wyndham - Carlsbad

```
            10   success for your case?
            11       A.      Well, I don't -- obviously that
            12   statement was made.  I don't remember it, but
            13   obviously it was.  And if I were to hear that
            14   right now, if somebody were to say that to me
            15   right now, then I'm thinking that it's 100
            16   percent taken care of.
```

**23. PAGE 122:07 TO 123:25  (RUNNING 00:01:53.776)**

```
            07       Q.      Understood.  I'll continue the
            08   clip.
            09
            10               (recording playing)
            11
            12               So our service fee to get you out
            13   of this timeshare legally and permanently
            14   forever and to preserve your credit, because I
            15   know you don't want your credit going down the
            16   drain; right?
            17               Uh-huh.
            18               Our total service fee is going to
            19   be $9,898.  So it's a fraction of what you owe,
            20   and that includes the credit preservation
            21   service.  Now, the next part of this is very
            22   important so I'm going to say this to you; and
            23   if you have any questions, I'll answer all of
            24   them at the end.  By law we must have a direct
            25   relationship between you and the attorney.  So
  00123:01   in about 30 days when the attorney reaches you,
            02   you're going to write the attorney a separate
            03   check for $750.  That completes the loop of the
            04   attorney-client relationship.  Now, here is the
            05   most important part.  Once the attorney sends
            06   out a letter to your developer, you're out of
            07   your timeshare because nobody should be
            08   contacting you whatsoever.  That letter is going
            09   to tell the developer that they're only allowed
            10   to talk to our company and our attorney that is
            11   going to be representing this case.  So in a
            12   short period of time, Suzanne, you'll be done
            13   with your developer, you're not making anymore
            14   payments while we're getting you out and your
            15   credit is preserved.  Is that the outcome that
            16   you're looking for?
            17               Yes.
            18               Any questions at all?
            19               Not right now.  Let me see.
            20               Take your time.
            21               You gave me the cost, a kind of
            22   guarantee, guaranteed to get out of it.
            23               Uh-huh.
            24
            25               (recording stopped)
```

**24. PAGE 124:08 TO 125:10  (RUNNING 00:00:51.040)**

```
            08       Q.      Was it your impression that he
            09   responded in the affirmative that you were
            10   guaranteed to get out of it?
            11       A.      Yes.
            12
            13               (recording playing)
            14
            15               You've had a hundred percent
            16   success with getting people out.  What happens
            17   if you don't?
```

```
            18              We have never --
            19              You deal with Wyndham so I'm going
            20   to guess --
            21              Yes, we have never lost a single
            22   case.  We are very, very familiar with Wyndham.
            23              Okay.  And you've already told me
            24   how you go about cancelling it.
            25              What we do, yes.
 00125:01              (recording stopped)
            02
            03       Q.     (By Mr. Quinn) So again and I
            04   apologize for kind of repeating the same
            05   questions.  I think I've made the point, which
            06   is that the statement that he's making to you in
            07   this telephone call was it giving you the
            08   impression regarding the likelihood of success
            09   being 100 percent?
            10       A.     Yes.
```

**25. PAGE 136:13 TO 137:01  (RUNNING 00:00:45.922)**

```
            13       Q.     Okay.  And as we see on the screen
            14   that we have here on Exhibit 3, the seventh
            15   page, is that your signature dated March 9,
            16   2020?
            17       A.     Well, a Docusign signature, yeah.
            18       Q.     Okay.  And that's a good point.
            19   So as you were on the phone with Taylor Otto,
            20   were you on your computer reviewing and
            21   Docusigning electronically the agreement?
            22       A.     I don't remember.  I'm going to
            23   say yes just because I know that this took
            24   place, but to put them both -- I'm going to
            25   guess that we were talking at the same time as
 00137:01   going through this, yeah.
```

**26. PAGE 137:16 TO 137:25  (RUNNING 00:00:30.544)**

```
            16       Q.     (By Mr. Quinn) Ms. Miller, the
            17   next section I wanted to show you is another
            18   part of the Timeshare Compliance contract, and
            19   we're still looking at Exhibit 3.  After you
            20   signed the document where it says read and
            21   agreed to and accepted by and Taylor Otto as an
            22   authorized signatory also signed it.  The next
            23   page, do you see that page that says Timeshare
            24   Compliance client understanding?
            25       A.     Yes.
```

**27. PAGE 138:06 TO 138:19  (RUNNING 00:00:55.601)**

```
            06       Q.     Okay.  There's a couple of items I
            07   wanted to bring to your attention before we play
            08   the audio clip.  The first one is the first --
            09   there's eight separate sections here where you
            10   initialed.  Do you see that?
            11       A.     Yes.
            12       Q.     And in the audio clip you'll hear
            13   Taylor Otto describing these.  The first one
            14   here is, it states, "I/We understand that a
            15   release of my/our timeshare obligation may take
            16   many forms and are outlined in Section 4.2.A of
            17   the Timeshare Compliance services agreement."
            18   Do you see that?
            19       A.     Yes.
```

**28. PAGE 139:04 TO 140:18  (RUNNING 00:01:37.063)**

```
          04          Q.     Do you see that?  All right.  So
          05  the first part of the client understanding
          06  refers you to this section where it says, "The
          07  resolution of the client's timeshare may include
          08  but is not limited to reacceptance, supply of
          09  inventory in rem, deed in lieu, foreclosure,
          10  termination, surrender and release, timeshare
          11  release, settlement and release of claim,
          12  settlement offer, reinventory, loss of
          13  privilege, quit claim deed, voluntary and mutual
          14  release."  Do you agree that that's what it says
          15  there?
          16          A.     Yes.
          17          Q.     All right.  So with that in mind,
          18  let's listen to the next clip.
          19
          20                 (recording playing)
          21
          22                 And I'm going to read each one of
          23  these for you, and you can just kind of click
          24  each one as we're reading them.  Okay?
          25                 Uh-huh.
 00140:01                 So number one, there's a few
          02  different forms that we fill out.  We do it for
          03  you so you don't have to do it.  That's number
          04  one, any questions on that?
          05                 The one that says I/We understand
          06  the release of my -- that?
          07          Q.     Yeah.  So it's basically
          08  submitting forms.  I'm just kind of reiterating
          09  it for you.
          10          A.     Yeah.  Yeah.
          11          Q.     Okay.  Number two --
          12
          13                 (recording stopped)
          14
          15          Q.     (By Mr. Quinn) So did he provide
          16  you any explanation as to what this actually
          17  said?
          18          A.     Not that I recall.
```

**29. PAGE 153:10 TO 155:05  (RUNNING 00:01:59.480)**

```
          10          Q.     Okay.  I have one last clip to
          11  play for you.
          12
          13                 (recording playing)
          14
          15                 Now, what I want you to check out
          16  here is at the bottom of this page in bright
          17  yellow highlighting, whenever you use a debit or
          18  a credit card, there is a 3 percent merchant
          19  account fee added from the merchant account
          20  company that processes the card.  We are not a
          21  sales organization so we don't absorb that fee.
          22  That's passed on to the consumer.  Three percent
          23  is that $280 at the bottom.
          24                 Uh-huh.
          25                 I just wanted to let you know so
 00154:01  it's not a surprise when you get your bill and I
          02  didn't tell you about that.
          03                 Gotcha.
          04                 All right.  So what you'll do is
          05  sign, initial and click finish.
          06
```

**Wyndham - Carlsbad**

```
          07               (recording stopped)
          08
          09        Q.     (By Mr. Quinn) All right.  In this
          10   last section, do you know what Taylor Otto meant
          11   by Timeshare Compliance not being a sales
          12   organization?
          13        A.     No.
          14        Q.     When you heard it just now, what
          15   was your impression regarding what Timeshare
          16   Compliance was, based on what he said?
          17        A.     My first thought was, was -- just
          18   now my first thought was not -- to myself was
          19   not a sales organization because it sounds like
          20   it's all sales.
          21        Q.     And, in fact, they charged you
          22   over $9,000 as a result of this phone call,
          23   correct?
          24        A.     Yes.
          25        Q.     Did you trust that what Taylor
00155:01   Otto was telling you on the phone call was
          02   accurate?
          03        A.     I trusted that they were going to
          04   perform the service to get me out of my
          05   timeshare.  I did trust that.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:23:09.473)**