# Wyndham - Carlsbad

## 📁 Donboli, John (Vol. 01) - 03/25/2021     1 CLIP  (RUNNING 00:15:59.263)

🎬 Sir, can you please state your full name for ...

**JD-0325-0000911-001          23 SEGMENTS  (RUNNING 00:15:59.263)**      

### 1. PAGE 9:11 TO 9:13  (RUNNING 00:00:04.580)

```
        11        Q    Sir, can you please state your full name for
        12   the record.
        13        A    John Donboli.
```

### 2. PAGE 9:18 TO 9:20  (RUNNING 00:00:05.291)

```
        18             It's my understanding that you are a
        19   licensed attorney in California?
        20        A    That's correct.
```

### 3. PAGE 13:22 TO 14:07  (RUNNING 00:00:24.865)

```
        22        Q    Okay.  Yeah.  And what I was sort of getting
        23   at is that I understand that in, as you said, 2016,
        24   that you had formed Donboli Law Group; is that right?
        25        A    Right.
   00014:01        Q    And from that period forward, were you
        02   representing any new clients through Del Mar Law
        03   Group?
        04        A    Not that I remember.  I mean, I certainly
        05   wasn't seeking and identifying clients and putting
        06   them into Del Mar Law Group.  I had my own vehicle
        07   which is Donboli Law Group.
```

### 4. PAGE 14:18 TO 14:20  (RUNNING 00:00:11.519)

```
        18             When Del Mar Law Group was formed in 2006,
        19   who were the attorneys that formed that law firm?
        20        A    Sean Slattery and myself.
```

### 5. PAGE 22:10 TO 22:14  (RUNNING 00:00:13.459)

```
        10        Q    So has it been your practice that if a
        11   nonlawyer refers you a legal case, that you would not
        12   share legal fees with that nonlawyer?
        13        A    Correct.  We -- that's something that we
        14   don't do.
```

### 6. PAGE 23:04 TO 23:07  (RUNNING 00:00:12.130)

```
        04        Q    It's only permissible -- it's only
        05   permissible to share fees between attorneys?
        06        A    Yes, my understanding of it as a practicing
        07   attorney but not an expert on ethics.
```

### 7. PAGE 24:15 TO 24:24  (RUNNING 00:00:28.120)

```
        15        Q    Did you have any discussions with
        16   Mr. Slattery about the fact that you were intending to
        17   start that new law firm?
        18        A    Yeah.  I think -- I think -- I mean, it was
        19   formed more out of necessity.  I think he came -- if I
        20   recall correctly, I think he came to me and said that
        21   he wanted to disassociate or stop practicing with me,
        22   and he wanted to form -- I'm kind of paraphrasing
        23   here -- and he wanted to form a new firm, and he
        24   called it "Slattery, Sobel & DeCamp."
```

**8. PAGE 25:03 TO 26:02  (RUNNING 00:01:11.400)**

```
        03          Q    Based on that conversation that you had with
        04    Mr. Slattery, was -- was it your understanding that
        05    the partnership between you and Mr. Slattery was
        06    ceasing as of that -- that point?
        07          A    You know, yes and no.  In terms of actively
        08    putting new matters into Del Mar Law Group, my
        09    understanding was that no new cases would be put -- no
        10    new business would be put into it.  It was basically a
        11    receiving company because we had some class action
        12    settlements that we're work -- kind of working
        13    ourselves through.  We had some ARs.  We had some
        14    ass- -- we had assets.
        15          So the goal was to leave Del Mar Law Group
        16    intact, and, you know, we'd dedication some portion of
        17    time to kind of managing that, but that's not that
        18    much time.  And then that evolved into -- am I talking
        19    too fast again?
        20          Q    No.  Go ahead.  You're doing fine.
        21          A    And that eventually evolved after some time
        22    period and multiple conversations into Slattery,
        23    Sobel & DeCamp for him.  And he basically took all the
        24    existing employees, you know, what I consider all the
        25    main assets, kind of formed that, and I'm -- I felt I
00026:01    was on the outside looking in.  So I formed Donboli Law
        02    Group.
```

**9. PAGE 27:06 TO 27:23  (RUNNING 00:00:57.620)**

```
        06          Q    Okay.  So in the fall of '16, did you have
        07    any conversations with Mr. Slattery where you
        08    discussed what would happen to the other attorneys or
        09    employees of Del Mar Law Group once Slattery, Sobel &
        10    DeCamp, which I'll refer to as "SSD" -- once SSD was
        11    formed?
        12          A    There was no discussions about what would
        13    happen.  I was informed after the fact that it did
        14    happen, that all of the employees were now working for
        15    SSD -- and I'm not privy to how or when or timing or
        16    anything like that -- but that that had happened.  And
        17    I was informed that they were going to operate out of
        18    the same lease space that Del Mar Law Group used to
        19    occupy.  And so there were no conversations in terms
        20    of planning but just being told after the fact.
        21          Q    When you say you were told after the fact,
        22    was that by Mr. Slattery?
        23          A    Yes.
```

**10. PAGE 43:12 TO 43:16  (RUNNING 00:00:12.379)**

```
        12          Q    All right.  So would May of 2017 -- would
        13    that have been about the time that you would have
        14    first had conversations with Mr. Slattery about the
        15    timeshare business?
        16          A    Yes.
```

**11. PAGE 43:21 TO 44:18  (RUNNING 00:01:04.510)**

```
        21          Q    What do you recall Mr. Slattery telling you
        22    with respect to what this business was going to be
        23    and, you know, what -- what was supposed to be
        24    involved?
        25          A    Yeah.  I'm trying to -- I remember he was
00044:01    kind of excited about it.  And he had had lunch with
        02    some contact of his up in Orange County.  And he said
        03    it's -- you know, it's a new revenue stream.  And he
        04    wanted to -- you know, he -- it was -- he said it was
```

## Wyndham - Carlsbad

```
           05    for Del Mar Law Group, which kind of surprised me
           06    initially because Del Mar Law Group was kind of like a
           07    holding company.  Like, neither one of us was using
           08    it.
           09           So it's been like -- I'm kind of
           10    guestimating -- like, nine months according to our
           11    timeline.  I have Donboli Law Group.  He's got
           12    Slattery, Sobel & DeCamp.  So, like, why is he calling
           13    me to put new business into Del Mar Law Group?  So
           14    that was my first kind of curiosity.
           15           And then he kind of explained the bullet
           16    points there, that it's -- you know, it's called
           17    "timeshare."  And it's, you know, a number of cases,
           18    and just he kept focusing on the revenue stream.
```

**12. PAGE 45:22 TO 46:15  (RUNNING 00:00:51.670)**

```
           22        Q   What was your understanding of how the
           23    timeshare clients would be coming in?
           24        A   It was my understanding that there was going
           25    to be some kind of like an intake process that's
  00046:01    handled by the third-party firm.  I guess it's
           02    Pandora.  I didn't know their name back then, but I
           03    guess -- I mean, now I saw the name as defendants, I
           04    guess Pandora.  But I just called it like "Bo's
           05    company," so like Bo's company and their staff.
           06           It was told -- it was expressed to me by
           07    Sean that it's a really successful operation.  They
           08    really know what they're doing.  They're kind of --
           09    you know, I'm kind of paraphrasing here, but they
           10    figured out the secret sauce recipe on how to make a
           11    lot of money in this area.  And they're not happy with
           12    the lawyers they're using now, and there's a chance
           13    for us to step in.  And we're not using Del Mar for
           14    anything.  So let's use Del Mar, and, you know, we can
           15    share in the revenues.  That's what he initially said.
```

**13. PAGE 50:13 TO 50:24  (RUNNING 00:00:30.931)**

```
           13        Q   Did Mr. Slattery and you ever have any
           14    discussions about doing any due diligence with Pandora
           15    Marketing to find out how they were acquiring the
           16    clients?
           17        A   So that was a conver- -- I mean, in my head,
           18    there's like five or six reasons why I had hesitations
           19    about this, you know, book of business.  And that was
           20    one of them.
           21           So, like, during that mass tort time period
           22    that I was referring to, we actually just out of the
           23    blue get this -- you know, a bunch of complaints that,
           24    you know, they received, essentially, a junk fax.
```

**14. PAGE 51:17 TO 52:12  (RUNNING 00:00:50.863)**

```
           17           THE WITNESS:  So I've always been hesitant
           18    in terms of, you know, not being aware of what the
           19    marketing details are that -- that -- that are
           20    resulting in these leads.
           21           But, you know, typical Sean, like, "Hey,
           22    bro.  Got this, bro.  Bro."  You know, "It's" -- "it's
           23    good money, bro."  So that -- that was a source of
           24    contempt for him and I.
           25    ///
  00052:01    BY MR. QUINN:
           02        Q   Did you express to him your concerns
           03    about -- about wanting to know how the marketing was
           04    being conducted?
           05        A   Yeah.  I mean, I told him multiple times.
```

## Wyndham - Carlsbad

```
        06       Q    And what did he respond to you?
        07       A    He said, you know -- I can't remember.  We'd
        08   usually talk over lunch or over the phone, and I don't
        09   remember exactly.  But usually same theme, like, you
        10   know, I'm being like a little schoolgirl.  Like, "Come
        11   on.  This is a good chance to make some money."  And
        12   that's the theme of what he would usually say to me.
```

**15. PAGE 53:02 TO 53:07  (RUNNING 00:00:19.459)**

```
        02       Q    If Mr. Slattery had never been involved in
        03   this type of timeshare business before and you and him
        04   were practicing attorneys that had your, you know,
        05   long history of practicing law, did he explain to you
        06   why he wanted to get into this completely new area?
        07       A    Just as a revenue source.
```

**16. PAGE 57:14 TO 59:13  (RUNNING 00:02:00.131)**

```
    14  14            So did you have any reservations about
    15  15   participating in the timeshare business with
    16  16   Mr. Slattery?
    17  17       A    I did.
    18  18       Q    What were those reservations?
    19  19       A    There were several.
    20  20            You want me to go through them?
    21  21       Q    Yes, please.
    22  22       A    So one is just not understanding the whole
    23  23   thing, just, you know, being the -- you know, Sean --
    24  24   Sean and my relationship was kind of a -- very much of
    25  25   a yin-yang.
00058:01            So for -- I was kind of de facto office
     02   manager part- -- office managing partner.  Like, I'm
     03   the one who's got my head in the rudder book on
     04   ethics, and he's just more like, you know, shooting
     05   off his bullets.  I was -- you know, Sean's like, you
     06   know, "fire, ready, aim."
     07            So I just didn't know enough about it.  You
     08   know, I was willing to be convinced, you know, but I
     09   just wasn't being given the information.
     10            And the -- our practice -- I mean, the -- we
     11   had a really nice yin-yang simple one-page business
     12   agreement.  And this may come up because I produced --
     13   you asked for the partnership agreement.  So I have to
     14   explain this.  If I don't explain this, it's not going
     15   to make sense.
     16            So everything was 50/50.  You know, even --
     17   you can't book any other business.  It was just
     18   pure -- everything goes through Del Mar Law Group.
     19            And that changes in, like, the fall of '16.
     20   So he forms Slattery, Sobel & DeCamp.  I formed
     21   Donboli Law Group.  So all new business goes there.
     22            I don't expect to hear from him again in
     23   terms of new business.  Then he pops up on the radar,
     24   although I had been speaking with him to manage the
     25   entity Del Mar as these accounts receivables are being
00059:01   booked, and we're resolving that issue.  And now he
     02   wants to share this book of business.
     03            So my first curiosity is why are you even
     04   sharing this book of business with me?
     05            And he doesn't say straight up, but he
     06   basically says he gets a better cut at Del Mar.  So I
     07   don't know the intricacies of Slattery, Sobel &
     08   DeCamp, but his percentage slip with his partners
     09   there was something different than with him and I.  So
     10   he just wanted to bring that here to presumably save
     11   some percentage points.  So that was kind of
```

## Wyndham - Carlsbad

```
              12      Issue No. 1.  Why is that even being booked at Del Mar?
              13      Like, is -- so that's Issue 1.
```

**17. PAGE 59:21 TO 60:15 (RUNNING 00:00:53.839)**

```
              21              Issue No. 3 is -- we kind of touched upon
              22      this -- is not knowing the details of how these leads
              23      are being generated.  I never got an answer to that
              24      one.
              25              Issue 4 was -- I was -- I wasn't sure if,
     00060:01      you know, representing clients in other states was
              02      kosher or not.  You know, it may or may not be.  I
              03      just never took a deep dive on it.
              04              I know in some states -- I looked at
              05      pro hac vice rules in the past.  We represented someone
              06      in Massachusetts.  And based on my experience, if you
              07      want to represent in a litigation, you hire a local
              08      counsel.  It's a process.  I've done that.  I'm
              09      comfortable with that model.  I just wasn't comfortable.
              10              I'm not saying that these -- these, you
              11      know, uncomfortable issues couldn't have been resolved
              12      over time.  Like, representing people across the
              13      country and sending demand letters, does that comport
              14      to the local laws of the jurisdiction?  That was a
              15      concern that was never resolved for me.
```

**18. PAGE 61:17 TO 62:01 (RUNNING 00:00:22.190)**

```
              17          Q   Did you express any of those concerns to
              18      Mr. Slattery?
              19          A   All of them and frequently, yes.
              20          Q   And did he provide any response or rebuttal
              21      to those concerns?
              22          A   "Bro, bro, I'm going to indemnify you.  I'm
              23      going to cover you, bro."
              24              I mean, so, no.  He never -- not to be
              25      facetious, but -- so, no.  The details were never
     00062:01      really, you know, explained to me.
```

**19. PAGE 73:18 TO 74:02 (RUNNING 00:00:25.590)**

```
              18          Q   So my question -- next question would be:
              19      In November of 2017, did you observe who was working
              20      out of the address at 12250 El Camino Real, Suite 120?
              21          A   I did.
              22          Q   Who was that?
              23          A   That was the Slattery, Sobel & DeCamp law
              24      firm.
              25          Q   Was anyone else operating out of that
     00074:01      building?
              02          A   Not that I'm aware of.
```

**20. PAGE 78:17 TO 80:12 (RUNNING 00:02:01.029)**

```
              17          Q   Now, at the top of this document -- and this
              18      is a document that was produced by Slattery, Sobel &
              19      DeCamp.  It's SSD-75335.  That's the Bates number.
              20              Did you receive the communication from
              21      Mr. Slattery that's at the very top of this document?
              22          A   Yeah.  I haven't seen it recently, but I --
              23      but I do -- I mean, I generally recall.  It's the same
              24      like, $500 -- yeah.  That sounds -- that sounds
              25      familiar.
     00079:01          Q   What was your understanding as to why he
              02      sent you this message?
              03          A   Because he was upset that I removed $500
              04      from a checking account that he had -- had dedicated
              05      timeshare to pay a joint debt.
```

```
          06        Q     Mr. -- Mr. Slattery stated to you, "I moved
          07   your shit off timeshare because you habibed $500.  As
          08   we discussed, timeshare is separate."
          09             Is that what he told you?
          10        A    After -- yeah.
          11             I mean, so because I -- yeah.  I wasn't
          12   taking money for myself out of these timeshare
          13   accounts, but I was supposed to have visibility
          14   because of the fact that my tax was affected and a lot
          15   of other things.
          16             So when I did that, then he told his mom who
          17   contact -- I was told this by the bank person.  So his
          18   mom called the bank, had me taken off the online
          19   accounts.  And so when he said, "I moved your shit," I
          20   think he's referring to my online access because "you
          21   habibed," his colorful metaphor for improperly took --
          22   which I didn't improperly take because I'm a cosigner
          23   on all Del Mar Law Group accounts, and I was paying a
          24   joint debt.
          25             And then he was reinforcing, like, leave the
 00080:01   timeshare money alone.  That's his private money.
          02   Like, it was his pigeon.
          03        Q    What was your understanding of what the term
          04   "habibed" means?
          05        A    It's like a negative term that's like, I
          06   think, disparaging, I'm guessing, Middle Easterners.
          07   You know, I'm Persian.  So I think he's just, you
          08   know -- you know, he called me, like, a "raghead,"
          09   like a "Persian raghead" or something like that.  I
          10   mean, he talked out of school all the time.  So I
          11   think it was just his way of saying, you know, "You
          12   dirty Persian.  You stole 500 bucks."
```

**21.  PAGE 83:18 TO 84:05  (RUNNING 00:00:28.080)**

```
          18        Q    The -- was this e-mail that we've marked as
          19   Exhibit 10, the one that's July 31st, 2017 -- was this
          20   sent -- is this your e-mail address,
          21   jdonboli@delmarlawgroup.com?
          22        A    That's correct.  Yes.
          23        Q    And -- but it's addressed to "Joo."
          24             Do -- who is that?
          25        A    That is a disparaging comment towards people
 00084:01   who are of Jewish origin.
          02        Q    Are you Jewish?
          03        A    No.  But his way of insulting me because --
          04   so my cautiousness and my carefulness is -- he'd
          05   called me that word.
```

**22.  PAGE 84:21 TO 85:02  (RUNNING 00:00:19.389)**

```
          21             So starting here on Donboli-1, what is this
          22   first amended complaint of John H. Donboli?  Can you
          23   describe what this is.
          24        A    That is a lawsuit that I authorized to be
          25   filed in the state -- in California State Court
 00085:01   against Mr. Slattery and some of his other business
          02   interests.
```

**23.  PAGE 88:13 TO 90:06  (RUNNING 00:01:50.219)**

```
          13             So in paragraph 10 of your complaint, you
          14   indicate that the -- the timeshare scheme was engaged
          15   in over your objections; is that right?
          16        A    That's correct.
          17        Q    What were your objections?
          18        A    The seven that I listed before, which he --
          19   let me -- let me explain this because I think -- you
```

**Wyndham - Carlsbad**

```
           20   know, may -- you might read that and say like,
           21   "Well" -- "Well, if he objected, then why are there
           22   one or two or three demand letters with a signature?"
           23           So I had objections.  But then at some point
           24   in time he tries to alleviate my concerns by saying,
           25   "Hey, "I'm going to indemnify you, and these risk
00089:01   factors that you're contemplating are not really risk
           02   factors."
           03           So then after the fact when all my risk
           04   factors -- well, most of them -- most of my concerns
           05   come to fruition, especially with these lawsuits, and
           06   he says -- essentially, no response.  "Sorry, bro.
           07   You're on your own" -- I knew he never had my consent
           08   in the first place.
           09           You know, there's lots of analogies I could
           10   use, but it just -- it was never informed consent if
           11   you lied to me about getting this book of business.
           12   And for, like, the $5,000 I earned, I'm dealing with
           13   all this right now.
           14           So he never had my consent as an owner to be
           15   using Del Mar Law Group when he could have easily used
           16   Slattery, Sobel & DeCamp.  We talked -- that was the
           17   conversation:  "Why aren't you using Slattery, Sobel &
           18   DeCamp?"
           19           "I make more money over here."
           20           So why drag me into all this when we weren't
           21   even, in my opinion, active partners in '17?  We're
           22   just trying to close out Del Mar Law Group.
           23           And I'm locked out of financial accounts.  I
           24   don't know -- I still don't know.  How many clients,
           25   rhetorically, Michael, that -- you know, were -- did
00090:01   Del Mar Law Group represent?  I mean, 10?  20?  100?
           02   Slattery?  Carlsbad?  I have no clue.
           03           So in hindsight I think the whole thing
           04   was just -- you know, maybe "scheme" is a little
           05   harsh, but I -- that's how I felt when I wrote the --
           06   when I first made a complaint.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:15:59.263)**