## Wyndham - Carlsbad

📁 **Pavlenko, Yuliya (Vol. 01) - 06/29/2021**        1 CLIP  (RUNNING 00:16:19.206)

 Ma'am, can you please state your full name for ...

YP-0629-0000721-001          27 SEGMENTS  (RUNNING 00:16:19.206)        

**1. PAGE 7:21 TO 7:23  (RUNNING 00:00:04.450)**

```
        21      Q.  Ma'am, can you please state your full name for
        22  the record?
        23      A.  Yuliya Pavlenko.
```

**2. PAGE 8:17 TO 8:20  (RUNNING 00:00:15.400)**

```
        17      Q.  Okay.  You also understand that you are present
        18  here today as a representative of High Rise Marketing,
        19  LLC, which does business as Seaside Consultants Group?
        20      A.  Yes.
```

**3. PAGE 9:16 TO 9:18  (RUNNING 00:00:08.440)**

```
        16      Q.  Okay.  Can you describe what it is that Seaside
        17  does?
        18      A.  They help people get out of timeshares.
```

**4. PAGE 9:24 TO 10:02  (RUNNING 00:00:09.290)**

```
        24      Q.  Okay.  Is it fair to say that Seaside obtains
        25  clients who are timeshare owners that are seeking to get
  00010:01  out of their timeshare?
        02      A.  Yes.
```

**5. PAGE 10:07 TO 10:13  (RUNNING 00:00:16.370)**

```
        07      Q.  Now, are you familiar with a company known as
        08  Pandora Marketing, LLC, which does business as Timeshare
        09  Compliance?
        10      A.  Yes.
        11      Q.  What is your understanding of what that company
        12  is?
        13      A.  They were doing the back end service for us.
```

**6. PAGE 10:23 TO 11:21  (RUNNING 00:01:06.090)**

```
        23      Q.  Okay.  So that I can kind of understand sort of
        24  how the process would work, if a timeshare owner were to
        25  come into Seaside, would that timeshare owner sign a
  00011:01  Seaside contract?
        02      A.  Yes.
        03      Q.  And then, once that timeshare owner signs the
        04  Seaside contract, is it at that point that the customer
        05  would be sent over to Timeshare Compliance?
        06      A.  Yeah.
        07      Q.  Okay.  So is it fair to say that, essentially,
        08  once the client is signed up with Seaside, all of the
        09  activity in terms of the service that's being performed
        10  would have been done through Timeshare Compliance?
        11      A.  Correct.
        12      Q.  And did Seaside rely on Timeshare Compliance to
        13  provide the service that was being offered?
        14      A.  Yes.
        15      Q.  You mentioned a moment ago that these timeshare
        16  owners would be sent to an attorney as well; is that
        17  right?
        18      A.  That's correct.
```

## Wyndham - Carlsbad

```
            19      Q.  Who was responsible for sending the attorney --
            20  sending the client to the attorney?
            21      A.  The staff of Timeshare Compliance.
```

### 7. PAGE 13:15 TO 13:23  (RUNNING 00:00:32.870)

```
            15      Q.  In 2017, when you started with Seaside, was
            16  Seaside providing any of the service itself, or was it
            17  relying 100 percent on Pandora to provide the service?
            18      A.  From my knowledge, we were relying a hundred
            19  percent for Pandora to provide the service.
            20      Q.  Okay.  And for how long was it that Seaside was
            21  relying on Pandora to provide the service?
            22      A.  For a while.  Until about end of 2019, when we
            23  decided to no longer continue.
```

### 8. PAGE 16:08 TO 16:24  (RUNNING 00:00:55.730)

```
            08      Q.  Did you ever have any conversations or
            09  communications with the attorneys that Timeshare
            10  Compliance was using?
            11      A.  No, not in the beginning.
            12      Q.  When you say, the beginning, do you mean back
            13  in 2017 when you started?
            14      A.  Yeah, up to 2019.  It was later, when we pulled
            15  away from them, when clients would call us requesting
            16  help, I would have -- we would have no choice but to try
            17  to get them help since we no longer were with Timeshare
            18  Compliance.  So throughout that time, no.
            19      Q.  All right.  And when you say that clients
            20  started reaching out to you for help, can you explain
            21  what you mean by that?
            22      A.  Well, because the process was taking so long,
            23  and the results weren't happening, clients of course
            24  started to reach out to us, Seaside.
```

### 9. PAGE 17:04 TO 17:17  (RUNNING 00:00:34.950)

```
            04      Q.  Were clients of Seaside complaining about the
            05  length of time that it was taking?
            06      A.  Yes.
            07      Q.  Did you ever communicate that to anyone at
            08  Timeshare Compliance?
            09      A.  Yes.
            10      Q.  Do you know who you spoke with about it?
            11      A.  You know, the staff.  It's possible Ashleigh
            12  Matoua (ph.).  I spoke to her a lot.
            13      Q.  Did she indicate whether she was aware that
            14  this was an ongoing issue?
            15      A.  Yes.
            16      Q.  What did she say about that?
            17      A.  It's a process.  It's a lengthy process.
```

### 10. PAGE 18:01 TO 19:01  (RUNNING 00:01:22.220)

```
      00018:01      Q.  Okay.  Now, you said a moment ago that, while
            02  you did not have regular contact with the attorneys from
            03  2017 to 2019, there was at some point after that where
            04  there was some contact with the attorneys?
            05      A.  Yes.  Because clients were complaining, and we
            06  were no longer with Timeshare Compliance, we had to, you
            07  know, get some sort of resolution.
            08      Q.  Okay.  Did Seaside at some point end its
            09  relationship with Timeshare Compliance?
            10      A.  Yes.
            11      Q.  When was that?
            12      A.  About at the end of 2019.
            13      Q.  Okay.  And why was it that Seaside ended its
```

## Wyndham - Carlsbad

```
           14   relationship with Timeshare Compliance?
           15        A.   Because the results weren't there, and it's
           16   been about a year to two years now, and clients are not
           17   getting results, so of course they became frustrated,
           18   and they began calling us requesting refunds, and it
           19   just became -- it just wasn't working.  We had to pull
           20   away.
           21        Q.   How often were you receiving complaints?
           22        A.   Pretty often.  As the time went on, the closer
           23   it got to two years, the longer, then of course more
           24   complaints started happening.  In the beginning, of
           25   course, there wasn't many, but, towards the end, the
  00019:01  closer, the more complaints.
```

**11. PAGE 19:21 TO 20:06  (RUNNING 00:00:39.050)**

```
           21        Q.   So what was it about this time period, end of
           22   2019?  Were there specific types of clients that were
           23   complaining more than others?
           24        A.   None that -- I mean, they just got tired of
           25   hearing the same thing, stay patient.  So it really was,
  00020:01  you know, the clients that got signed up in 2017, you
       02   know.  By the time it was 2019, they had been in the
       03   process for two years, you know, so, at that point, they
       04   were getting frustrated, feeling like there's no results
       05   and nothing new is being said.  So that's why the refund
       06   requests started happening.
```

**12. PAGE 20:11 TO 20:13  (RUNNING 00:00:07.050)**

```
           11        Q.   Was the volume of refund requests something of
           12   concern for the company?
           13        A.   Yes.  Absolutely.
```

**13. PAGE 21:24 TO 22:08  (RUNNING 00:00:30.400)**

```
           24        Q.   This is an e-mail dated September 1, 2020.  It
           25   was Bates stamped PROD14102, and this is an e-mail to
  00022:01  Debbie White at Carlsbad Law Group from
       02   clients@SeasideConsultants.com, and it has Ashlie Davis
       03   on the signature block.  Do you see that?
       04        A.   Yes, I see it.
       05        Q.   Have you seen this e-mail before?
       06        A.   Yes, I have.
       07        Q.   You're familiar with this particular e-mail?
       08        A.   Yes.
```

**14. PAGE 22:24 TO 23:17  (RUNNING 00:00:51.380)**

```
           24        Q.   Did Mr. Slattery or Carlsbad Law Group, to your
           25   knowledge, ever do anything after they sent the demand
  00023:01  letter?
       02        A.   From my understanding, no.
       03        Q.   Now, we spoke earlier about how, by the end of
       04   2019, that Seaside Consultants was fielding lots of
       05   complaints and refund requests, right?
       06        A.   Correct.
       07        Q.   And in this e-mail that was sent to Debbie
       08   White, it discusses how -- it says, how am I supposed to
       09   call a client every three months to tell them, oh, the
       10   demand letter was sent last year and we are still
       11   waiting for a response from the developer to release you
       12   from the timeshare?  Then I get asked, oh, what else is
       13   the law firm doing to get a response?  And we all know
       14   you all don't do anything else after the demand letter
       15   is sent out, but I can't tell them that.
       16        Do you recall reading that?
       17        A.   Yes.
```

**15. PAGE 23:18 TO 23:22  (RUNNING 00:00:11.590)**

```
        18      Q.   Does this encapsulate the issue, in your mind,
        19   in terms of the fact that, if a client had a demand
        20   letter sent in 2017, what was to be said to them in 2019
        21   regarding the status of the case?
        22      A.   Right.
```

**16. PAGE 23:24 TO 24:20  (RUNNING 00:01:27.120)**

```
        24      Q.   Did Carlsbad Law Group or Mr. Slattery ever
        25   give you any satisfactory explanation as to why, for a
00024:01   client who received a demand letter in 2017, nothing
        02   else had been done?
        03           MR. WAGNER:  Brian Wagner, object to the form.
        04      Q.   You can answer the question.
        05      A.   No.
        06      Q.   In fact, did anyone at your office ever
        07   confront Mr. Slattery with the fact that there was
        08   nothing else being done after the demand letter was
        09   sent?
        10           MR. WAGNER:  Brian Wagner, object to the form.
        11      A.   Yes.
        12      Q.   Who confronted Mr. Slattery with that?
        13      A.   Ashlie Davis.  In this e-mail, she's clearly
        14   stating what more could be done.
        15      Q.   I want to show you another e-mail that we'll
        16   mark as Exhibit 3.
        17           (Exhibit No. 3 was entered into this record.)
        18      Q.   This is an e-mail chain from back in October of
        19   2020.  Do you see that?
        20      A.   Uh-huh.
```

**17. PAGE 25:20 TO 26:14  (RUNNING 00:00:45.850)**

```
        20      Q.   On October 1st, or, excuse me, October 5th, she
        21   sent an e-mail to Carlsbad Law Group and Sean Slattery,
        22   copying you, asking what was being done.  Specifically,
        23   Attorney Slattery, what can we do to move forward with
        24   the cancellation of these clients' timeshare contract?
        25   Do you see that?
00026:01      A.   Uh-huh.
        02      Q.   And then, on October 14th, Ashlie Davis then
        03   sends a follow up e-mail.  Do you see that?
        04      A.   Yes.
        05      Q.   And you recall receiving a copy of that e-mail?
        06      A.   Yes.
        07      Q.   All right.  Here, she said, please follow up
        08   with me on this matter.  As I mentioned in a previous
        09   e-mail, these clients have been with your firm for the
        10   past three years, and their timeshare is still active.
        11   How will your team be moving forward to manifest the
        12   cancellation of their timeshare?
        13      Do you see that?
        14      A.   Yes.
```

**18. PAGE 26:24 TO 27:05  (RUNNING 00:00:21.370)**

```
        24      Mr. Slattery wrote to Ashlie Davis and to yourself,
        25   and said, e-mails like this demonstrate some people
00027:01   don't understand the process and our contribution to it.
        02      I'm happy to educate anyone during a phone
        03   conference this afternoon, if need be.
        04      Do you recall that e-mail?
        05      A.   Yes.  I recall that e-mail, yes.
```

## Wyndham - Carlsbad

**19. PAGE 27:17 TO 28:11  (RUNNING 00:00:57.510)**

```
           17        Q.  So in response to Sean Slattery's e-mail, she
           18   indicated, a phone conference would be much appreciated.
           19   I would like to discuss how you and your team plan on
           20   manifesting the desired resolution of canceling our
           21   clients' timeshares.  Do you see that?
           22        A.  Yes.
           23        Q.  In response, Mr. Slattery, on the same day, at
           24   11:20 a.m. says, limited time today.  Now or at 2.
           25        Then he says something kind of interesting.  He
  00028:01   says, one question to think about before the meeting...
           02   what is Seaside doing toward, quote, "manifesting the
           03   desired resolution of canceling our client's
           04   timeshares", end quote, other than asking us silly
           05   questions like this.
           06        Do you recall receiving that e-mail?
           07        A.  Yes.
           08        Q.  When you received that e-mail, was it your
           09   impression that it was Mr. Slattery's job to obtain the
           10   desired resolution?
           11        A.  Yes.
```

**20. PAGE 28:13 TO 28:15  (RUNNING 00:00:07.420)**

```
           13        Q.  Why would Mr. Slattery be asking Seaside about
           14   what it's doing to cancel the timeshare?
           15        A.  I don't know.
```

**21. PAGE 28:17 TO 30:01  (RUNNING 00:01:54.060)**

```
           17        Q.  So after Mr. Slattery sends this e-mail asking
           18   what Seaside is doing to manifest the desired
           19   resolution, we see here that Ashlie responded back,
           20   saying, 2 o'clock would be fine, and then talks about
           21   the scope of work according to an e-mail received from
           22   Mr. Slattery on May 27, 2020.  Do you recall this May
           23   27, 2020 e-mail?
           24        A.  Yes.
           25        Q.  Okay.  What was it that Mr. Slattery was
  00029:01   communicating to you in that May 27, 2020 e-mail?
           02        A.  This is -- this was an e-mail between Ashlie
           03   and Sean Slattery.
           04        Q.  Yeah, I know, but it says here that there was
           05   another e-mail on May 27, 2020 that talked about what
           06   the scope of work was for Mr. Slattery.
           07        A.  Yes.  And it's listed right there.  Send out a
           08   letter of representation, send a detailed legal analysis
           09   and demand letter, and use their best efforts to
           10   manifest a resolution.
           11        Q.  Okay.  So were you aware Mr. Slattery had
           12   communicated that these three items were what he
           13   considered to be his scope of work?
           14        A.  Yes.
           15        Q.  The three items that are listed is, one, send a
           16   letter of representation; two, send a detailed legal
           17   analysis and demand letter; and, three, use your best
           18   efforts to manifest any resolution.  Do you see that?
           19        A.  Uh-huh.
           20        Q.  Did Mr. Slattery ever communicate to you what
           21   he was doing in terms of his best efforts to manifest
           22   any resolution?
           23        A.  No.
           24        Q.  Are you aware of anything that Mr. Slattery did
           25   beyond sending a demand letter?
  00030:01        A.  No.
```

**22. PAGE 30:11 TO 31:03  (RUNNING 00:00:54.550)**

```
          11      Q.   Was Mr. Slattery intimidating Ashlie?
          12      A.   Yes.
          13           MR. WAGNER:  Brian Wagner, object to the form.
          14      A.   That's exactly why I didn't allow the call to
          15   continue.  My staff was very upset.
          16      Q.   Was it your impression that the e-mails that
          17   Mr. Slattery was sending was to intimidate?
          18           MR. WAGNER:  Brian Wagner, object to the form.
          19      A.   I'm not sure what he was trying to do, but
          20   possible.
          21      Q.   In response to these e-mails that Mr. Slattery
          22   was sending, what did you tell your staff?
          23      A.   Oh, I told my staff that they're not going to
          24   be getting on the call, don't worry about it, and that I
          25   will take care of everything.
 00031:01      Q.   Now, the e-mails that we were looking at here,
          02   this was in 2020, correct?
          03      A.   Yes.
```

**23. PAGE 35:17 TO 35:18  (RUNNING 00:00:06.906)**

```
          17   rest of my exhibits that I've got here.
          18        Okay.  The next document I'd like to show you I'll
```

**24. PAGE 35:21 TO 36:06  (RUNNING 00:00:28.460)**

```
          21      Q.   Do you see that e-mail that you sent to Vanessa
          22   at Timeshare Compliance on June 21, 2018?
          23      A.   Yes.
          24      Q.   Do you recall sending this e-mail?
          25      A.   I do.
 00036:01      Q.   Now, your e-mail was in response to an e-mail
          02   that Vanessa sent to you that said, I spoke to him on
          03   the 19th.  He wanted to make sure that the Tradebloc was
          04   in place before stopping his payments.
          05        Do you recall that?
          06      A.   Yes.
```

**25. PAGE 36:10 TO 36:17  (RUNNING 00:00:22.950)**

```
          10      Q.   Can you read for me, Ms. Pavlenko, what you
          11   stated to Vanessa at Timeshare Compliance?
          12           MR. WAGNER:  Brian Wagner, object to the form.
          13      A.   I understand.  However, Ashleigh let's them
          14   know when it is safe to stop making the payments.  The
          15   clients understand in the end of the day it's up to
          16   them, but, first, they were told, yes, it's safe, and
          17   now they are told, no, it's not.
```

**26. PAGE 36:25 TO 37:07  (RUNNING 00:00:16.380)**

```
          25      Q.   So your statement here, that it was your
 00037:01   understanding that Ashleigh let's them know when it is
          02   safe to stop making payments, what Ashleigh are you
          03   referring to?
          04      A.   Matoua.
          05      Q.   Is that Ashleigh Matoua at Timeshare
          06   Compliance?
          07      A.   Correct.
```

**27. PAGE 37:24 TO 38:11  (RUNNING 00:00:51.350)**

```
          24      Q.   Was it Seaside's standard procedure that all of
          25   its clients would be offered credit protection?
 00038:01      A.   Yes.
          02      Q.   As we sit here today, we're now June of 2021,
          03   does Seaside continue to receive complaints from
```

## Wyndham - Carlsbad

```
04   customers who were signed up between 2017 and 2019?
05       A.  Yes.
06       Q.  Has Mr. Slattery ever reached out to you or
07   anyone else at Seaside to try to do something additional
08   to try to address these concerns?
09       A.  No.
10           MR. QUINN:  Thank you, Ms. Pavlenko.  That's
11       all the questions I have.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:16:19.206)**