Case Clip(s) Detailed Report
Tuesday, October 18, 2022, 1:16:40 PM

# Wyndham - Carlsbad

 **Debbie White**　　　　　　　　　　　　　　　　　　　　　　　　1 CLIP  (RUNNING 00:42:43.662)

 UPDATED

-1230-0001303　　　　　　61 SEGMENTS  (RUNNING 00:42:43.662)　　　　

**1. PAGE 13:03 TO 13:05  (RUNNING 00:00:05.415)**

```
          03          Q    Ma'am, can you please state your full name
          04     for the record?
          05          A    Deborah Gonzales White.
```

**2. PAGE 16:06 TO 17:24  (RUNNING 00:01:53.916)**

```
          06          Q    Have you ever worked at Del Mar Law Group?
          07          A    Yes.
          08          Q    When was that?
          09          A    When I started.
          10          Q    In May of 2018?
          11          A    Yes.
          12          Q    Okay.  And how long did you work at Del Mar
          13     Law Group?
          14          A    I think until March 2019.  I think.  I
          15     believe.
          16          Q    Were you an employee, or an independent
          17     contractor?
          18          A    Employee.
          19          Q    Did you receive direct deposit for your --
          20          A    Yes.
          21          Q    -- salary?
          22          A    Mm-hm.
          23          Q    Okay.  And do you know, was it Del Mar Law
          24     Group that was providing you that salary, or was it
          25     some other entity?
00017:01          A    It was Del Mar until we switched the name.
      02          Q    Are you familiar with the law firm Slattery
      03     Sobel & DeCamp?
      04          A    Briefly, but not -- not really.
      05          Q    When you started in May of -- you said May
      06     of 2018 --
      07          A    Mm-hm.
      08          Q    -- and you said you started with Del Mar
      09     Law Group?
      10          A    Mm-hm.
      11          Q    Just so I'm clear, from May of 2018 until
      12     March of 2019, you're telling me that you worked at
      13     Del Mar Law Group?
      14          A    Yes.
      15          Q    And then from March of 2019 until January
      16     of '21, you were working at Carlsbad Law Group?
      17          A    Yes.
      18          Q    Do you know why you switched from Del Mar
      19     to Carlsbad in March of 2019?
      20          A    No.  I mean, Sean told us our name was
      21     changing.
      22          Q    When you say "Sean," you're referring to
      23     Sean Slattery?
      24          A    Yes.
```

**3. PAGE 18:09 TO 18:16  (RUNNING 00:00:30.113)**

```
          09          Q    I'm going to ask you in a minute about some
          10     of the duties that you had, as you called it, a case
```

```
            11    coordinator with the firm.
            12              But the more basic point I wanted to ask:
            13    With respect to the duties that you did have, were
            14    those duties completed at the direction of Sean
            15    Slattery?
            16         A    Yes.
```

### 4. PAGE 19:13 TO 19:18 (RUNNING 00:00:17.576)

```
            13         Q    What did Sean tell you regarding the name
            14    change?
            15         A    We were moving and he was going to change
            16    it.  We were in Del Mar and we were moving to
            17    Carlsbad and he was going to change the firm name.
            18    That's -- that's all I was ever told.
```

### 5. PAGE 22:03 TO 22:11 (RUNNING 00:00:26.040)

```
            03         Q    Was it your impression that he was the head
            04    of the law firm?
            05         A    Yes.
            06         Q    The case coordinator position; what was
            07    your starting pay when he first hired you?
            08         A    I think when I started, I think it was like
            09    $20 an hour.
            10         Q    $20 an hour?
            11         A    Yeah.
```

### 6. PAGE 23:15 TO 23:18 (RUNNING 00:00:13.710)

```
            15         Q    Was it your understanding that your role
            16    would be strictly related to timeshare owners?
            17         A    Yes.  Well, and I dealt with some of the
            18    referral companies.
```

### 7. PAGE 24:18 TO 24:23 (RUNNING 00:00:17.980)

```
            18         Q    Did Mr. Slattery explain to you how Del Mar
            19    Law Group was obtaining the timeshare owner clients?
            20         A    Yes.
            21         Q    What did he say?
            22         A    He was getting referrals from Timeshare
            23    Compliance.
```

### 8. PAGE 25:13 TO 26:15 (RUNNING 00:01:28.250)

```
            13         Q    Have you ever been to Timeshare
            14    Compliance's office?
            15         A    Yeah.  I went -- I went a few times with
            16    Sean.
            17         Q    What did you do there?
            18         A    We just had meetings.
            19         Q    Approximately how many times do you think
            20    that you went there with Sean to the office?
            21         A    I'd say two or three.
            22         Q    And do you know who was present for
            23    Timeshare Compliance at those meetings?
            24         A    So the two owners, Rich and Bo.  I don't
            25    know if Bo was at all of them.  And Ashleigh Matua.
   00026:01    And I don't -- there was some people I don't recall
            02    their names.  But the one I dealt regularly with was
            03    Ashleigh Matua.
            04         Q    Do you remember the last time that you went
            05    to their office?
            06         A    No.
            07         Q    Was it sometime -- was it shortly before
            08    you left in January 2021, or was it much earlier than
            09    that?
            10         A    Much earlier.
```

Case Clip(s) Detailed Report
Tuesday, October 18, 2022, 1:16:40 PM

## Wyndham - Carlsbad

```
11      Q    What was the subject of the meetings?
12      A    Really just kinda go over -- you know, I
13 don't even really remember.  Basically, just the
14 general procedures.  And making sure that if we had
15 questions, that they could answer anything.
```

### 9. PAGE 27:03 TO 27:14 (RUNNING 00:00:33.703)

```
03      Q    If timeshare owners had questions regarding
04 the status of their particular matter, was that
05 something -- was there any arrangement in place as to
06 who was supposed to respond to those questions?
07      A    They were supposed to deal directly with
08 Timeshare Compliance.  However, sometimes the clients
09 did call us directly.
10      Q    So the timeshare owner was supposed to
11 communicate with Timeshare Compliance?
12      A    Mm-hm.  I believe Timeshare Compliance was
13 supposed to check with the clients like on a
14 quarterly basis.
```

### 10. PAGE 27:15 TO 28:16 (RUNNING 00:01:29.815)

```
15      Q    You mentioned earlier that when you started
16 in --
17           I believe you said March of 20 --
18      A    May.
19      Q    May of 2018?
20      A    Mm-hm.
21      Q    (Continuing) -- that there was already a
22 process in place?
23      A    Mm-hm.
24      Q    Can you describe that process?
25      A    Well, the first thing is the clients would
00028:01 reach out to us, and then we would send them a memo.
02 And in that memo, we would include our contract.  And
03 then they would review the contract, sign it, and
04 return it to us.  And then Sean would sign the
05 contract and we would return it to the clients.  And
06 at that point, ask for payment.
07           And then once the payment was received, we
08 would send a Cease and Desist Letter to the
09 developer.  And then the file would be assigned to an
10 attorney for a Demand Letter.
11      Q    Anything else, or was that the last step in
12 the process?
13      A    I mean, it grew as I stayed there.  You
14 know, when I stayed, we developed procedures for
15 closing the files, and then it just grew when we
16 fine-lined it more.
```

### 11. PAGE 33:18 TO 34:07 (RUNNING 00:00:51.425)

```
18      Q    Was it typical that the welcome email with
19 the contract was sent out the same day that the
20 timeshare owner would contact the law firm?
21      A    No.  I mean, the volume was high, so -- in
22 the beginning, I think we would respond like within
23 five business days.  And towards the end, it was --
24 it was supposed to be ten business days, but we
25 were -- we were even getting swamped with that.
00034:01      Q    Why was it taking so long to send the
02 welcome email and the contract?  Just the volume of
03 work?
04      A    Yeah.  The volume.  And there were lots of
05 phone calls.  A lot of people would call and they
06 didn't quite understand and it took time.  Each call
07 took plenty -- I mean, a call could be a half-hour.
```

Case Clip(s) Detailed Report
Tuesday, October 18, 2022, 1:16:40 PM

## Wyndham - Carlsbad

**12. PAGE 34:16 TO 35:14 (RUNNING 00:01:06.230)**

```
          16         Q    Once the contract was signed and returned,
          17    you testified earlier that Sean Slattery would also
          18    sign the contract?
          19         A    Yes.
          20         Q    And then was it the -- was it the process
          21    in place to then take the signed contract from Sean
          22    Slattery and provide a copy of that to the timeshare
          23    owner?
          24         A    Yes.
          25         Q    After the retainer agreement or the
00035:01        contract was fully executed, what was the next step
          02    in the process?
          03         A    We would send it back to the client and we
          04    would ask them for payment at that point.
          05         Q    Up until that point, were you required to
          06    verify anything with the exit company, Timeshare
          07    Compliance or another company?
          08         A    No.  Because they were the ones that put
          09    the client names into the -- into the spreadsheet.
          10    So once they were in the spreadsheet, we knew that
          11    they would be contacting us.
          12         Q    Was the spreadsheet -- was that a shared
          13    document on the Google Drive?
          14         A    Mm-hm.
```

**13. PAGE 37:11 TO 37:19 (RUNNING 00:00:25.170)**

```
          11         Q    Other than Timeshare Compliance, was there
          12    any other timeshare exit companies that you dealt
          13    with?
          14         A    Yes.  Resort Advisory Group.  And there was
          15    another one.  I can't remember their names, though.
          16    I believe they were out of Encinitas or -- it was
          17    some beach town.  I can't remember.
          18         Q    Seaside Consulting?
          19         A    Yes.  Yes.
```

**14. PAGE 40:15 TO 41:08 (RUNNING 00:00:51.628)**

```
          15         Q    Who was in charge of drafting and sending
          16    out the Cease and Desist Letter?
          17         A    I was.
          18         Q    Was there a form that you would use for
          19    that?
          20         A    Mm-hm.
          21         Q    I noticed on some of the Cease and Desist
          22    Letters, or maybe a lot of them, that it would
          23    typically have more than one timeshare owner on the
          24    letter.  Is that --
          25         A    Yes.
00041:01         Q    Okay.  Was there any reason for that?
          02         A    I think to save time.
          03         Q    After the Cease and Desist Letter was sent
          04    out, what was the next step in the process?
          05         A    Then the file would go back in the main
          06    drawer.  And the attorney was advised that -- or
          07    Trevor Bowen was advised that a Demand Letter was
          08    needed.
```

**15. PAGE 41:15 TO 42:01 (RUNNING 00:00:38.380)**

```
          15         Q    Was there anyone other than Trevor Bowen
          16    that was drafting Demand Letters?
          17         A    I think Carol Corona did some.  And then
          18    there were some -- some attorneys that did it.  But
          19    they weren't even in the office, so I don't -- I
```

```
            20    don't know their names.  And then Karyn was hired.  I
            21    don't know Karyn's last name.
            22         Q    Carol Corona; is she an attorney?
            23         A    She was a paralegal.
            24         Q    Was that Carol Corona's job to draft those
            25    Demand Letters?
  00042:01         A    Yes.
```

### 16. PAGE 42:12 TO 42:14 (RUNNING 00:00:07.060)

```
            12         Q    Did you observe the Demand Letters being
            13    drafted?
            14         A    In the beginning, I was proofing them.
```

### 17. PAGE 42:18 TO 42:25 (RUNNING 00:00:38.550)

```
            18         Q    What did you observe was required in order
            19    to complete the Demand Letter?  What information?
            20         A    Well, how much they paid.  How much down
            21    payment they put into it.  So I guess I would start
            22    with the total cost of the timeshare.  Then how much
            23    they had paid to date.  And then the balance still
            24    due.  And what the percentage of the interest rate
            25    was.  And that's about it, I think.
```

### 18. PAGE 43:10 TO 44:13 (RUNNING 00:01:23.855)

```
            10         Q    Did Carol Corona work in the office?
            11         A    Yes.
            12         Q    And did you observe her drafting some of
            13    these Demand Letters?
            14         A    Yes.
            15         Q    Did she use the documents that were
            16    provided by Timeshare Compliance in order to complete
            17    those Demand Letters?
            18         A    Yes.
            19         Q    Was it necessary to contact the client in
            20    order to prepare the Demand Letter?
            21         A    Usually not.  But I believe if they had
            22    questions, they would contact them.
            23         Q    So after the Demand Letter was drafted,
            24    what was the next step?
            25         A    Then we waited to hear back from the
  00044:01    developer.
            02         Q    Was it typical to provide the timeshare
            03    owner with a copy of the Demand Letter?
            04         A    Typically, we didn't.  But if they
            05    requested it, we were happy to provide it.
            06         Q    Were you made aware of any reason why it
            07    was typical not to provide a copy of the Demand
            08    Letter to the timeshare owner?
            09         A    Just because of the volume of work.  And we
            10    didn't -- we didn't ever reach out to the clients.
            11    We never initiated calls.  We would take their calls
            12    and we were always more than happy to help them, but
            13    we didn't initiate any contact with them.
```

### 19. PAGE 44:23 TO 46:04 (RUNNING 00:01:38.640)

```
            23         Q    What was the next step in the process after
            24    you were waiting for the response from the developer?
            25         A    Nothing.  It went -- the file was put back
  00045:01    in the drawer and we waited to hear.  And often,
            02    Timeshare Compliance would contact us and say, "Okay,
            03    the Demand Letter went out on this date.  Do you know
            04    what the status is?"  And we would look into it.  But
            05    if we hadn't heard, there was nothing that we did
            06    further.
```

## Wyndham - Carlsbad

```
           07          Q     So if there was no response from the
           08    developer, there would be no further action on the
           09    part of Del Mar or Carlsbad?
           10          A     Correct.
           11          Q     If a client -- after going through this
           12    whole process and the Demand Letter's sent and
           13    there's no response from the developer, was it -- was
           14    it your job to update the client on a regular basis,
           15    or was Timeshare Compliance expected to make the
           16    updates?
           17          A     Timeshare Compliance.  Like I said, we
           18    didn't initiate calls to the clients.  Simply because
           19    of the volume of clients and we didn't have a huge
           20    staff.
           21          Q     In order for Timeshare Compliance to
           22    provide the updates to the client, they obviously had
           23    access to the spreadsheet; correct?
           24          A     Mm-hm.
           25          Q     Other than providing a date that the Demand
  00046:01    Letter was sent, would they have any other
           02    information from the law firm regarding the status of
           03    the case?
           04          A     No.
```

### 20. PAGE 46:11 TO 47:04 (RUNNING 00:00:54.330)

```
           11          Q     Did anyone tell you regarding whether or
           12    not the timeshare owner clients that were coming
           13    through, whether or not those clients had any type of
           14    credit repair service?
           15          A     Yes.  I forget what that was called too.
           16    Credit -- I can't remember what it was called.  But
           17    we wouldn't accept them -- in the beginning, we would
           18    accept them if they didn't have it.  But there came a
           19    time where Sean wouldn't accept them unless that
           20    credit -- what's it called?  Credit -- I can't
           21    remember -- unless the credit protection was in
           22    place.
           23          Q     Have you ever heard of something called
           24    Tradebloc?
           25          A     Right.  The Tradebloc was in place.
  00047:01          Q     Did Sean tell you that he only wanted to
           02    take on clients that had the Tradebloc in place?
           03          A     Yes.  Like I said, not initially in the
           04    beginning.  But as time went on, yes.
```

### 21. PAGE 49:08 TO 49:16 (RUNNING 00:00:22.730)

```
           08          Q     If the clients continued to make their
           09    payments, did you believe they would be more likely,
           10    or less likely to get out of their timeshare
           11    contract?
           12          A     Personally, I thought they would be less
           13    likely.  I mean, they're a good-paying client.  Why
           14    would they release them?
           15          Q     I'd like to show you what we're going to
           16    mark as Exhibit 1.
```

### 22. PAGE 49:23 TO 49:25 (RUNNING 00:00:06.086)

```
           23          Q     Do you remember what your email address
           24    was?
           25          A     dwhite@carlsbadlawgroup.com.
```

### 23. PAGE 52:01 TO 52:16 (RUNNING 00:00:44.320)

```
  00052:01          Q     Would you mind reading for us your email to
           02    Aurora on March 15, 2019?
```

## Wyndham - Carlsbad

```
           03          A    Okay.  "As I explained in the email to John
           04     and Susan, CLG will not tell the clients to 'not make
           05     their payments.'  That is a liability issue for us as
           06     a law firm.  What CLG can tell them is that if there
           07     is a Tradebloc in place, it would be safe for them to
           08     stop payments.
           09               "However, what I will tell you is that if
           10     the clients continue to make their payments, they
           11     will never get out of their contract.  Therefore, we
           12     rely on RAG to advise the clients to stop payment.
           13               "If you need further explanation, please
           14     call Attorney Sean."
           15          Q    Do you recall sending that email to Aurora?
           16          A    No.  I didn't even remember who Aurora was.
```

### 24. PAGE 52:21 TO 54:10 (RUNNING 00:01:46.430)

```
           21          Q    So based upon this email, was it Sean that
           22     advised you that it was a liability issue for the law
           23     firm to tell the clients to not make payments?
           24          A    Yes.
           25          Q    And you said here, "Therefore, we rely on
  00053:01     RAG to advise the clients to stop payment."  Was that
           02     the policy that Mr. Slattery had told you to follow?
           03          MR. GABRIELSON:  Object to form.
           04          A    I don't know if he told me that.  I don't
           05     know.
           06          Q    Who told you that?
           07          MR. GABRIELSON:  Object to form.
           08          A    I don't recall.  I don't recall that.  And
           09     I don't recall typing that email.
           10          Q    "However, what I will tell you is that if
           11     the clients continue to make their payments, they
           12     will never get out of their contract."  Was that
           13     something that you typically told timeshare clients
           14     or --
           15          A    No.  No.  We would never tell them that.
           16          Q    Then why did you write that in the email in
           17     March of 2019?
           18          A    Oh, I think it's common sense that if they
           19     make their payments, why are they going to release
           20     them?  They were reluctant to release them anyway.
           21          Q    You indicated here, "Therefore, we rely on
           22     RAG to advise the clients to stop payment."  Your
           23     language that you "rely on RAG," did someone at RAG
           24     tell you that that's what they were telling timeshare
           25     owners?  That they could stop payment?
  00054:01          A    I don't recall.  I didn't have that much
           02     conversation with Resort Advisory.  I had much more
           03     with Timeshare Compliance.  And I believe that Aurora
           04     wasn't there a whole lot.
           05          Q    And you also would have been in regular
           06     communication with Sean Slattery; correct?
           07          A    Yes.
           08          Q    And did you speak with Sean Slattery on a
           09     daily basis?
           10          A    Yes.
```

### 25. PAGE 55:02 TO 55:14 (RUNNING 00:01:04.800)

```
           02          Q    Okay.  So with respect to the fact that you
           03     said, "We rely," when you said "we," were you
           04     referring to you personally, or were you referring to
           05     "we" meaning Carlsbad Law Group?
           06          A    I probably meant Carlsbad Law Group.
           07          Q    Did Sean Slattery ever explain to you why
           08     he only wanted clients that had the Tradebloc in
```

Case Clip(s) Detailed Report
Tuesday, October 18, 2022, 1:16:40 PM

## Wyndham - Carlsbad

```
            09    place?
            10         A    Not in a whole lot of detail, but just that
            11    he wanted them protected.
            12         Q    Did you receive phone calls from timeshare
            13    owners who had credit issues?
            14         A    I think so.
```

**26. PAGE 56:02 TO 56:18 (RUNNING 00:00:55.870)**

```
            02         Q    If in the process that we discussed, if
            03    there was no response from the developer, you said
            04    that there was no next step; is that fair?
            05         A    Correct.
            06         Q    So did you ever have an instance where
            07    there was a client who a Demand Letter had been sent,
            08    and the Demand Letter had been sent several years
            09    prior?
            10         A    Yes.
            11         Q    What would you tell those people that there
            12    was no next step?  Did you ever indicate to them that
            13    there was no next step?
            14         A    What I would say is that they're going to
            15    have to move on it sometime.  Because if they weren't
            16    making payments, then the timeshare was sitting there
            17    idle, and they would -- they would eventually want to
            18    resell it and start making money on it again.
```

**27. PAGE 57:02 TO 57:05 (RUNNING 00:00:13.860)**

```
            02         Q    Was there a process in place to advise the
            03    clients when the 12 or 18 months had lapsed and the
            04    representation was going to end?
            05         A    No.
```

**28. PAGE 59:03 TO 59:04 (RUNNING 00:00:06.125)**

```
            03         Q    I'm going to show you a document that I'm
            04    going to mark as Exhibit 8.
```

**29. PAGE 59:09 TO 60:01 (RUNNING 00:00:53.280)**

```
            09         Q    Okay.  So this is an email dated
            10    October 4th, 2018.  And it's WYN-Carlsbad076951.  Do
            11    you see that?
            12         A    Mm-hm.
            13         Q    And do you recall -- this is after you
            14    would have started with Del Mar Law Group.  Do you
            15    recall ever receiving responses like this from
            16    Wyndham that said --
            17         A    So this was from Wyndham to Sean?
            18         Q    Yes.
            19         A    Yeah, I would -- yeah.  We did receive some
            20    of those.
            21         Q    And so you recall specifically receiving
            22    emails from Wyndham that were rejecting the Demand
            23    Letters?
            24         A    Yes.  I mean, I didn't -- personally, I
            25    didn't read them.  I mean, there was so much work, I
   00060:01   would see what it was and I would pass it along.
```

**30. PAGE 61:02 TO 61:07 (RUNNING 00:00:16.770)**

```
            02         Q    So after Del Mar Law Group received
            03    notification for certain clients by Wyndham that it
            04    was rejecting the demand, was there any next step
            05    that was communicated to you by Sean Slattery as to
            06    what to do for these people?
            07         A    No.
```

## Wyndham - Carlsbad

**31. PAGE 62:13 TO 62:17 (RUNNING 00:00:15.970)**

```
         13          Q    And now we're looking at Exhibit 35, which
         14     is an email you sent in December of 2018.  And as you
         15     said, you were asking questions of Sean Slattery and
         16     Trevor Bowen?
         17          A    Mm-hm.
```

**32. PAGE 63:01 TO 64:11 (RUNNING 00:01:32.180)**

```
00063:01          Q    Right.  And so with respect to the Morrises
      02     who received a rejection to their Demand Letter in
      03     2018 by Wyndham, Ashleigh Matua writes to you and
      04     says, "Hi Debbie, Our clients Sybil and Timothy
      05     Morris are requesting a refund and our Sr. leadership
      06     team advised that they will be reaching out to the
      07     clients, however they would like direct update on
      08     their case.
      09               "Sr. leadership is asking that you please
      10     provide a detailed update on this file and if you
      11     have an estimated time frame of when it might close
      12     or how it might close.
      13               "Thank you Debbie!" ?
      14               Do you remember receiving that?
      15          A    I don't remember receiving it, but yeah,
      16     it's typical.
      17          Q    And then your response, you forwarded that
      18     email to Sean and Trevor.  You see that?
      19          A    Mm-hm.
      20          Q    And can you read for me what you wrote to
      21     Sean Slattery and Trevor Bowen?
      22          A    "Please advise how you want me to respond.
      23     Typically, I would state that (as shown on
      24     spreadsheet) last action is --" I think it's -- it's
      25     blocked.  I can't see.  Something -- "10.04.2018
00064:01     Wyndham responded to our demand of 08.07.2018
      02     advising that there is no offer.  I would then
      03     explain foreclosure/Tradebloc situation and advise
      04     that in this situation, foreclosure is NOT a bad
      05     thing.
      06               "Please know that I am getting multiple
      07     emails like this daily.  This one seems to be more
      08     direct with the 'Sr. Leadership' mentioned several
      09     times.  I believe that we are receiving these because
      10     we are now approaching the 18-month deadline and TSC
      11     is concerned about having to reimburse many clients."
```

**33. PAGE 65:10 TO 66:07 (RUNNING 00:01:16.804)**

```
         10          Q    You then said below that, "Please know --"
         11     this is written to Sean Slattery and Trevor Bowen.
         12     "Please know that I am getting multiple emails like
         13     this daily."  Do you remember getting those multiple
         14     emails daily about that?
         15          A    Yeah.  Sort of.
         16          Q    Were you concerned at all that there really
         17     was no additional update to provide once the demand
         18     had been sent and the response, if any, had been
         19     received?
         20          A    On occasion, we would send -- we would
         21     resend the demand or -- I mean, each situation was so
         22     different.  If there was something that I saw, I
         23     pulled out the file and it was jumping out at me, I
         24     would share it with Sean.  And maybe they would send
         25     the same Demand Letter a second time.
00066:01          Q    The exact same Demand Letter?
      02          A    I believe so.
```

## Wyndham - Carlsbad

```
        03          Q    If it didn't work the first time, what was
        04     the thought process as to why the exact same Demand
        05     Letter being sent a second time would be effective?
        06          A    I don't know the thought process behind
        07     that.
```

### 34. PAGE 68:07 TO 68:16 (RUNNING 00:00:25.930)

```
        07          Q    How much did you observe that Timeshare
        08     Compliance was charging customers?
        09          A    A lot more than Carlsbad Law Group was
        10     getting.
        11          Q    Do you know how much specifically?
        12          A    Well, it varied.  Because I think it was
        13     based upon what they paid for the cost of the sale.
        14          Q    The cost of the sale of the timeshare
        15     contract?
        16          A    Yes.  The timeshare itself.
```

### 35. PAGE 68:24 TO 69:23 (RUNNING 00:01:13.080)

```
        24          Q    From the perspective of somebody working at
        25     Carlsbad Law Group, was there any difference in the
00069:01     amount of work to be performed depending upon the
        02     total sale price of the timeshare?
        03          A    No.
        04          Q    If the work to be performed was the same no
        05     matter how much a timeshare owner had paid for a
        06     timeshare, was it ever explained to you why Timeshare
        07     Compliance was charging different rates?
        08          A    No.
        09          Q    Were you ever curious about that?
        10          A    Yeah.  And I believe I did ask, and I was
        11     told it was based upon the sale.  The cost of the
        12     sale of the timeshare.
        13          Q    Now, other than sending the timeshare owner
        14     to Carlsbad Law Group, were you aware of anything
        15     that Timeshare Compliance itself was doing for the
        16     fee that it charged?
        17          A    No.
        18          Q    Did you ever ask any questions about why it
        19     was that the law firm was only receiving $600 to $750
        20     yet Timeshare Compliance was collecting thousands of
        21     dollars?
        22          A    I often wondered it, but I felt it wasn't
        23     my place to get into Sean's business.
```

### 36. PAGE 79:03 TO 79:08 (RUNNING 00:00:18.471)

```
        03          Q    Do you recall, while you were working at
        04     either Del Mar or Carlsbad, a discussion about
        05     whether or not clients that Del Mar had signed up in
        06     2017 were actually out of their timeshare, but there
        07     was just no proof of it?
        08          A    Vaguely.  Vaguely.
```

### 37. PAGE 80:10 TO 81:10 (RUNNING 00:01:15.940)

```
        10          Q    I'm going to show you what we'll mark as
        11     Exhibit 15.  It's PROD14102.
        12               (Exhibit Plaintiffs' 15 remotely identified
        13     and provided electronically to the reporter)
        14               See this?
        15          A    Mm-hm.
        16          Q    And do you recall an email that you sent to
        17     clients@seasideconsultants.com and cc:'d
        18     kimr@seasideconsultants --
        19          A    Mm-hm.
```

```
            20      Q     -- back in September of '18?
            21      A     Yes.
            22      Q     What do you remember about this?
            23      A     Let me read it.  It caused a ruckus.  She
            24   wasn't happy with my email.  But we didn't have
            25   manpower.  And the way we had it set up, Timeshare
00081:01     was always very accommodating and trying to make our
            02   lives easier.  And Ashlie wasn't of the same mind.
            03   Ashlie Davis.
            04      Q     You mentioned here in the email, you said,
            05   "Ashlie, we have a staff of four manning the phones
            06   and simply do not have the ability to provide
            07   updates."  Is that what you're referring to that
            08   caused the ruckus?
            09      A     Yeah.  She felt that it was our
            10   responsibility.
```

### 38. PAGE 82:17 TO 83:22 (RUNNING 00:01:22.790)

```
            17      Q     Can you read for me just that second longer
            18   paragraph that she sent to you?
            19      A     "We don't provide quarterly updates, it's
            20   just not possible.  We call them if there is
            21   something triggering to the case.
            22            "How am I supposed to call a client every
            23   three months to tell them, 'Oh, the Demand Letter was
            24   sent last year and we are still waiting for a
            25   response from the developer to release you from the
00083:01     timeshare.'  Then I get asked, 'Oh, what else is the
            02   law firm doing to get a response,' and we all know,
            03   you all don't do anything else after the Demand
            04   Letter is sent out, but I can't tell them that.
            05            "I have managed to create a little spiel to
            06   make it seem like we're not just waiting around.  I
            07   have mentioned that if nothing is on their credit
            08   report, then they are fine and the case is moving
            09   along as it should.  However, some clients are simply
            10   not satisfied with that, and most times it is better
            11   for them to hear this directly from the law firm who
            12   is handling their case."
            13      Q     Did you discuss with Sean Slattery this
            14   email?
            15      A     I believe so.  But, you know, like I'm
            16   saying, I've been gone for three months.  And really,
            17   once I quit, I tried to forget it all.
            18            And I believe with this one that I -- I
            19   took it to Sean and said, "You know what?  This is
            20   what we're dealing with."  And I believe at that
            21   point, he contacted the owner of Seaside and they had
            22   a meeting.
```

### 39. PAGE 88:05 TO 88:15 (RUNNING 00:00:37.440)

```
            05      Q     In Exhibit 15, did you discuss with Sean
            06   Slattery the spiel that Ashlie Davis indicated that
            07   she was using?
            08            MR. GABRIELSON:  Object to form.
            09      A     I think I probably just took that to Sean
            10   or forwarded it to him and say, "You know what?  How
            11   do you -- how do you want to handle this?"  I mean,
            12   that was above my -- my level of dealing with things.
            13      Q     Okay.  So did you forward this email to
            14   Sean Slattery?
            15      A     I'm sure I did.
```

### 40. PAGE 89:18 TO 90:04 (RUNNING 00:00:34.580)

```
            18            My question is:  Were you aware that there
```

Case Clip(s) Detailed Report
Tuesday, October 18, 2022, 1:16:40 PM

## Wyndham - Carlsbad

```
            19    were clients of Carlsbad Law Group who Wyndham had
            20    not let out of the contract?
            21         MR. GABRIELSON:  Object to form.
            22         MR. KLEIN:  Object to form and foundation.
            23    A    Yes.
            24    Q    How many clients of Carlsbad Law Group were
            25    you aware of in that situation?
   00090:01  A    I don't know the number, but there were
            02    quite a few.  Because at one point, we ended up
            03    pulling all the Wyndham files out and putting them in
            04    separate cabinets.
```

### 41. PAGE 90:19 TO 91:02 (RUNNING 00:00:29.410)

```
            19    Q    Did you ever discuss with Sean Slattery
            20    what to tell timeshare owners who it had been
            21    multiple years since the Demand Letter had been sent?
            22         MR. GABRIELSON:  Object to form.
            23    A    Yes.  And I believe that Sean was going to
            24    meet with -- with Timeshare and they were going to
            25    figure out how they wanted to approach that.
   00091:01  Q    Meet with Timeshare Compliance?
            02    A    Yes.
```

### 42. PAGE 100:19 TO 100:20 (RUNNING 00:00:04.520)

```
            19    Q    I'm going to show you a document that we'll
            20    mark as Exhibit 20.  It's PANDORA-017162.
```

### 43. PAGE 101:06 TO 101:17 (RUNNING 00:00:28.670)

```
            06    Q    And this email that we've marked as
            07    Exhibit 20, you see here that this is an email that
            08    you had sent to Ashleigh Matua at Timeshare
            09    Compliance in April of 2019?
            10    A    Yes.
            11    Q    And you said here, "As you can see from the
            12    spreadsheet, nothing --"
            13    A    -- "has."  Yeah.
            14    Q    -- "nothing has happened other than Wyndham
            15    responding to our Demand Letter advising there is NO
            16    OFFER."  In all caps.  Do you see that?
            17    A    Mm-hm.  Yes.
```

### 44. PAGE 101:22 TO 102:13 (RUNNING 00:00:59.120)

```
            22    Q    You then said, "I am asking you to call
            23    David Ansay," the client, "because he says his father
            24    is still paying on his timeshares!!??!!  This client
            25    is a September 2017 referral!!"  Why were you -- you
   00102:01  appear to be, from the use of the exclamation points,
            02    that you were surprised by this information?
            03    A    Well, because that was two years after we
            04    accepted him as a client and he was still paying and
            05    that was probably the reason he hadn't been released.
            06    Because I -- you know?
            07    Q    Then below that, you said, "Please let us
            08    know whether or not Mr. Ansay is still paying
            09    Wyndham."  Do you see that?
            10    A    Mm-hm.  Yes.
            11    Q    "That would explain why the matter has not
            12    moved into default/foreclosure."
            13    A    Yes.
```

### 45. PAGE 103:25 TO 104:07 (RUNNING 00:00:24.770)

```
            25    Q    Did Mr. Slattery advise you on what to tell
   00104:01  clients on whether or not the Tradebloc would protect
            02    their credit?
```

Case Clip(s) Detailed Report
Tuesday, October 18, 2022, 1:16:40 PM

## Wyndham - Carlsbad

```
           03      A     I believe so.
           04      Q     What did he say?
           05      A     Well, it wouldn't allow negative comments
           06   to go onto their credit reports regarding the
           07   timeshare ownership.
```

### 46. PAGE 115:09 TO 115:11 (RUNNING 00:00:07.730)

```
           09      Q     Did you tell clients that the credit block
           10   was effective?
           11      A     Yes.
```

### 47. PAGE 116:02 TO 116:09 (RUNNING 00:00:28.538)

```
           02      Q     Did you ever give any advice to clients
           03   regarding how they would go about stopping payment?
           04      A     I think sometimes clients would ask, and I
           05   would say, "I don't know.  But if it were me, I would
           06   probably call my bank and tell them to stop
           07   payments."  I mean, for the automatic ones.  Like I
           08   said, the clients weren't the most sophisticated
           09   people in the world.
```

### 48. PAGE 121:03 TO 121:04 (RUNNING 00:00:04.130)

```
           03      Q     I'm going to show you what we marked as
           04   Exhibit 1b, which is the email to the client.
```

### 49. PAGE 121:09 TO 121:17 (RUNNING 00:00:31.344)

```
           09      Q     Read for me the highlighted line there.
           10      A     "As a law firm, CLG does not give advice to
           11   clients as to when you should stop making payments.
           12   All I can say is that, as long as a Tradebloc is in
           13   place, it would be safe for you to stop payments."
           14      Q     That belief that it would be safe to stop
           15   payments, was that based upon information provided to
           16   you by Sean Slattery?
           17      A     Yes.  And I believe Ashleigh as well.
```

### 50. PAGE 122:13 TO 122:18 (RUNNING 00:00:22.570)

```
           13      Q     So if a timeshare owner stopped paying
           14   Timeshare Compliance, did that -- did that result in
           15   Carlsbad Law Group ceasing any additional work?
           16      A     If we were instructed by TSC.
           17      Q     And did that occur from time to time?
           18      A     Occasionally.
```

### 51. PAGE 122:24 TO 123:06 (RUNNING 00:00:33.530)

```
           24      Q     Would -- if the owner of a Timeshare
           25   Compliance -- the customer of Timeshare Compliance,
  00123:01   the timeshare owner, if that person had stopped
           02   making payments to Timeshare Compliance, did Del Mar
           03   or Carlsbad provide any notification to the client
           04   that they were not going to take any further action?
           05      A     No.  I think Timeshare Compliance notified
           06   them.
```

### 52. PAGE 124:02 TO 124:21 (RUNNING 00:00:58.610)

```
           02      Q     Yeah.  If you have a situation where the
           03   timeshare owner made their payment to the attorney,
           04   to Carlsbad Law Group, for instance --
           05      A     Mm-hm.
           06      Q     -- but had not completed the payments to
           07   Timeshare Compliance --
           08      A     Yes.
           09      Q     -- was it ever explained to you why
```

```
        10   Carlsbad Law Group would stop doing any work on that
        11   owner's behalf?
        12        A    No.  I think because in their contract with
        13   Timeshare Compliance, it was agreed that they would
        14   pay the full amount to TSC and then as well as our
        15   fee.  So I think it was part of their contract with
        16   TSC.
        17        Q    Was it your impression that the contract
        18   with Timeshare Compliance had to be met in order for
        19   the services of Carlsbad Law Group to be performed?
        20        A    I believe.  But I really didn't -- I didn't
        21   really pay attention to that.
```

### 53. PAGE 125:25 TO 126:01 (RUNNING 00:00:26.360)

```
        25        Q    I'd like to show you a document that I'll
00126:01     mark as Exhibit 27.
```

### 54. PAGE 127:08 TO 128:13 (RUNNING 00:01:14.710)

```
        08        Q    Was it typical in your experience that
        09   timeshare owners who wanted a refund would get less
        10   than 100 percent?
        11        A    I mean, it just depended.  If we had
        12   already sent the C&D.  We had spent weeks sending out
        13   the documents, getting them executed.  If we had
        14   invested time in it, we were --
        15        Q    What documents were you getting executed?
        16        A    The contract.
        17        Q    The retainer agreement?
        18        A    Yes.
        19        Q    And the Cease and Desist you're talking
        20   about, that's the form Cease and Desist that you
        21   prepared?
        22        A    Yes.
        23        Q    So that was the reason why you would give
        24   somebody less than 100 percent of a refund?
        25        A    Yes.  I would present it to Sean and Sean
00128:01     would decide.
        02        Q    So the 50 percent, are you referring to
        03   50 percent of like the $750 that they paid the
        04   attorney?
        05        A    Yes.  And remember, a lot of times, the
        06   clients could call and have us on the phone for a
        07   half-hour each call.
        08        Q    And who were they talking to on those
        09   calls?
        10        A    Any member of the team.  I think there were
        11   five when I was there.  And everybody except one
        12   person would take phone calls.  Gloria did not take
        13   calls.
```

### 55. PAGE 129:07 TO 129:20 (RUNNING 00:00:32.615)

```
        07        Q    Well, you understand that these people
        08   didn't just pay $750; right?
        09        A    Right.  Right.
        10        Q    You understand that these people paid, in
        11   many instances, thousands of dollars?
        12        A    Yes.
        13        Q    Okay.  So if a client paid $600 to Carlsbad
        14   Law Group and they got $300 back, you understand that
        15   that's not 50 percent of what they paid?
        16        A    Yes.
        17        Q    So who would they have to go to to get the
        18   rest of the refund?
        19        A    That wasn't my -- my business.  I don't
        20   know.  They would have to talk to Ashleigh.
```

```
56. PAGE 151:02 TO 151:09 (RUNNING 00:00:20.710)
        02         Q    Did you discuss with Mr. Gabrielson whether
        03    Carlsbad Law Group had a policy about what to tell
        04    people who asked if they could stop making their
        05    payments?
        06         A    I think the way he presented it to me is
        07    that he knew that we didn't tell them that.
        08         Q    Mr. Gabrielson knew that?
        09         A    I believe so.

57. PAGE 154:09 TO 154:24 (RUNNING 00:00:40.080)
        09         Q    Do you see here on February 20th, 2020 this
        10    email where you said in the second paragraph,
        11    "Timeshare Compliance put a Tradebloc in place for
        12    you on 04.19.2019"?
        13         A    Yes.
        14         Q    And can you read for me the next sentence?
        15         A    "This Tradebloc should protect your
        16    credit."
        17         Q    What gave you the impression that the
        18    Tradebloc would protect their credit?  Had you been
        19    told that by someone?
        20         A    Yes.  Sean and Ashleigh.  And Rachel.
        21         Q    Did you rely on those statements that were
        22    made to you in restating that to other timeshare
        23    owners?
        24         A    Yes.

58. PAGE 167:01 TO 167:02 (RUNNING 00:00:05.330)
   00167:01         Q    I'd like to show you what we will mark as
        02    Exhibit 49.

59. PAGE 169:21 TO 170:21 (RUNNING 00:01:11.480)
        21         Q    Was this Attorney Phases document that was
        22    being created, do you know whether or not this was
        23    being used for marketing?  For marketing purposes?
        24         A    I have no idea.
        25         Q    Do you see here on July 15th, 2020 that
   00170:01    Rachel Tuhro then sent an email to Karyn Young and
        02    copied Ashleigh Matua?
        03         A    I see it, yes.
        04         Q    And she says, "I like everything that you
        05    came up with.  The only slight change we will need to
        06    make is below."  And she talks about the phases?
        07         A    Yes.
        08         Q    And she goes through these phases,
        09    Phase 1.A, Phase 1.B, that talk about the attorney.
        10    And then she says, "This is because all the other
        11    attorneys need to fit into these Phases as well as
        12    our emails, texts, and CRM layout.  Also, from a
        13    marketing perspective, people remember odd numbers 3
        14    steps 5, 7."  See that?
        15         A    Yes.
        16         Q    Does this refresh your recollection at all
        17    as to whether or not this document was to be used for
        18    marketing purposes?
        19         A    I don't think I've ever seen this document
        20    before.  I think at that point, it was between Rachel
        21    and Karyn.

60. PAGE 171:03 TO 171:21 (RUNNING 00:00:46.120)
        03         Q    You see this is from Debbie White to Rachel
        04    at Resort AG?
        05         A    Yes.
```

Case Clip(s) Detailed Report
Tuesday, October 18, 2022, 1:16:40 PM

## Wyndham - Carlsbad

```
06          Q    And it attaches here a PowerPoint that's
07     the Attorney Phases?
08          A    Yes.
09          Q    What did you tell Rachel on July 14th,
10     2020?  Can you read that?
11          A    It says, "I have started my review/changes.
12     Will forward to you tomorrow."  So I think, if I
13     recall correctly, she must have given us a starting
14     point with it.  And I don't -- truly, I don't recall
15     what it was for.  And what I remember is, yeah, I may
16     have started it and then I said, "You know what?  I
17     can't -- I can't do it."
18          Q    And so you turned it off to --
19          A    Karyn.
20          Q    -- Karyn?
21          A    Yes.
```

**61. PAGE 173:05 TO 173:18  (RUNNING 00:00:38.073)**

```
05          Q    Did you need these Attorney Phases in order
06     to send out the Demand Letters?
07          A    No.  Because we already knew what we were
08     doing.
09          Q    Was this Attorney Phases, was this to
10     benefit Timeshare Compliance?
11          A    Yes.  And if I recall, Sean -- I think I
12     showed it to Sean and Sean's like [descriptive
13     sound].  And that's when I said, "I'm not doing
14     this."
15          Q    So Sean saw this?
16          A    I believe.  I mean, again, this is like so
17     long ago.  And remember, I'm responding to like 60 to
18     80 emails a day.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:42:43.662)**