# Wyndham - Carlsbad

 **Slattery, James L. (Vol. 01) - 01/21/2021 [James Slattery]**   1 CLIP  (RUNNING 00:57:11.910)

 UPDATED

JS-0121-0001114         57 SEGMENTS  (RUNNING 00:57:11.910)             

### 1. PAGE 11:14 TO 11:16  (RUNNING 00:00:06.440)

```
          14       Q    Sir, can you please state your full name for
          15   the record.
          16       A    Sure.  James Lewis Sean Slattery.
```

### 2. PAGE 14:19 TO 14:22  (RUNNING 00:00:08.490)

```
          19       Q    Are you a licensed attorney in California?
          20       A    Yes, I am.
          21       Q    Are you licensed in any other state?
          22       A    I am not.
```

### 3. PAGE 20:08 TO 20:10  (RUNNING 00:00:14.980)

```
          08       Q    Has there ever been any other owner of Del Mar
          09   Law Group other than yourself and John Donboli?
          10       A    No.
```

### 4. PAGE 20:17 TO 22:13  (RUNNING 00:03:25.700)

```
          17       Q    So currently as we sit here today, is Mr.
          18   Mr. Donboli an owner of Del Mar Law Group?
          19       A    Yes.
          20            Del Mar Law Group, just to give you some
          21   background, Counsel, is not active.  It hasn't been
          22   active since I started Slattery Sobel DeCamp.
          23            And when I say active, I mean it's an active
          24   entity.  It's just not an active law firm.  It doesn't
          25   have any clients, it doesn't have any attorneys.  It
00021:01   existed for the purposes of accounts receivable and some
      02   continuing class action settlements.  And currently it
      03   exists for the purposes of a dispute that me and
      04   Mr. Donboli are currently having.
      05       Q    I wanted to get into that because I want to
      06   clear up some things.  There's three law firm entities
      07   that are defendants in this case, Del Mar Law Group,
      08   Slattery Sobel & DeCamp and Carlsbad Law Group, correct?
      09       A    Del Mar Law Group, LLP, Slattery Sobel DeCamp,
      10   LLP and Carlsbad Law Group, LLP.
      11       Q    Del Mar Law Group, LLP was formed sometime
      12   around 2009 and remains active until today, is that
      13   right?
      14       A    Correct.
      15       Q    All right.  But when did Del Mar Law Group,
      16   LLP stop having clients?
      17       A    When I started Slattery Sobel DeCamp.
      18       Q    What year was that that you started Slattery
      19   Sobel DeCamp?
      20       A    January of 2017 maybe.
      21       Q    Why did you start that entity?
      22       A    Because John Donboli was not in the office for
      23   about a year and my practice, along with some attorneys
      24   I was working with, were proliferating, and we --
      25   Camille DeCamp and Steven Sobel, who were both working
00022:01   at Del Mar Law Group, the three us of formed a
      02   partnership called Slattery Sobel DeCamp, LLP, which was
      03   -- that is when Del Mar Law Group stopped having
```

CONFIDENTIAL                                              EXHIBIT 14     page 1

## Wyndham - Carlsbad

```
          04   clients.
          05        Q    In January of 2017?
          06        A    I remember my break from John Donboli was in
          07   October, probably October of '16.  And so there were a
          08   couple of months where Camille might have been working
          09   for Del Mar Law Group, even though she was going to
          10   exit.  So there was a little bit of a transition.  But
          11   I'd say for all intents and purposes we were entirely up
          12   and running and separate from Del Mar Law Group in
          13   January of 2017.
```

### 5. PAGE 23:19 TO 23:25 (RUNNING 00:00:20.640)

```
          19        Q    The employer liability cases that you say that
          20   you've handled --
          21        A    I don't say I handle that, Counsel.  I do
          22   handle them.  I actually handle cases like that.  I'm
          23   not saying that I handle.  I do handle them.
          24        Q    Do you represent employers or employees?
          25        A    I represent employers.
```

### 6. PAGE 24:19 TO 25:12 (RUNNING 00:00:57.908)

```
          19        Q    Did you ever go and cold-call any of those
          20   clients asking them for business?
          21        A    No.  I've never made a cold call in my life.
          22        Q    Why not?
          23        A    Not one.
          24             Because I'm busy.  Like my time is in need.
          25   So I have work, enough where I don't need to make phone
 00025:01   calls and cold calls.
          02        Q    Are you permitted --
          03        A    No, I've never made a cold call in my entire
          04   career, Mr. Quinn.
          05        Q    Are you finished?
          06        A    I bet you guys have.
          07        Q    Are you finished?
          08        A    I am.
          09        Q    Are you permitted to cold-call potential
          10   clients, such as your employer clients, for work?
          11        A    Under the California Rules of Professional
          12   Responsibility, no.
```

### 7. PAGE 25:16 TO 25:17 (RUNNING 00:00:05.910)

```
          16        Q    Have you ever represented timeshare owners as
          17   clients?
```

### 8. PAGE 28:06 TO 28:15 (RUNNING 00:00:23.980)

```
          06        Q    What was the office address for Del Mar Law
          07   Group?
          08        A    It was an El Camino Real address.  El Camino
          09   Real, Suite 100.  I forget the first prefix numbers.
          10        Q    What was the office address for Slattery,
          11   Sobel & DeCamp?
          12        A    Same.
          13        Q    So you were operating out of the exact same
          14   office?
          15        A    Yeah.
```

### 9. PAGE 30:23 TO 31:02 (RUNNING 00:00:16.356)

```
          23        Q    Did you have two separate leases for Del Mar
          24   and for SSD?
          25        A    No.  SSD absorbed Del Mar Law Group's -- the
 00031:01   remainder of Del Mar Law Group's leases, and paid the
          02   rent.
```

**10. PAGE 32:12 TO 32:20  (RUNNING 00:00:35.780)**

```
           12        Q     When did Slattery, Sobel & DeCamp end?
           13        A     Again, constructively, it might -- it is an
           14   active entity for the purposes of accounts receivable.
           15   But, again, like Del Mar Law Group, it stopped taking
           16   any clients or working on any matters when we -- I
           17   formed the Carlsbad Law Group with David Hall and Tim
           18   Campen.
           19        Q     When did you form Carlsbad Law Group?
           20        A     I stated earlier March of 2019.
```

**11. PAGE 33:02 TO 33:14  (RUNNING 00:00:39.140)**

```
           02        Q     There was no merger of any of those entities?
           03        A     No.
           04              And essentially I was the person who had all
           05   the work.  So I would just move the work out of Del Mar
           06   Law Group into Slattery Sobel DeCamp.
           07              And then when Slattery Sobel DeCamp, they
           08   didn't bring in any work, they had taken other jobs, I
           09   still had a lot of work and I still had attorneys
           10   working for me at Slattery Sobel DeCamp.
           11              And then David Hall came back into my life and
           12   we started Carlsbad Law Group.  And I just transitioned
           13   all of my hourly clients out of Slattery Sobel DeCamp
           14   and we're doing it here at Carlsbad Law Group.
```

**12. PAGE 40:14 TO 41:01  (RUNNING 00:00:51.560)**

```
           14        Q     When did you first start accepting timeshare
           15   owners as clients?
           16        A     Probably the middle of 2017.
           17        Q     And that was after Slattery Sobel DeCamp had
           18   been formed?
           19        A     No.
           20        Q     You said earlier that Slattery Sobel DeCamp
           21   was formed in January of '17.  So that would be after,
           22   right?
           23        A     Yeah.  Yeah.  I guess you're right.  But, you
           24   know, Counselor, there was a lot of stuff going on, so I
           25   -- you know, again, I could be saying 20 -- just forget
  00041:01   it.  I believe it was in the middle of 2017.
```

**13. PAGE 41:09 TO 41:17  (RUNNING 00:00:32.660)**

```
           09        Q     You testified earlier that one of the reasons
           10   you formed SSD was because Donboli was not around, is
           11   that right?
           12        A     That's correct.  For the money that I was
           13   generating, he was -- believed he was entitled to and
           14   was taking half, and I was -- I was not okay with that
           15   because I was generating the revenue along with
           16   Mr. Sobel and Ms. DeCamp and that's why we started that
           17   law firm, for equity purposes.
```

**14. PAGE 41:23 TO 43:04  (RUNNING 00:02:39.670)**

```
           23        Q     Describe for me how it was that you came to
           24   start obtaining these timeshare-owner clients in 2017.
           25        A     That's a long story.  An enterprising friend
  00042:01   of mine who I've known since high school and I grew up
           02   surfing with has a surf company and some other
           03   businesses, and I've kept in touch with him throughout
           04   the years by virtue of my friendship and my occupation,
           05   he met Mr. Folk and Mr. Wilson in one of his -- one of
           06   his business endeavors.  And I remember him -- at the
           07   time he was telling me about it I was working on some
           08   trademark issues for his surf company, and so this is
```

**Wyndham - Carlsbad**

```
            09   just kind of dialogue on the side, like what's going on.
            10   And then -- that probably lasted for like seven months,
            11   where he -- you know, at some point that business was
            12   proliferating and they said you need to meet these two
            13   guys because, you know, they don't know a good attorney
            14   and, you know, you've been doing great work for me.
            15           And so I'd say like sometime in the beginning
            16   of 2017 Chhris put together a meeting between the four
            17   of us.  And they were just basically asking me what kind
            18   of practice I had, and then I think they started talking
            19   about what they're doing.  And, you know, I just kind of
            20   gave them my take on, you know, what that was and they
            21   kind of went on their way.
            22           And then it was probably a couple of months
            23   later where we touched base again and we started talking
            24   about me and my law firm taking referrals from people
            25   who needed an attorney for the timeshare exit or the
   00043:01   timeshare resolution.
            02       Q   When you said Folk and Wilson, are you
            03   referring to Rich Folk and William Bo Wilson?
            04       A   I am.
```

**15. PAGE 46:18 TO 46:24  (RUNNING 00:00:16.940)**

```
            18       Q   You did attend the other depositions in this
            19   case, right?
            20       A   Which depositions are you referring to?
            21       Q   The deposition of William Wilson or the
            22   deposition of Rich Folk.
            23       A   I was probably in on 60, 70 percent of those,
            24   correct, those two.
```

**16. PAGE 46:25 TO 47:11  (RUNNING 00:00:50.070)**

```
            25       Q   At least based upon your knowledge in having
   00047:01   witnessed those depositions, were you aware either
            02   before those depositions or now, presently, that Pandora
            03   Marketing was operating in some way RAG through a
            04   services agreement?
            05           MR. WAGNER:  I'm going to object to the form.
            06       Go ahead.
            07       A   Yeah.  Yeah, I think what they were -- there
            08   was -- I was getting referrals from RAG and Timeshare
            09   Compliance.  And there was a time period where Timeshare
            10   Compliance was doing stuff for RAG.  And -- that's what
            11   I know.  What exactly they were doing, I don't know.
```

**17. PAGE 53:20 TO 55:01  (RUNNING 00:02:23.730)**

```
            20       Q   Did Rich or Bo ever tell you or describe for
            21   you what it is that they or their company Timeshare
            22   Compliance was telling these customers about what it is
            23   that you would do for them?
            24       A   No.  No.
            25       Q   They never described how it is that they were
   00054:01   describing the service that you would be providing?
            02       A   Can you repeat that?
            03       Q   Did they ever -- did they ever tell you how
            04   they were describing the service that you would provide?
            05       A   No.  I don't recall them ever telling anybody
            06   the service that I would -- well, -- I guess, yeah,
            07   constructively, yeah, that we -- that there was an
            08   attorney who could -- who you could call and who could
            09   help you out.  And then I would take that call and we
            10   would, you know, enter into a relationship.
            11       Q   Did Rich or Bo ever tell you how Timeshare
            12   Compliance was obtaining its customers?
            13       A   No.
```

## Wyndham - Carlsbad

```
         14        Q    Did you ever ask?
         15        A    Yeah, I do remember a conversation early on
         16   where they were saying they had leases -- a lease with a
         17   real estate company with space throughout the country
         18   and that they would run television and radio
         19   advertisements in those areas where they would kind of
         20   set up like their market.  So yes, that was my
         21   understanding.
         22        Q    Did they ever share with you any of those
         23   radio or TV advertisements?
         24        A    No.  But I have seen a television -- probably
         25   two or three television commercials just in watching TV
00055:01   myself, or my kids or my wife, when the TV is on.
```

**18. PAGE 55:10 TO 57:07 (RUNNING 00:03:24.860)**

```
         10        Q    Have you ever listened to any of the
         11   recordings of the telephone sales calls that Timeshare
         12   Compliance was conducting?
         13        A    I listened to the ones I think you played
         14   during -- was it Mr. Folks' deposition?
         15        Q    The recordings that we played during Mr.
         16   Folks' deposition, did you have any concern upon
         17   listening to those conversations regarding the manner in
         18   which your service was being described?
         19        A    Sure.
         20        Q    What were your concerns?
         21        A    I don't recall specifically other than I think
         22   they were going to say that I would tell them to stop
         23   making their payments and I would cure everything.  And
         24   that wasn't -- that wasn't the case.
         25             I remember having discussions after that
00056:01   deposition with Rich and Bo themselves regarding their
      02   own frustration with those examples and how they were
      03   contrary to their best practices.  And I think they
      04   fired Courtland for 24 hours after that happened.
      05             I just remember there was a lot of
      06   consternation because Rich and Bo were expressing how
      07   those -- those examples were not consistent with their
      08   best practices.
      09        Q    Did you suggest to Rich, Bo or anyone else at
      10   Timeshare Compliance about how they could change their
      11   telephone sales pitch?
      12        A    No, other than, you know, that particular
      13   example that everyone was frustrated about.
      14        Q    Did you ask Rich or Bo to change the sales
      15   script that's currently in place at Timeshare Compliance
      16   after you heard that deposition testimony?
      17        A    No, no.  I mean, I'm confident in the
      18   businessmen and the conduct of how those two gentlemen
      19   run their business, and I knew that that would change.
      20             But, Counsel, you've got to understand, like,
      21   the agreement that any timeshare consumer enters in with
      22   -- to me is completely separate.  And whatever
      23   expectation they might have coming, before calling my
      24   office, may or may not change when they enter an
      25   engagement with me because it's very clear what I'm
00057:01   going to do for them, what I'm not going to do for them,
      02   what I'm going to tell them and what I'm not going to
      03   tell them.
      04             So the moment that I get that call, it's very
      05   clear that it's a separate relationship with me.  You're
      06   asking me to help you out.  And this is the way that I
      07   would help you out.
```

**19. PAGE 57:17 TO 58:19  (RUNNING 00:01:46.070)**

```
           17        Q    Can you think of a scenario where a timeshare
           18   owner would be referred to you by Timeshare Compliance
           19   and would get to you before any payment was made to
           20   Timeshare Compliance?
           21        A    When you say get to me, I don't really know
           22   what you mean by that.
           23             But, yeah, I do remember a few, I'd say a
           24   handful, over five, where throughout the time where in
           25   the discussions a client was having or -- wait, wait,
  00058:01   wait -- that a customer was having with Timeshare
           02   Compliance that that consumer or their representative in
           03   the case that it was somebody it was old and dealt with
           04   a child, you know, a son or a daughter who was
           05   representing them, would call me and ask and inquire
           06   what exactly I would do.
           07             And so when you say get to me, there are some
           08   times that I'm taking a lot of phone calls where people
           09   are, okay, well, who is Carlsbad Law Group, who is Sean
           10   Slattery, and what does this process look at.  And so I
           11   don't know if that's falls into "get to you."
           12             But there have been numerous instances where
           13   they're contacted -- people have contacted me before
           14   making any payment to Timeshare Compliance.
           15        Q    In those circumstances where you spoke with
           16   the consumer, did that customer or consumer ultimately
           17   sign up with Timeshare Compliance?
           18        A    I don't recall.  I don't recall.  Probably.
           19   But I don't know.
```

**20. PAGE 63:12 TO 64:03  (RUNNING 00:00:57.830)**

```
           12        Q    The timeshare owners that were signing --
           13   well, let me ask you this.  Did all of the timeshare
           14   owners that you represented sign a retainer agreement?
           15        A    Yes.
           16        Q    And was that retainer agreement signed by you?
           17        A    Yes.  There may have been instances early on
           18   where John Donboli was signing the retainer agreements,
           19   and then I know of events recently where I might not be
           20   in the office and Cynthia would sign a retainer
           21   agreement.  But, yeah, for the most part 99 percent of
           22   them I signed.
           23        Q    Was any law firm that you were affiliated with
           24   reflected on that retainer agreement as well?
           25        A    Yeah, depending upon the law firm that they
  00064:01   were engaging.  It would have either said Del Mar Law
           02   Group or Carlsbad -- Del Mar Law Group, LLP Or Carlsbad
           03   Law Group, LLP.
```

**21. PAGE 66:17 TO 67:08  (RUNNING 00:01:05.440)**

```
           17        Q    Why is it that according to you the retainer
           18   agreements indicate that there can be no guaranteed
           19   outcome?
           20        A    Look, Mike, you're an attorney.  Are you
           21   taking a case that you guarantee any outcome from?
           22   There's too many variables, no matter what context
           23   you're talking about, whether you're talking about
           24   arbitration, talking about litigation or even
           25   prelitigation jousting.  Like, you can't -- you're an
  00067:01   advocate.  You can't guarantee it.  I mean, I don't got
           02   to tell you.  Do you guarantee your results?  What
           03   attorney does?  That would be madness.
           04        Q    Do the California Rules of Professional
           05   Conduct allow you to guarantee outcomes?
```

## Wyndham - Carlsbad

```
          06       A    That's a good question.
          07            It just goes to the reasonableness, like who
          08  would want to guarantee any outcome as an attorney.  Why
```

**22. PAGE 68:25 TO 69:20  (RUNNING 00:01:05.222)**

```
          25       Q    So a claim of a hundred percent success rate
 00069:01  would be a form of a guarantee.  Do you agree with that?
          02            MR. WAGNER:  I'm going to object to the form.
          03       A    It's a good question.  I don't know.
          04  Different judges would probably differ on it.  So I
          05  don't know.  It's a good question.
          06  BY MR. QUINN:
          07       Q    Well, I'm asking you because you represent
          08  these timeshare owners.  Do you think it's appropriate
          09  for someone to tell these timeshare owners that there's
          10  a hundred percent success rate in getting people out of
          11  their timeshare?
          12            MR. WAGNER:  I'm going to object to the form.
          13       A    If somebody said that, would it be
          14  appropriate?  No.  Unless it was true.
          15  BY MR. QUINN:
          16       Q    Is it true?
          17       A    Is what true?
          18       Q    That you have a 100 percent success rate in
          19  getting people out of a timeshare?
          20       A    No.
```

**23. PAGE 70:06 TO 70:11  (RUNNING 00:00:26.290)**

```
          06       Q    Did Mr. John Donboli ever express to you any
          07  reservation or reluctance in entering into this business
          08  relationship with Timeshare Compliance?
          09       A    Was it monetarily going to be worth his while.
          10       Q    That was his only concern?
          11       A    Yes.
```

**24. PAGE 70:24 TO 71:19  (RUNNING 00:01:28.480)**

```
          24       Q    Are you aware that Mr. Donboli in the lawsuit
          25  that he filed against you in the Superior Court of
 00071:01  California San Diego, that he has alleged that you
          02  orchestrated a timeshare scheme over his objection?
          03       A    No.  But if he wrote that, I wouldn't doubt
          04  it.  The guy has written a lot of stuff that is
          05  incredible.
          06       Q    In paragraph ten of the first amended
          07  complaint of John Donboli, he says:  Donboli further
          08  alleges on information and belief that Slattery used Del
          09  Mar Law Group assets and funds to orchestrate a, quote,
          10  timeshare scheme, unquote, over objection of Donboli
          11  that consisted of Slattery sending demand letters on
          12  partnership letterhead to customers.
          13            Do you disagree with the veracity of that
          14  statement?
          15       A    Absolutely.
          16            He received money -- he received money on
          17  behalf of clients that we received money for and he
          18  signed letters and participated in it.  So absolutely I
          19  have a disagreement with that.  He participated in it.
```

**25. PAGE 72:09 TO 73:16  (RUNNING 00:02:14.335)**

```
          09       Q    Did you or Mr. Donboli ever check with the
          10  California Bar regarding the propriety of the
          11  relationship with Timeshare Compliance before you
          12  entered into the agreement?
          13       A    No.
```

```
         14        Q    Have you ever sought any opinion, ethics
         15   opinion, or other advice from the California Bar
         16   regarding the propriety of the relationship that you
         17   have with Timeshare Compliance?
         18        A    Not from the California Bar, no.
         19        Q    Have you sought that from any other bar
         20   association?
         21        A    No.
         22        Q    You said not from the California Bar, so that
         23   makes me believe that you have sought an ethics opinion
         24   of some type from some other organization.  Is there
         25   another organization --
00073:01        A    Not necessarily an ethics opinion.  There was
         02   an attorney who used to prosecute for the California Bar
         03   who Rich and Bo hired about how this thing was going to
         04   work.  And I remember having lunch with the three of
         05   them about administrative realities versus canons of
         06   professional responsibilities, whether it be in the
         07   context of an attorney referral service or in the
         08   context of improper solicitation or in the context of
         09   fee sharing.
         10        Q    Were there any conclusions that you reached
         11   based upon that conversation?
         12        A    When you say conclusions, I don't really know
         13   what you mean by that.  I mean, we heeded the advice,
         14   measured it against the realities of efficient
         15   administration and representation and proceeded
         16   accordingly.
```

**26. PAGE 75:13 TO 76:24  (RUNNING 00:02:43.117)**

```
         13        Q    For $750 a client, how could it possibly be
         14   expected that you could do anything other than perhaps
         15   send a letter on behalf of a client?
         16        A    Oh, Counsel, we do a lot for that $750.  First
         17   we draft a cease and desist letter to the developer,
         18   which advises the developer to stop communicating with
         19   my client and instead communicate with me.  So that
         20   relieves my client the burden of having to deal with an
         21   obligation they're looking to resolve.
         22             After retaining them and sending out that
         23   letter of representation, we also send out a factually
         24   detailed legal analysis and demand letter, which is, as
         25   you've seen, despite how you characterize them, they are
00076:01   substantive factually detailed letters written by good
         02   attorneys in my office.
         03             And then, third, what comes after that can
         04   take a multitude of shapes for what we do for that $750.
         05             And -- I mean, I don't know.  Do we go
         06   backwards on it after it's all said and done?  Quite
         07   possibly on a lot of this stuff because of the various
         08   things that can happen have happened and will happen
         09   after initiating a communication with -- or not
         10   initiating but with our subsequent demand letter
         11   explaining the bases of why they should allow our client
         12   to resolve their exit or resolve their obligation.
         13        Q    Are all of the retainer agreements that you
         14   enter into with these timeshare-owner customers based
         15   upon a flat non-refundable fee?
         16        A    Non-refundable?  No.  I don't -- we don't have
         17   nonrefundable fees.  I've refunded thousands of clients
         18   who become bigger headaches than I want to deal with
         19   because they -- did I say thousands?  I don't know.
         20   Maybe like 20 people who are just -- who their
         21   expectations are out of whack.  You refer them to our
         22   services agreement and they're still unhappy.  So no
         23   matter where I am at in the process and how much money
```

```
         24    I've expended, I've refunded numerous customers.
```

**27. PAGE 88:08 TO 88:19  (RUNNING 00:00:38.185)**

```
         08         Q    Do you know who at Timeshare Compliance puts
         09    together the letter of explanation?
         10         A    Yeah.  It would be the person -- I don't know
         11    what they call them, but whoever the person is who is
         12    executing the deal.  I don't know if they call them an
         13    analyst or a sales representative or whoever that person
         14    is.
         15         Q    Have you spoken with any of these sales
         16    representatives regarding what they should look for in
         17    terms of speaking with the customer or what they should
         18    include in the letter of explanation?
         19         A    No.
```

**28. PAGE 94:10 TO 94:22  (RUNNING 00:00:58.960)**

```
         10         Q    Why would your clients need credit protection?
         11         A    It's a long story.  Essentially because many
         12    of them have decided to stop paying their obligation,
         13    their timeshare obligation, and many times that results
         14    in an attempt by the developer to negatively report on
         15    that client's credit.  And so if they're not doing so
         16    properly and in compliance with the reporting laws, they
         17    need somebody to catch that so that they remove any
         18    leverage the developer might have to make them make
         19    their payments.  So basically negative credit reporting
         20    is the only leverage that your clients have to make sure
         21    my clients pay their obligation.  Or you can sue them,
         22    which Diamond has chose to do, which was a bad decision.
```

**29. PAGE 118:15 TO 119:06  (RUNNING 00:00:49.890)**

```
         15         Q    Speaking about California, that kind of leads
         16    me to my next question, which is:  Is Timeshare
         17    Compliance or RAG registered with the state bar of
         18    California as a legal referral service?
         19         A    No, because they're not a legal referral
         20    service.
         21              Do you know what a legal referral service is?
         22    Do you know how it's defined under California law?
         23         Q    I do.  Do you?
         24         A    Yes, I do.  I'm very well aware of what it is,
         25    of what a legal referral service is and what is
00119:01    necessary to establish someone who thinks they might not
         02    be a legal referral service but actually is.  Yes, I'm
         03    very well aware of those.
         04         Q    All right.  So you don't believe that --
         05         A    Timeshare Compliance is not a legal referral
         06    service under California law.
```

**30. PAGE 122:07 TO 123:15  (RUNNING 00:01:56.965)**

```
         07         Q    What is it that Timeshare Compliance does for
         08    your clients other than what your office does?
         09         A    Ask him.
         10         Q    I'm asking you.
         11         A    What do I know that they do?
         12              Oh, wow, they do a lot.  They advertise to
         13    bring the word to the general public that timeshare
         14    developers are scoundrels and that they rip off most of
         15    their contracts and there's probably going to be a
         16    reason why you could get out.  And if you're interested
         17    in getting out, you may want to call them.  So there's a
         18    public service aspect to it.
         19              A lot of people seek out their advice when
```

**Wyndham - Carlsbad**

```
           20    they have no understanding of what to do with their
           21    timeshare obligation, that they've stopped paying for
           22    it, and they ask them for guidance, and that they have a
           23    strategy how they get out.  And it can include referral
           24    to an attorney or it can include credit protection or it
           25    can include, you know, an escrow type of -- that if you
00123:01         don't get out and the money you pay us, we will pay you
      02         back if you don't get out.  Some sort of escrow
      03         money-back guarantee.
      04               They do a lot.  They escort the client through
      05         the process of a timeshare resolution.  And that can
      06         take many forms and can be both qualitative as well as
      07         quantitative.
      08               And the entirety of what they do I'm not
      09         familiar with, but what I just said is probably a pretty
      10         good general explanation.
      11         Q    Other than advertising, you said seek out
      12         advice.  I'm still not clear on what it is that you're
      13         aware of that Timeshare Compliance is doing for your
      14         clients.  Can you describe that in any way?
      15         A    Describe what?
```

**31. PAGE 123:16 TO 124:05  (RUNNING 00:00:51.765)**

```
           16         Q    Aren't they advertising that they're going to
           17    send their customers to a lawyer?
           18              MR. WAGNER:  Object to the form.
           19         A    No.  I think that they say that they have
           20    lawyers who they can refer you to.  And that may be --
           21    may or may not be a part of the process.  But I'm not
           22    familiar with exactly the contents of their advertising
           23    and how it implicates my legal services.
           24              But, whatever those are, a client by the time
           25    they make a phone call to me, not me making a phone call
00124:01         to them, they have a very clear written understanding of
      02         exactly what I and my law firm is going to do
      03         irrespective of any understanding they may or may not
      04         have as a result of representations by Timeshare
      05         Compliance or anybody else.
```

**32. PAGE 124:06 TO 124:13  (RUNNING 00:00:15.690)**

```
           06    BY MR. QUINN:
           07         Q    After the client signs up with your office,
           08    does Timeshare Compliance do anything else for them?
           09         A    Yes.
           10         Q    What?
           11         A    It depends.
           12         Q    Depends on what?
           13         A    On whatever the circumstance is.
```

**33. PAGE 127:13 TO 127:24  (RUNNING 00:00:38.614)**

```
           13         Q    I think that the jury and I think the
           14    timeshare owners and your clients deserve an answer to
           15    the question, which is:  What is it that Timeshare
           16    Compliance does for these customers beyond send them to
           17    a credit repair service or send them to you?
           18              MR. WAGNER:  I'm going to object to the form
           19         of the question.
           20         A    Yeah.  And I'm going to also say it depends.
           21    And there are numerous instances where they have gone
           22    above and beyond both economically -- above what they
           23    have do.  So what they do is what the client expects
           24    them to do.
```

## Wyndham - Carlsbad

**34. PAGE 128:01 TO 129:25  (RUNNING 00:02:04.797)**

```
00128:01              MR. QUINN:  All right.  We're going to certify
     02        the question as the witness is being nonresponsive
     03        to the answer.
     04              THE WITNESS:  Mike, I told you they do a lot.
     05        And it depends on the circumstances.
     06        BY MR. QUINN:
     07        Q    If you don't know the answer, that's a
     08        completely fine answer.
     09        A    I do know the answer, Michael.  I'm telling
     10        you -- I'm telling you it depends.  Like I just told you
     11        of a circumstance.
     12              Like here's another thing they did.  There was
     13        a lawsuit by Hilton that was filed in New York.  It was
     14        one of my clients.  I tried to negotiate with the Hilton
     15        attorney.  I couldn't.
     16              What did Timeshare Compliance do?  They hired
     17        an attorney in New York, paid that attorney's legal
     18        fees, who negotiated a 30,000-dollar settlement from the
     19        timeshare obligation and Timeshare Compliance paid it,
     20        not the client.  So when I say it depends, there is a
     21        specific example of stuff that they do.  They paid
     22        $30,000 on a client that they collected less than $5,000
     23        for it to go away.
     24              So, again, to answer your question, Mike, it's
     25        not only credit repair and attorney referral service.
00129:01        They do a ton of stuff because they are advocates who
     02        care about what they're doing and they've worked on the
     03        side of the developers, your clients, and know the evil
     04        that your clients perpetuate.
     05              MR. WAGNER:  Okay.  Stop.
     06              MR. QUINN:  Yeah, just for the record, the
     07        witness has waggled his tongue and shaking --
     08              THE WITNESS:  I'm on video.
     09        BY MR. QUINN:
     10        Q    On video.  Yeah, we have video.
     11        A    I'm on video.  Because you're getting me a
     12        little riled up, Mike.  I know that was your objective,
     13        so you've succeeded.
     14        Q    It's certainly not.  I've tried to ask you I
     15        think a very fair question.
     16        A    And I gave a very fair response.
     17        Q    Every time I ask the question you go on a rant
     18        and you don't answer the question.  So once again we'll
     19        certify the question.  And we'll come back and try to
     20        revisit it.  And you're going to actually answer the
     21        question.
     22        A    We're doing --
     23              MR. WAGNER:  Hold on.  Stop, stop.  Don't
     24        speak until he asks a question.
     25              THE WITNESS:  All right.
```

**35. PAGE 134:22 TO 135:24  (RUNNING 00:01:32.766)**

```
     22        Q    Let's start here.  How many Wyndham owners do
     23        you currently represent?
     24        A    I don't know.
     25        Q    More than 500, less than 500?
00135:01        A    Oh, way less than 500.  We're probably talking
     02        about maybe a hundred.
     03        Q    Okay.  Could it be over 200?
     04        A    No.
     05        Q    Were all of those clients -- did all of these
     06        clients come to you through a referral from either
     07        Timeshare Compliance or RAG?
     08        A    Yes.  I believe so.
```

## Wyndham - Carlsbad

```
            09      Q    Can you name for me any one of those clients?
            10      A    Sure.  Sam Smith.  Carol Nagy.  I forget.
            11   Johnson.  A lot of them.  I mean, I can't remember all
            12   of them.
            13           But I do know of specific instances.  Like
            14   Mr. Smith, for instance, I know Mr. Smith had a
            15   50,000-dollar obligation with Wyndham.  And prior to
            16   contacting Timeshare Compliance or myself, he tried to
            17   enroll in Wyndham's Ovation program and he was told,
            18   sure, we'll let you out of your contract because we care
            19   about the happiness of our customers.  All you have to
            20   do is pay us $50,000 and we will let you out.
            21           And that client wasn't necessarily happy with
            22   that question.  He stopped making payments.  He
            23   contacted Timeshare Compliance, who referred him to me,
            24   I wrote a demand letter and a cease and desist letter.
```

### 36. PAGE 137:12 TO 138:02  (RUNNING 00:00:49.603)

```
            12      Q    Is it fair to say if I write down the entire
            13   list of Wyndham owners, you wouldn't be able to
            14   recognize the majority of these names?
            15           MR. WAGNER:  Object to the form.
            16      A    Probably.  That's probably a fair
            17   characterization.
            18   BY MR. QUINN:
            19      Q    How many of these Wyndham owners have you
            20   actually personally spoken with?
            21      A    Myself, John Slattery, probably less than
            22   five.
            23           I take that back.  Probably ten, five to ten.
            24           Well, actually, I take that back.  I know of
            25   five to ten that I've spoken to, but I've probably
   00138:01   spoken to more in the context of a client reaching out
            02   and asking for some assistance or some sort of update.
```

### 37. PAGE 140:09 TO 140:12  (RUNNING 00:00:12.811)

```
            09      Q    The money that you receive from timeshare
            10   owners, is that not deposited into a trust account or an
            11   IOLTA account?
            12      A    It is not deposited into an IOLTA account.
```

### 38. PAGE 148:06 TO 148:13  (RUNNING 00:00:26.827)

```
            06      Q    Did you ever place any restrictions on the
            07   manner in which Timeshare Compliance was advertising?
            08      A    No.
            09      Q    In hindsight, do you believe that you should
            10   have placed restrictions on the manner in which they
            11   were advertising?
            12           MR. WAGNER:  I'm going to object to the form.
            13      A    No.
```

### 39. PAGE 158:06 TO 158:07  (RUNNING 00:00:03.875)

```
            06      Q    All right.  So I'm going to show what you
            07   we'll mark as Exhibit 9.
```

### 40. PAGE 158:17 TO 159:18  (RUNNING 00:01:17.775)

```
            17      Q    So this is an exhibit that we had used in the
            18   deposition of Rich Folk, so you should have seen this
            19   before in the case.
            20      A    That's probably where I've seen it.
            21      Q    I bring it to your attention because
            22   June 20th, 2018 you sent an email from
            23   sslattery@ssdlawoffice.com --
            24      A    Right.
```

```
           25        Q    -- in which you said that:  "Vanessa, as you
 00159:01  know, we sent a factually based legal analysis and
       02  demand letter to El Dorado in August of 2017.  As is
       03  their practice, El Dorado has not responded.  Given the
       04  cost and futility of sending another letter into the El
       05  Dorado black hole, as well as the fact we have little to
       06  no leverage without a lawsuit, it is best to wait for El
       07  Dorado to foreclose/cancel the contract and rest on the
       08  protection of the trade block.  This file is not worthy
       09  of being the first against El Dorado.  Accordingly,
       10  there is no next step.  The best course of action is for
       11  the clients to monitor their credit to ensure the trade
       12  block is working."
       13             Do you remember writing that email?
       14        A    I do.
       15        Q    How many other customers or clients can you
       16  recall that you provided similar advice to that they
       17  should just rely on the trade block?
       18        A    That I have?  Probably the majority of them.
```

**41. PAGE 160:15 TO 160:16  (RUNNING 00:00:11.730)**

```
           15        Q    Next I'd like to show you what we've marked as
           16  Exhibit 8.
```

**42. PAGE 161:10 TO 161:14  (RUNNING 00:00:13.682)**

```
           10        Q    So once again this is another example of the
           11  SSD law office email account being used to conduct
           12  business with Timeshare Compliance, isn't that true?
           13             MR. WAGNER:  Object to the form.
           14        A    That's probably a fair assessment.
```

**43. PAGE 163:20 TO 163:24  (RUNNING 00:00:29.500)**

```
           20        Q    I'm going to show you what I've marked as
           21  Exhibit 27, which is Slattery Sobel DeCamp's answers to
           22  interrogatories.  Do you see that?
           23        A    Yeah.  If you could just minimize it just a
           24  bit.
```

**44. PAGE 175:25 TO 176:06  (RUNNING 00:00:26.384)**

```
           25        Q    All right.  So if you're getting upwards of 40
 00176:01  clients per month, around 500 clients a year, as you
       02  said, and these in-house attorneys, employees of yours,
       03  are engaged in other matters in addition to those, is it
       04  accurate that the independent contractor attorneys are
       05  performing most of the letter writing?
       06        A    Yes.
```

**45. PAGE 177:10 TO 177:20  (RUNNING 00:00:39.070)**

```
           10        Q    How are the independent contractor attorneys
           11  who draft these letters, how are they compensated?
           12        A    It varies.  But I think Trevor gets a hundred
           13  fifty dollars a letter and Kevin gets a hundred fifty
           14  dollars a letter.  And I'm not sure about Juan.  I don't
           15  know if he's at 125 or 150.
           16        Q    For the $150, is their only obligation to just
           17  draft that letter or do they have other duties in order
           18  to earn that money?
           19        A    Well, they need to do everything necessary to
           20  draft a letter up to our standards and what we expect.
```

**46. PAGE 181:14 TO 181:21  (RUNNING 00:00:54.063)**

```
           14        Q    I'm showing you now what we've marked as
           15  Exhibit 11.  Are you able to see that email?
```

## Wyndham - Carlsbad

```
    16      A    I do.
    17      Q    Do you remember sending that email?
    18      A    Yeah.
    19      Q    What was the purpose of sending that email?
    20      A    You can read it and see that I don't want
    21   clients without credit protection.
```

**47. PAGE 183:08 TO 183:12 (RUNNING 00:00:11.343)**

```
    08               Question:  Is that why you prefer to have
    09          clients that have accepted the credit protection,
    10          because of the negative credit consequences that
    11          might result from stopping payments?)
    12               THE WITNESS:  Yeah, that's fair.
```

**48. PAGE 184:18 TO 185:15 (RUNNING 00:01:26.670)**

```
    18      Q    Do you know whether your clients use
    19   Tradebloc?
    20      A    I think -- if you are -- Tradebloc is maybe
    21   the name of an entity, but it's also the name of a
    22   strategy.
    23           So if you're referring to the name of the
    24   company, yes, I believe some clients signed up with an
    25   entity called Tradebloc.
00185:01           If you're talking about the strategy, I talked
    02   about that before.  Some have, some do.  With respect to
    03   me, I don't want clients that don't have some sort of
    04   credit protection in place.
    05           And credit protection, again, it doesn't
    06   always work.  Like it's basically if a developer crosses
    07   the Ts and dots the Is in compliance with all the
    08   regulations concerning reporting and negative reporting,
    09   then, you know, you've got a different situation.
    10           But because of the established protocols that
    11   don't comply with the credit reporting laws, credit or
    12   trade block, using the strategy, has been pretty
    13   effective for my clients who have it.  Again, it
    14   minimizes the leverage that your client might have to
    15   extract payments from my client.
```

**49. PAGE 188:10 TO 189:03 (RUNNING 00:00:53.110)**

```
    10      Q    Have you ever spoken with a client who told
    11   you that they were told by Timeshare Compliance that
    12   they could safely stop making payments?
    13      A    Safely?
    14           That word throws me off, so no.  I mean,
    15   there's always peril in stopping making a payment.
    16   There's unpredictability.
    17      Q    All right.  So I'll remove that word.
    18           Has a client ever told that you somebody at
    19   Timeshare Compliance told them they could stop making
    20   their payments?
    21      A    They could stop making their payments?  I
    22   don't know if it's "could."  No, I don't know.  I don't
    23   recall.  I mean, anybody can stop making their payments.
    24           And especially if I've got a timeshare
    25   obligation that's fleecing me for a thousand dollars a
00189:01   month and I can't use that timeshare, I can't go to that
    02   timeshare, like, I don't know if I would be inclined to
    03   pay for it either.
```

**50. PAGE 193:21 TO 194:19 (RUNNING 00:01:06.710)**

```
    21      Q    Have you had clients whose interest has been
    22   foreclosed?
    23      A    Yes.
```

```
            24       Q    Did you represent those clients in the
            25  foreclosure proceeding?
    00194:01       A    No.
            02       Q    Why not?
            03       A    For numerous reasons.  It depends on the
            04  situation.  Is it a foreclosure out of state where I
            05  can't represent them.  Is it a foreclosure where they
            06  just want the points back and they're not going to be
            07  chasing any money.
            08            I mean, there's an incredible amount of
            09  variables, Counsel.
            10       Q    Have you ever represented a client in a
            11  foreclosure proceeding?
            12       A    No.  In what capacity?  Like challenge the
            13  foreclosure?  Like we want the timeshare obligation to
            14  send, so, no, I wouldn't go in there and say, no, you
            15  can't foreclose upon it.  So no.
            16            Many times a foreclosure is a timeshare
            17  resolution or a resolution of their timeshare
            18  obligation.  They foreclosed on it.  You don't have to
            19  pay for it anymore.
```

**51. PAGE 201:14 TO 202:05 (RUNNING 00:00:59.640)**

```
            14       Q    Do you have any issue with Timeshare
            15  Compliance telling your clients before they're referred
            16  to you that Timeshare Compliance will completely remove
            17  their liability from the contract?
            18       A    Am I okay with it or do I have an issue with
            19  it?  Is that the question?
            20       Q    Yeah.
            21       A    No, primarily because they're dealing with
            22  Timeshare and what Timeshare does for them is what
            23  Timeshare is going to do for them and what they
            24  negotiated for Timeshare to do.
            25            Those expectations, they don't carry over to
    00202:01  me.  And you can see from my retainer agreement where I
            02  make it very, very clear what I'm going to do.  That I
            03  don't guarantee any results, I'm not going to represent
            04  them in a lawsuit if they get sued, and a myriad of
            05  other things of what I do and what I don't do for $750.
```

**52. PAGE 203:21 TO 206:03 (RUNNING 00:02:59.770)**

```
            21       Q    No, no, no.  I'm asking whether it's
            22  reasonable to expect, do you expect that when the
            23  clients come to you that they would have already
            24  developed expectations as to what your service would
            25  entail based upon the communications that they had with
    00204:01  Timeshare Compliance?
            02            MR. WAGNER:  Object to the form.
            03       A    I don't know what their understanding is.
            04  That's why my retainer agreement, my discussions with
            05  them go through painstaking efforts to make sure they
            06  have the proper expectations of what I am going to do
            07  for them, what I can do for them and what I can't do for
            08  them for the cost of 750 bucks.
            09  BY MR. QUINN:
            10       Q    So I think that ultimately is the major issue
            11  here, which is if this client goes to Timeshare
            12  Compliance and pays them $23,000 and they're then
            13  referred to you and they pay an additional $750, don't
            14  you think that that $23,000 that they just paid would
            15  create some level of expectation as to what's going to
            16  actually happen to them?
            17            MR. WAGNER:  Object to the form.
            18       A    I can't speculate on what the clients think.
```

**Wyndham - Carlsbad**

```
            19   BY MR. QUINN:
            20       Q    Well, you're an attorney, right?
            21            Are you?
            22       A    Yeah.
            23       Q    You don't see any issue with the fact that a
            24   client that you're receiving and you're going to do work
            25   for for $750 just paid somebody else thousands of
00205:01    dollars to accomplish the same objective that you're
            02   claiming you're going to try to do?
            03            MR. WAGNER:  Object to the form.
            04       A    No, I don't, because the means by which you
            05   obtain that objection [sic] can take many forms, some of
            06   which don't include a fancy lawyer.
            07   BY MR. QUINN:
            08       Q    Why do you believe that the expectations that
            09   the timeshare owner may develop from speaking with
            10   Timeshare Compliance wouldn't carry over to you?
            11       A    What expectations are we talking about?
            12       Q    Well, you tell me.  You've got close to a
            13   thousand clients, 50 a month, 500 last year.  Wouldn't
            14   you know generally what their expectations are, having
            15   taken all of those clients in?
            16            MR. WAGNER:  Object to the form.
            17       A    To the extent that there's a disconnect of
            18   what their expectations are when they meet me, guess
            19   what, they don't retain me.  They go back to Timeshare
            20   Compliance and they get their money back.
            21            You're talking about hundreds of people that I
            22   have firsthand knowledge of where that's happened.  They
            23   come to me.  I explain to them what's going on.  They go
            24   back to Timeshare Compliance and they're no longer a
            25   client.  Thousands of dollars are refunded to clients
00206:01    that fall into that misunderstanding of any expectations
            02   on what they think they're going to do for their fee and
            03   what I'm going to do for mine.
```

**53. PAGE 206:12 TO 206:21 (RUNNING 00:00:24.661)**

```
            12       Q    You just said thousands of dollars have been
            13   refunded.  Why?
            14       A    Absolutely.  Thousands of dollars have been
            15   refunded.  I have refunded many of my fees even after
            16   writing -- fulfilling all of my obligations because I
            17   don't want people running around thinking that I did bad
            18   service for them.  And to cut them a check for their
            19   refund is -- I'm happy to do it.  I want all of my
            20   clients to be happy and content with what I'm doing for
            21   them.
```

**54. PAGE 210:25 TO 211:18 (RUNNING 00:01:03.053)**

```
            25       Q    All right.  This was marked as Exhibit 79 to
00211:01    the Rich Folk deposition.
            02            Did you see this call script during that
            03   deposition or thereafter?
            04       A    No, not this call script.  But if this is the
            05   one where Courtland was talking, if it's that, I heard
            06   it.
            07       Q    Are you under the impression that these call
            08   scripts were only used by Courtland on that one call?
            09       A    I don't know anything about call scripts.  I
            10   didn't even know what a call script was until this case.
            11       Q    So you never even inquired of Timeshare
            12   Compliance or RAG as to what it was they were telling
            13   people on the phone?
            14            MR. WAGNER:  I'm going to object to the form.
            15       A    Did I ever inquire?
```

```
           16             Well, I mean, by virtue of the numerous
           17   discussions I had an understanding of what they were
           18   trying to do.
```

**55. PAGE 211:20 TO 212:08  (RUNNING 00:00:54.930)**

```
           20        Q    Did you ever ask them for any information on
           21   what it was they were telling prospective
           22   timeshare-owner customers on the phone?
           23        A    You know, we had a real kind of upper-level
           24   conversation about other timeshare exit companies
           25   offering a money-back guarantee and the variety of legal
  00212:01   perspectives you could have on something like that.
           02             And, you know, my -- my out-loud thinking was
           03   I don't necessarily like the idea of you guys
           04   advertising a money-back guarantee because if after 18
           05   months somebody wants to get their money back, they're
           06   not going to get their money back, they're going to get
           07   somebody else's money back.  So just by that virtue it
           08   might be considered a Ponzi scheme.
```

**56. PAGE 222:11 TO 222:24  (RUNNING 00:00:46.059)**

```
           11        Q    Were you aware that during the sales pitch
           12   that Timeshare Compliance was engaged in they were
           13   informing the customers that they were going to have to
           14   pay the attorney a separate fee?
           15             MR. WAGNER:  Object to the form.
           16        A    I'd say yeah, I'd say yeah.  Like there needs
           17   to be a clear understanding that they are hiring an
           18   attorney under a separate agreement for separate
           19   services for a separate fee.
           20             So, yeah, I was aware that, you know,
           21   especially after the first three months where the
           22   clients were going to be paying me individually as
           23   opposed to as a check from them.  That's -- yeah, I
           24   would have been aware by virtue of that process change.
```

**57. PAGE 222:25 TO 223:15  (RUNNING 00:00:51.414)**

```
           25        Q    Below that it says:  "But here's the most
  00223:01   important part.  Once the attorney contacts your
           02   developer, the burden of your timeshare is off your
           03   shoulders.  From that point, your attorney will be on
           04   your side fighting for you."
           05        A    I see that.
           06        Q    How would the burden of the timeshare be off
           07   the owner's shoulders simply by the attorney contacting
           08   the developer?
           09             MR. WAGNER:  Object to the form.
           10        A    Yeah, I mean, I think it's accurate.  Like you
           11   basically -- you're lawyered up.  You've got your credit
           12   protection in place.  And the ball's in the developer's
           13   court.
           14             I don't know what the question was, but I'm
           15   okay with that.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:57:11.910)**