UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WYNDHAM VACATION OWNERSHIP,
INC., WYNDHAM VACATION
RESORTS, INC., WYNDHAM RESORT
DEVELOPMENT CORPORATION,
SHELL VACATIONS, LLC, SVC-
AMERICANA, LLC and SVC-HAWAII,
LLC,

      Plaintiffs,

v.                                                                                  Case No. 6:19-cv-1908-WWB-EJK

SLATTERY, SOBEL & DECAMP, LLP,
DEL MAR LAW GROUP, LLP,
CARLSBAD LAW GROUP, LLP, JL
"SEAN" SLATTERY, PANDORA
MARKETING, LLC, PANDORA
SERVICING, LLC, INTERMARKETING
MEDIA, LLC, KENNETH EDDY,
WILLIAM WILSON and RICH FOLK,

      Defendants.
_____/

## ORDER

THIS CAUSE is before the Court on the two-day, non-jury trial that commenced on November 3, 2022, on Plaintiffs' claims against Defendants Slattery, Sobel & Decamp, LLP ("**SS&D**"), Del Mar Law Group, LLP ("**Del Mar**"), Calsbad Law Group, LLP ("**Carlsbad**"), and JL "Sean" Slattery ("**Slattery**") (collectively, "**Lawyer Defendants**"). A default was entered against Defendants Pandora Marketing, LLC ("**Pandora Marketing**"), Pandora Servicing, LLC ("**Pandora Servicing**") (collectively, "**Pandora**"), and Intermarketing Media, LLC ("**Intermarketing**") (collectively with Pandora, "**Marketing Defendants**").

**I.      LEGAL STANDARD**

"In an action tried on the facts without a jury[,] . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). "The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury." *Men of Destiny Ministries, Inc. v. Osceola Cnty.*, No. 6:06-cv-624-Orl-31DAB, 2006 WL 3219321, at *3 (M.D. Fla. Nov. 6, 2006). Plaintiff bears the burden of establishing, by a preponderance of the evidence, each element of its claim. *Id.* "A 'preponderance of the evidence' . . . means an amount of evidence that is enough to persuade [the trier of fact] that the Plaintiff's claim is more likely true than not true." Pattern Jury Instructions (Civil Cases) of the Eleventh Circuit, Basic Instruction No. 3.7.1 (2013).

**II.     FINDINGS OF FACT**

Plaintiffs are in the business of selling and maintaining timeshares. Wyndham Vacation Ownership, Inc. ("**WVO**") is the parent company of Wyndham Vacation Resorts, Inc. ("**WVR**") and Wyndham Resort Development Corporation ("**WRDC**"). (Doc. 937 at 94:6–11). Shell Vacations, LLC ("**Shell Vacations**") is the parent company of SVC-Americana, LLC ("**SVC-Americana**") and SVC-Hawaii, LLC ("**SVC-Hawaii**"). (*Id.*). WVR, WRDC, SVC-Americana, and SVC-Hawaii sell and manage timeshares through legally binding contracts. (*Id*. at 95:21–97:1). WVR and Shell Vacations provide member services such as reservations, club activities, and marketing throughout the life of the ownership. (*Id.* at 96:20–97:8). The developers service the club and engage with owners for the ongoing life of the contract. (*Id.* at 97:9–16). After a timeshare owner purchases

2

their product, Plaintiffs communicate through newsletters to advertise new promotions and through telephone and e-mail to encourage them to utilize the timeshare. (*Id.* at 104:22–105:25).

Plaintiffs allege that by accepting timeshare exit referrals from Marketing Defendants, Lawyer Defendants harm Plaintiffs by participating in false advertisement related to Plaintiffs' timeshare contracts, conspiring with Marketing Defendants to interfere with the business relationship between the timeshare owners and Plaintiffs, and by violating Florida's Deceptive and Unfair Trade Practices Act. (*See generally* Doc. 36). Plaintiffs identified 215 owners that retained Slattery and that 227 contracts were thereby affected. (Doc. 939 at 190:8–14).

In May 2017, Slattery discussed with John Donboli using Del Mar for the timeshare business. (Doc. 981-11 at 2–3). At that time, Donboli expressed to Slattery his concerns about how the marketing was being conducted. (*Id.* at 3). Slattery, however, was not concerned and believed the business provided a good opportunity to generate revenue. (*Id.* at 3–4). Although Slattery had already formed SS&D, he wanted to run the timeshare clients through Del Mar so he could receive a better cut. (*Id.* at 4). Despite Donboli's concerns, Del Mar accepted timeshare referrals from June 2017 through February 2019. (Doc. 941 at 421:14–422:14). Twenty-three of those referrals are at issue in this case. (Doc. 932-2 at 1–4). Carlsbad began receiving timeshare referrals in March 2019 and continues to receive referrals. (Doc. 943 at 770:10–15). Carlsbad received referrals on 204 of the owners at issue. (Doc. 932-2 at 1–4). From October 2016 through February 2019, SS&D never represented any timeshare clients, did not receive a referral letter from any exit company, never received income related to timeshare work, and never had any

communication with Wyndham. (Doc. 941 at 418:19–419:5). Slattery is a partner of each of the three law firms involved in this litigation. (*Id.* at 416:8–9, 418:11–13, 420:14–15).

On March 2, 2017, Slattery learned of the timeshare exit process, which included providing a cease-and-desist letter, a recommendation to stop making payments, and credit repair. (Doc. 932-692 at 1–2; Doc. 941 at 405:7–408:12). Such process was set forth in Marketing Defendants' sales script used in their calls to potential clients:

> Now, here's the most important part: Once the attorney sends out a letter to your developer, you're out of your Timeshare because nobody should be contacting you whatsoever. That letter is going to tell Wyndham that they're only allowed to talk to our company and our attorney that is going to be representing this case.
>
> You're also going to call your credit card company and have them put a stop pay or do not honor on the card so they don't keep pulling money out of that every month, so you'll stop bleeding on that.
>
> So in a short period of time, you'll be done with the developer, you're not making any more payments, and your credit is preserved[.]

(Doc. 564-6 at 95:22–96:10, 166:4–19). The Court has already determined that the foregoing statement used in Marketing Defendants' scripts constitutes false advertisement. (Doc. 734 at 3, 11). Slattery admitted it is possible that Marketing Defendants are still using the same scripts. (Doc. 941 at 338:1–4). He also acknowledged that he is unable to accept referrals that have been acquired via false and misleading advertising. (*Id.* at 341:5–11). Yet, he has not made any effort to inform himself of Marketing Defendants' current advertising scheme. (*Id.* at 341:9–14). Slattery even stated, "I would be okay with an injunction preventing me from accepting clients that were a result of false and misleading advertising." (*Id.* at 343:10–13).

The Marketing Defendants testified that Slattery does in fact know how they are marketing their services, and he has not placed any restrictions on advertising. (Doc.

981-4 at 2; Doc. 981-5 at 2).  Deborah Gonzalez White, a former Del Mar employee, attended meetings with Slattery, Wilson, and Folk, in which they discussed general procedures.  (Doc. 981-13 at 2).  Also, Slattery either drafted or worked on a letter to be sent by Marketing Defendants that informed their clients that even though they had not received confirmation from the developer, the clients "should consider [themselves] released from [their] timeshare."  (Doc. 941 at 393:1–7).  Slattery also stated in an e-mail that he explained to a client that the credit protection provided by Marketing Defendants "makes the foreclosure an exit."  (*Id.* at 401:4–15; Doc. 932-690 at 1).  Similarly, an employee of Carlsbad told a Pandora Marketing representative that the law firm highly encouraged the clients to use the credit repair "because without it I kind of feel like we're all kind of really not doing much for them."  (Doc. 941 at 402:18–403:18).

The evidence further establishes that Slattery's relationship with the Marketing Defendants extends beyond merely accepting referrals.  There was testimony from Marketing Defendants that the attorney provides the resolution to the timeshare exit.  (Doc. 981-4 at 3).  In fact, Pandora advertises an outcome that is being provided by the lawyers. (*Id.*).  Initially, Slattery received his fee from the Marketing Defendants, but after speaking to an ethics lawyer who suggested that it could be construed as fee-splitting, Marketing Defendants instructed its clients to pay Slattery directly.  (Doc. 941 at 373:12–374:3).  Despite receiving his fee directly, Slattery negotiated the fee he would charge his timeshare clients with Marketing Defendants.  (*Id.* at 365:20–366:11).  In fact, Slattery's request for a higher fee was rejected by Marketing Defendants' fear that timeshare clients would not accept Marketing Defendants' services, evincing that Slattery was integral to Marketing Defendants' scheme.  (Doc. 932-695 at 1–2).

5

After signing the Services Agreement, the client signs Slattery's retainer agreement and pays the $750 fee to Slattery. (Doc. 941 at 428:1–13). The retainer agreement includes a paragraph that there is no guarantee that the contract will be cancelled. (*Id.* at 428:17–429:4). Slattery stated that there have been occasions where the language in his retainer agreement is inconsistent with the client's understanding from Marketing Defendants, but that the retainer agreement reconciles "whether the client signs up with [him] or cancels from [Marketing Defendants]." (*Id.* at 429:5–14). The retainer letter advises the timeshare owner that the firm will send a cease-and-desist letter and a detailed demand letter to resolve the client's "situation to the degree possible." (*Id.* at 430:22–432:1, 432:21–24). Slattery sets forth in the retainer agreement the services that he will provide and that his relationship with the owners is separate from Marketing Defendants. (Doc. 981-14 at 5–7).

The timeshare owners, however, do not speak with an attorney when they sign the retainer agreement or before the cease-and-desist letter is sent. (Doc. 941 at 444:13–446:4). Rather, once the clients sign up with Marketing Defendants, they are placed on a Google Drive shared by Lawyer Defendants and Marketing Defendants. (*Id.* at 427:18–23). Lawyer Defendants then obtain the information from Marketing Defendants to draft the letters. (Doc. 981-13 at 5). Regardless of the location of the client and their timeshare, every demand letter references California law because Slattery is only licensed in California and because he believes that if a developer has any relationship in California, California law applies to their actions in every other state. (Doc. 941 at 446:19–447:12). And while Slattery agrees that he has a duty of candor to his clients as a member of the California Bar, his retainer agreement does not alert his clients that he is only

6

licensed to practice in California.  (*Id.* at 326:18–22, 444:5–12).  As for the total amount of legal fees paid, the parties stipulate that the relevant owners paid Lawyer Defendants $156,750.00.  (*Id*. at 323:16–18).

Plaintiffs were suspicious of the letters signed by Slattery because the timeshare owners were not located in California, and he and his firms did not have any "expertise in the timeshare space."  (Doc. 937 at 111:4–16).  Nonetheless, Wyndham initially investigated sixteen letters from Slattery's firm but were unable to substantiate any of the claims. (*Id.* at 113:2–15).  Wyndham did, however, allow several of the sixteen timeshare owners identified in the letters to exit their timeshare.  (*Id.* at 113:7–18).  Ultimately, Wyndham stopped reviewing Slattery's letters in Fall 2018.  (*Id.* at 113:22–114:16).  Undeterred, Slattery continued to send the letters.  (*Id.* at 114:17–20).  And despite knowing Wyndham would no longer respond to his letters, Slattery did nothing further beyond sending the letters as set forth in the retainer agreement, (Doc. 941 at 327:10–15, 328:19–21, 433:11–434:1), and considered foreclosure a resolution to the timeshare obligation, (Doc. 981-14 at 15).

Once the timeshare owner retains Slattery and the letters are sent, Wyndham loses its opportunity to reengage the timeshare owner to resolve the issues.  (Doc. 937 at 116:14–117:6, 163:12–164:3).  Specifically, Wyndham is prohibited from offering options under their Financial Hardship program for timeshare owners who have a loan balance but can no longer afford their timeshare.  (*Id.* at 108:16–109:2).  In addition to losing their ability to communicate with their timeshare owners, the timeshare owners can no longer use their timeshares pursuant to Pandora Marketing's Services Agreement.  (Doc. 932-638 at 5; Doc. 939 at 270:3–19).  Wyndham suffers a loss when the timeshare

7

owner does not utilize his timeshare. (Doc. 937 at 162:24–163:11). And Wyndham suffers further harm once a timeshare owner becomes delinquent because it must expend money and resources to collect the debt and pays costs associated to foreclose on the timeshare. (*Id*. at 160:22–161:14). In addition to the costs to remarket the defaulted timeshare, Wyndham must also pay the maintenance fees. (*Id.* at 161:15–162:4).

As for payments, Slattery advised the clients that it was their choice to stop making payments based on their personal needs, but he accepted referrals from Marketing Defendants that do so advise. (Doc. 941 at 436:8–437:2, 451:14–452:5). Slattery, however, believed that clients would not get the developers' attention if they kept paying because his clients that continued to pay were not released from their timeshares. (*Id.* at 438:5–25). Although Slattery felt that some of the fees charged by the Marketing Defendants were outrageous (for example, Terry Lite paid Pandora Marketing $39,279.49 to default on his timeshare obligation), he never so informed his clients. (*Id.* at 326:11–17; Doc. 939 at 269:2–8).

On these facts, Plaintiffs allege three counts against Lawyer Defendants: Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count II); Tortious Interference with Contractual Relations (Count IV); Violation of Florida's Deceptive and Unfair Trade Practices Act ("**FDUTPA**") (Count V); and Civil Conspiracy to Commit Tortious Interference (Count VI). (Doc. 36 at 39–52). Plaintiffs seek disgorgement damages and a permanent injunction. (*See id.* at 52).

## III.   STANDING

The Court finds that Plaintiffs have standing to sue Lawyer Defendants. Much ado was made about which entity owned the loans at the time the injury occurred or when the

8

lawsuit was filed.  Although Plaintiffs presented evidence that they repurchased the subject loans that were securitized[1] prior to filing the Amended Complaint, the Court finds that ownership of the loans is not required to establish an actual controversy.  The evidence is uncontroverted that the timeshare owners' beef was with Plaintiffs, Marketing Defendants focused their false advertisement on Plaintiffs, and Lawyer Defendants directed their correspondence to Plaintiffs.  Although the loans were securitized, Plaintiffs continued to service the timeshares themselves and kept in contact with the timeshare owners.

The Court also rejects Lawyer Defendants' argument that the judgment must be entered against SVC-Americana and SVC-Hawaii because neither have obtained a certificate of authority to transact business in Florida and have failed to comply with section 605.0904(1), Florida Statutes.  SVC-American and SCV-Hawaii may pursue claims arising under federal law pursuant to Federal Rule of Civil Procedure 17(b)(3)(A) along with any supplementary state law claims.  *See Reviv IP, LLC v. Revive Health &*

---

[1] Wyndham Consumer Finance. Inc. ("**WFO**"), a third party, services the loans and maintenance fees.  (Doc. 937 at 95:1–7).  There are also securitization SPEs that buy the loans when they are securitized.  (*Id.* at 95:8–11).  Plaintiffs securitize certain loans by selling them to a third party, but the timeshare ownership is not securitized.  (*Id.* at 150:24–151:3, 152:21–23).  If a securitized loan defaults, Wyndham repurchases the loans, moves it back to WFO, and then back to the developer entities.  (*Id.* at 152:2–8).  While WFO is not contractually obligated to repurchase a securitized loan that is in default, the loan would "sit . . . in limbo indefinitely . . . in a special purpose entity that doesn't have any operations to recover the inventory."  (*Id.* at 153:9–16).  In other words, to recoup the inventory Wyndham must repurchase it.  (*Id.* at 153:17–20).  Wyndham also receives a residual interest on the securitized loans that are not in default.  (*Id.* at 153:21–154:11).  Anything that went delinquent prior to July 22, 2019, was repurchased before filing the lawsuit.  (*Id.* at 155:12–156:6).  Indeed, 227 loans were repurchased by the developers prior to the lawsuit being filed.  (*Id.* at 157:6–158:15; Doc. Nos. 932-274–932-495).

*Wellness Stuart, LLC*, No. 19-62923-CIV, 2020 WL 4936987, at *2 (S.D. Fla. Aug. 24, 2020).

## IV. CLAIMS

### A. Contributory False Advertising (Count II)

The Court granted summary judgment as to the first four elements of the Lanham Act claim—specifically finding that Marketing Defendants' solicitations were misleading, had the capacity to deceive timeshare owners, the deception had a material effect on the timeshare owners' decisions to pay for the Marketing Defendants' services, which includes Lawyer Defendants' services, and the misrepresentations affect interstate commerce. (Doc. 734 at 10–11); *see, e.g.*, *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).

Because Count II alleges a contributory claim, Plaintiffs must still prove that Lawyer Defendants contributed to Marketing Defendants' misrepresentations. To do so, Plaintiffs must establish: (1) that the "third party in fact directly engaged in false advertising that injured the plaintiff" and (2) "that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015). Contribution can be proven by showing that Lawyer Defendants "intended to participate in or actually knew about the false advertising." *U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, 524 F. Supp. 3d 1320, 1329–30 (S.D. Fla. 2021) (quoting *Duty Free Ams.*, 797 F.3d at 1277). "The plaintiff must also [prove] that the defendant actively and materially furthered the unlawful conduct—either by inducing it, causing it, or in some other way working to bring it about." *Id.* (quoting *Duty Free Ams.*, 797 F.3d at 1277). "[T]he Eleventh Circuit

specifically found it 'conceivable that there could be circumstances under which the provision of a necessary product or service, without which the false advertising would not be possible, could support a theory of contributory liability.'" *Bluegreen Vacations Unlimited, Inc. v. Timeshare Lawyers P.A.*, No. 20-24681-Civ, 2023 WL 3198192, at *13 (S.D. Fla. May 2, 2023) (quoting *Duty Free Ams.*, 797 F.3d at 1277).

Here, there is evidence that Slattery and his law firms materially participated in Marketing Defendants' false advertisement to the extent that Marketing Defendants cannot sell their services without Lawyer Defendants and Lawyer Defendants would not be representing timeshare owners without Marketing Defendants' referrals. *U.S. Structural Plywood*, 524 F. Supp. 3d at 1333 (finding that because the third party and the defendants would be out of business without the false advertising, it was hard to suggest that the false advertisements did not advance the defendants' business interests). The evidence further establishes that Slattery was aware of Marketing Defendants' process, knew of their deceptive sales practices, took no action to correct the deception, and instead continued to accept Marketing Defendants' referrals. Moreover, Lawyer Defendants participated in the false advertisement by accepting the referrals and sending the cease-and-desist letters to Plaintiffs—the step that Marketing Defendants advertised to consumers released the timeshare owners from their timeshare obligations. *See Bluegreen Vacations*, 2023 WL 3198192, at *13 (finding sufficient evidence that "Marketing Defendants' entire scheme would fall short without the services of the Lawyer Defendants"). Although, Slattery testified that his agreement offered no guarantee, such agreement only came after the timeshare owners had paid thousands of dollars to Marketing Defendants based on the representation that Slattery's letter was necessary to

11

terminate the timeshare. In addition, Slattery's alleged ignorance to Marketing Defendants' advertisement is no defense. It has been held that "'looking the other way' easily satisfies the 'material participation'" standard. *U.S. Structural Plywood*, 524 F. Supp. 3d at 1332 (quoting *Duty Free Ams.*, 797 F.3d at 1277). Finally, Plaintiffs were damaged by the false advertisement because once the timeshare owners were enticed by the false advertisement to pay for Defendants' services, Plaintiffs could no longer reach out to the timeshare owners to offer a remedy and the timeshare owners were bound by their contract with Marketing Defendants to no longer use their timeshares. Accordingly, the Court finds that Plaintiffs have been injured by Lawyer Defendants' contribution to Marketing Defendants' false advertisement and that a permanent injunction is warranted.

If a party establishes a false advertising violation under the Lanham Act, the party "shall be entitled, . . . subject to the principles of equity, to recover . . . defendant's profits[.]" *TB Food USA, LLC v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29NPM, 2022 WL 3028061, at *18 (M.D. Fla. Aug. 1, 2022) (citing 15 U.S.C. § 1117(a)). As long as the amount of profits is not speculative, the Lanham Act permits the disgorgement of profits without proof of particular financial harm. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019). Thus, the Court finds that Plaintiffs are entitled to a disgorgement award in the amount of $156,750.00, the amount of profits stipulated to by the parties.

  **B.  Civil Conspiracy to Commit Tortious Interference (Count VI)**

In Florida, "to state a claim for civil conspiracy, [Plaintiffs'] must allege '(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by

12

unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff[s] as a result of the acts done under the conspiracy.'" *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)). "[T]here is no freestanding cause of action in Florida for 'civil conspiracy.'" *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. 2d DCA 2022) (quoting *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019)). Instead, "the allegations of conspiracy permit the plaintiff to hold each conspirator jointly liable for the actions of the coconspirators." *Id.* (quotation omitted). "Significantly, '[a] conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy. The conspirator need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Id.* (quoting *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987)); *see also Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014); *Bluegreen Vacations*, 2023 WL 3198192, at *15. "[T]he existence of a conspiracy may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Lucky Cap. Mgmt., LLC v. Miller & Martin, PLLC*, 762 F. App'x 719, 727 (11th Cir. 2019) (quotation omitted).

Plaintiffs allege tortious interference with business relationships as the underlying tort. Under Florida law, to prove tortious interference with a business relationship Plaintiffs must prove: "(1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the

13

breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (quotation omitted). "[W]here the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used." *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) (citations omitted).

Here, there was an agreement between Lawyer Defendants and Marketing Defendants that Lawyer Defendants would send a cease-and-desist letter and demand letter to Plaintiffs under false pretenses—that doing so would facilitate a timeshare exit from timeshares sold and maintained by Plaintiffs. Defendants knew that a business relationship existed between the timeshare owners and Plaintiffs. Lawyer Defendants, knowing there would be no response from Plaintiffs, intentionally sent cease-and-desist letters and baseless demand letters, that effectively ended any business relationship between Plaintiffs and the timeshare owners. Lawyer Defendants did so with knowledge that the promises made by Marketing Defendants to the timeshare owners were false and misleading. In sum, Lawyer Defendants were "knowingly helping to further the unlawful acts of [Marketing Defendants]" to interfere with business relationships between Plaintiffs and timeshare owners. *Logan*, 350 So. 3d at 414.

Slattery's defense suggested that Wyndham should have advised the timeshare owners that Plaintiffs would simply take the timeshare property back and release the owners in the event of a default or that they would not seek a deficiency judgment in the event of foreclosure. (Doc. 939 at 219:25–220:18). Yet, Slattery offered no explanation for why he, as their attorney, did not offer such advice. Instead, he intentionally took referrals knowing the timeshare owners were paying Marketing Defendants what were,

14

sometimes, exorbitant fees when his clients could have simply stopped paying for free. *See Logan*, 350 So. 3d at 414 (finding that the defendant's refusal to disclose the co-conspirator's wrongdoing and participating in related litigation were not acts of diligent representation but rather acts of a coconspirator attempting to keep his own role in the conspiracy from becoming known).

Finally, Plaintiffs were damaged by the interference because they could no longer communicate with the timeshare owners in order to maintain their business relationship and were ultimately forced to pay to initiate foreclosure proceedings and remarket the defaulted timeshares facilitated by Defendants. Accordingly, the Court finds a permanent injunction is warranted.

## V.     Violation of FDUTPA (Count V)

"FDUTPA prohibits '[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (quoting Fla. Stat. § 501.204(1)). In order to prove a FDUTPA claim a plaintiff must prove that the defendant engaged in a deceptive act or unfair practice that caused actual damages. *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 212 (Fla. 4th DCA 2019).

"[A]n entity does not have to be a consumer to bring a FDUTPA claim, [but] it still must prove the elements of the claim, including an injury to a consumer." *Id.*; *Orange Lake Country Club, Inc. v. Castle Law Grp., P.C.*, No. 6:17-cv-1044-Orl-31DCI, 2018 WL 1535719, at *5 (M.D. Fla. Mar. 29, 2018); *see also* Fla. Stat. § 501.211(2) (stating that "[i]n any action brought by a *person* . . . , such *person* may recover" (emphasis added)). Further, although "[l]awyers acting to exercise a legal remedy are typically not considered

15

to be engaged in trade or commerce[,]" "[l]awyers are not *per se* exempt from FDUTPA." *Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-cv-576-Orl-28DCI, 2020 WL 6585802, at *7 (M.D. Fla. Nov. 10, 2020) (citing *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1371 (S.D. Fla. 2009).

"To satisfy the first element, the plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Carriuolo*, 823 F.3d at 983–84 (quoting *Florida v. Com. Com. Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. 1st DCA 2007)). "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). "This is an objective test, i.e., a party asserting a deceptive trade practice need not show actual reliance on the representation or omission at issue." *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1363 (M.D. Fla. 2019) (quotation omitted). It has been held that evidence of a lawyer who represents to his client that a mere letter will relieve a timeshare owner of its contractual obligation satisfies the first element of a FDUTPA claim. *See id.* at 1364; *Bluegreen Vacations*, 2023 WL 3198192, at *16–18 ("Contrary to the Lawyer Defendants' assertion, however, the conduct at issue does not pertain to their legal practice, but instead to their close involvement in, and facilitation of, the Marketing Defendants' business scheme."). Further, it is undisputed that at least one of Lawyer Defendants' clients, Terry Lite, resides in Florida. FDUTPA "applies to practices directly affecting Florida consumers" and "there is no requirement

16

that the problematic conduct occur[ ] entirely within Florida." *Bluegreen Vacations*, 2023 WL 3198192, at *16–18 (internal quotations and citations omitted).

As for causation and harm, Terry Lite—and others—accepted Lawyer Defendants' representation based on Marketing Defendants' representations and relied on their services as a legal means to exit his timeshare and defaulted on his obligations. Thus, the evidence demonstrates that Defendants' practices were deceptive to objectively reasonable consumers. *See id.* Finally, Plaintiffs have established they were harmed by Lawyer Defendants' deception based on the costs to repossess and resell the timeshare interests associated with the defaulted loans. Based on the foregoing, the Court finds that injunctive relief under FDUTPA is warranted. *See Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012) (reiterating that "[s]ection 501.211(1), Florida Statutes, permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future.").

## VI. CONCLUSION

Having carefully considered the evidence presented at trial, the Court finds in favor of Plaintiffs, and against Defendants Slattery, Sobel & Decamp, LLP, Del Mar Law Group, LLP, Carlsbad Law Group, LLP, and JL "Sean" Slattery, as to Counts II, V, and VI. Plaintiffs are entitled to a disgorgement award in the amount of $156,750.00. On or before **August 18, 2023**, Plaintiffs shall submit a proposed permanent injunction in accordance with this Order.

**DONE AND ORDERED** in Orlando, Florida on August 7, 2023.


_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record